Marla H. Kanemitsu (CA Bar No. 220703)
kanemitsum@dicksteinshapiro.com
DICKSTEIN SHAPIRO LLP
2049 Century Park East, Suite 700
Los Angeles, CA 90067-3109
Telephone: (310) 772-8300
Facsimile: (310) 772-8301

*Attorney for Plaintiff*
*Foster Poultry Farms, Inc.*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
(Fresno Division)

| | |
|---|---|
| FOSTER POULTRY FARMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> XL INSURANCE AND CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, <br><br> Defendants. | CASE NO. _____ <br><br> **COMPLAINT FOR:** <br> **1. DECLARATORY JUDGMENT** <br> **2. BREACH OF CONTRACT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff, FOSTER POULTRY FARMS, INC. (hereinafter "Foster"), by and through its attorneys, hereby files this Complaint against the Defendants, XL INSURANCE and CERTAIN UNDERWRITERS AT LLOYD'S, LONDON (collectively, "XL"), and respectfully alleges as follows:

## **INTRODUCTION**

1. This is an action for declaratory judgment brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, *et. seq.*; for damages for breach of contract; and for further necessary and appropriate relief.

2. At its core, this is an action against XL Insurance and Certain Underwriters at Lloyd's, London, insurance companies, for their improper denial of insurance benefits under a Product Contamination Policy – Food and Beverage (hereinafter "the Policy") that Foster purchased

for a premium of nearly Six Hundred Thousand Dollars ($600,000.00) and for which the defendants each individually subscribed.

3. Foster is a family-owned producer of high-quality poultry products in the United States.

4. Foster suffered substantial monetary losses as a result of a Notice of Suspension initiated by the Food Safety and Inspection Service (hereinafter "FSIS") of the United States Department of Agriculture that resulted in the closure of one of its California facilities and the destruction of 1.3 million pounds of contaminated food product.

5. Foster timely sought coverage from XL under the Policy for its directly related losses, including, but not limited to, costs associated with the withdrawal, destruction, and disposal of adulterated products; lost profits; increased operating costs; and expenses associated with customer shortages and other third-party liabilities.

6. Foster's claim for its reasonable and necessary losses arising from the Notice of Suspension was wrongfully denied by XL in direct contravention of the plain meaning of the terms and conditions of the Policy and controlling law.

## PARTIES

7. Foster Poultry Farms, Inc. is a California corporation having its principal place of business at 1000 Davis Street, Livingston, California 35334-0457.

8. Upon information and belief, Defendant XL Insurance is a global insurance company, incorporated under the laws of a foreign sovereign with its principal place of business in Dublin, Ireland, and executive offices in Hamilton, Bermuda, and Stamford, Connecticut. Upon information and belief, Defendant XL Insurance is licensed to do business, and does business, in California through at least three (3) office locations in California.

9. Upon information and belief, Defendants Certain Underwriters at Lloyd's, London, are an association of underwriters and/or individual insurance companies existing under the laws of

the United States or the laws of a foreign sovereign that sold or subscribed to the Policy, and consist of XL Syndicate 1209 (Lloyd's), Ark Syndicate 4020 (Lloyd's), and Syndicate 1206 (Lloyd's). Upon information and belief, Defendants Certain Underwriters at Lloyd's, London, are licensed to do business, and do business, through their respective agents in California.

## JURISDICTION AND VENUE

10. This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1332. Complete diversity of citizenship exists between the parties, and the amount in controversy, as set forth in more detail below, is in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

11. Plaintiff brings this action pursuant to 28 U.S.C. § 2201 and Rules 3 and 57 of the Federal Rules of Civil Procedure.

12. This court has personal jurisdiction over XL because XL's business activities are conducted within the territorial confines of this judicial district and division. Moreover, the Policy contains a Service of Suit Clause in which XL contractually agreed to submit to the jurisdiction of any court of competent jurisdiction within the United States.

13. Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 1391(a) and (b) because this is a civil action and a substantial part of the events giving rise to this claim occurred in this district.

## FACTUAL BACKGROUND

**The Insurance Policy**

14. XL sold Foster the Policy on or about May 25, 2013.

15. A true and correct bates stamped copy of the Policy is attached hereto as Exhibit 1.

16. The Policy is a standard-form policy drafted by the insurance industry and/or contains language drafted by XL.

17. Foster was obligated to pay a premium of nearly Six Hundred Thousand Dollars ($600,000.00) as set forth in the Policy, and Foster paid the premium due.

18. In exchange for the premium paid, XL contractually agreed "to reimburse [Foster] for all or any **Loss** arising out of **Insured Events** first discovered during the **Policy Period** and reported to [XL] during the **Policy Period**." *See* Ex.1 at Bates No. FPF000010.

19. Item 5 of the Policy's Schedule lists the "Policy Period" as May 25, 2013 through May 24, 2014.

20. The Policy defines "**Insured Events**" as: "**Accidental Contamination**," "**Malicious Contamination**," "**Product Extortion**," and "**Government Recall**." *See* Ex. 1 at Bates No. FPF000012, as modified by the Government Recall Endorsement at Bates No. FPF000023.

21. The Policy then defines "**Accidental Contamination**," in relevant part, as:

> Error in the manufacture, production, processing, preparation, assembly, blending, mixing, compounding, packaging or labelling (including Instructions for use) of any **Insured Products**, or
>
> the introduction into an **Insured Product** of an ingredient or component that is, unknown to the **Insured**, contaminated or unfit for its intended purpose, or
>
> error by the **Insured** in the storage or distribution of any **Insured Products** whilst in the care or custody of the **Insured**
>
> provided that the use or consumption of such **Insured Products** has led to or would lead to:
>
> i) bodily injury, sickness, disease or death of any person(s) or animal(s) physically manifesting itself within 365 days of use or consumption, or
>
> ii) physical damage to or destruction of tangible property (other than the **Insured Products** themselves).

*See* Ex. 1 at Bates No. FPF000011.

22. The Policy defines "**Government Recall**," in relevant part:

    1. The recall of **Insured Products** which has been initiated

        (a) voluntarily by the **Insured**, or

        (b) as a result of an order by the Food and Drug Administration, the United States Department of Agriculture, the Canadian Food Inspection Agency or any other US or Canadian state or regulatory body with similar authority with regard to food safety (Regulatory Bodies), and

where either (a) or (b) above arise directly from a determination by the Regulatory Bodies that there is a reasonable probability of **Insured Products** causing serious adverse health consequences or death to humans or animals, or have otherwise been classified as Class I or Class II by the Regulatory Bodies, or

    2. any order of suspension of registration of any of the **Insured's** facilities or operations, only in conjunction with or following the recall of **Insured Products** per item 1. above, which arises directly from a determination by the Regulatory Bodies, that **Insured Products** which have been manufactured, processed, packed, received or held by the **Insured** at the same suspended facilities or operations have a reasonable probability of causing serious adverse health consequences or death to humans or animals, or have otherwise been classified as Class I or Class II by the Regulatory Bodies, or …

*See* Ex. 1 at Bates No. FPF000023.

23. The Policy defines "**Loss**" as:

[T]he following reasonable and necessary expenses incurred by the **Insured** within twelve months after the discovery by the **Insured** of an **Insured Event** . . . and which arise solely and directly out of such **Insured Event**:

A. **Pre-Recall Expenses**;

B. **Recall Expenses**;

C. **Third Party Recall Expenses**;

D. **Loss of Gross Profit**;

E. **Rehabilitation Expenses**;

F. **Increased Cost of Working**;

G. **Product Extortion Demand**.

*See* Ex. 1 at Bates No. FPF000010.

24. The Policy then defines each of these enumerated types of "**Loss**" with its own definition.

25. For example, "**Recall Expenses**" is defined as:

> The following costs and expenses reasonably and necessarily incurred by the **Insured** arising solely and directly out of an **Insured Event** for the purposes of or in connection with recalling, withholding, reworking, destroying or replacing **Contaminated Products**:
>
> i) expenses of communications including emergency incident phone lines, public relations specialists, radio, television, internet and media announcements, newspaper and magazine advertising;
>
> ii) transportation costs in recalling and/or withdrawing **Contaminated Products**;
>
> iii) expense for rent or hire of additional warehouse space;
>
> iv) the cost of hire of additional persons, other than regular employees of the **Insured**, and of additional accommodation of such persons;
>
> v) remuneration paid to employees of the **Insured** for overtime;
>
> vi) out of pocket expenses incurred by personnel under paragraphs (iv) and (v) above, including transportation, other than to and from the employees' normal place of work;
>
> vii) Reasonable [sic] and necessary costs incurred by retailers, wholesalers and distributors which are devoted exclusively to recalling **Contaminated Products** on behalf of the **Insured**;
>
> viii) costs incurred by the **Insured** for the physical examination, reworking, relabelling [sic] and/ or destruction and disposal of **Contaminated Products**, including destruction and disposal of packaging and labelling material that cannot be reused;
>
> ix) costs incurred by the **Insured** in redistributing reworked or relabeled products provided that the cost of reworking and redistribution does not exceed the cost of replacing the **Contaminated Products**;
>
> x) costs incurred by the **Insured** in replacing **Contaminated Products** which have been or will need to be disposed of or destroyed and delivering them to customers or their nominated agents, or costs incurred by the **Insured** for reimbursing the value of such **Contaminated Products**, upon the amount received by or due to the **Insured** for such **Contaminated Products**, should replacement not be possible;

xi) similar directly related expenses.

*See* Ex. 1 at Bates No. FPF000014.

**The Insured Event (i.e. The Notice of Suspension)**

26. On January 8, 2014, the FSIS issued a Notice of Suspension to Foster at Foster's facility located at 843 Davis Street, Livingston, California.

27. A true and correct bates stamped copy of the Notice of Suspension is attached hereto as Exhibit 2.

28. The Notice of Suspension indicated that the FSIS would begin withholding marks of inspection and suspending the assignment of inspectors at Foster's Livingston facility in accordance with Title 9 Code of Federal Regulations, Part 500.3(a)(4). *See* Ex. 2 at Bates No. FPF000040.

29. The Notice of Suspension was issued as a result of a series of documented findings of German cockroach activity at the facility.

30. The Notice of Suspension outlined at least four (4) separate incidences of German cockroach sightings, including:

   A. September 14, 2013 – A German cockroach observed on the production floor in Plant 1 near the liver tumbler area;

   B. November 4, 2013 – A German cockroach observed in Plant 2 on the wall by the ice machine during production;

   C. December 28, 2013 – A German cockroach observed on a faucet in Plant 1;

   D. January 7, 2014 – A German cockroach was observed on gray plastic tub that was in direct product contact.

31. The FSIS concluded that Foster's Livingston facility had failed to prevent "insanitary conditions" and that such failure on the part of Foster prevented it from producing "wholesome, unadulterated meat and poultry products." *See* Ex. 2 at Bates No. FPF000040.

32. Based on this initial finding, the FSIS ordered a complete shutdown of all operations at the Livingston facility.

33. In accordance with the Poultry Products Inspection Act, 21 U.S.C. § 451, *et seq*., the Notice of Suspension also outlined a list of corrective actions Foster was required to take to reinstate the inspectors at its Livingston facility. *See* Ex. 2 at Bates No. FPF000043.

34. Concerned that Foster's products were produced under insanitary conditions, the FSIS eventually required Foster to dispose of 1.3 million pounds of its Insured Product.

35. Foster was required to fully and completely comply with this mandatory requirement before the FSIS would reinstate the assignment of inspectors and stamps of inspection and permit the reinstatement of operations at the Livingston facility.

36. Accordingly, the Livingston facility was in intermittent operation from January 8, 2014 through January 21, 2014.

37. The Livingston facility finally resumed operations on January 21, 2014.

38. As a result of the Notice of Suspension, Foster incurred significant covered losses, including, but not limited to, directly related expenses such as fumigation services; costs associated with the withdrawal, destruction, and disposal of adulterated products; lost profits; increased operating costs; and expenses associated with customer shortages and other third-party liabilities.

39. Foster suffered monetary damages of approximately Fourteen Million One Hundred Fifty Seven Thousand Nine Hundred Eighty Five Dollars ($14,157,985.00) as a result of the cockroach infestation that led to the Notice of Suspension.

**The Insurance Claim**

40. Foster notified XL about the Notice of Suspension in a series of communications, both written and oral, that commenced within hours of the FSIS's suspension of operations at Foster's Livingston facilities.

41. The first such communication was an email to XL dated January 9, 2014, from Mark Colgate of RKH Insurance Brokers ("RKH"), the London-based surplus lines broker who assisted Foster and its domestic insurance broker, Wells Fargo, with the placement of the Policy.

42. A true and correct bates stamped copy of the January 9, 2014 email to XL is attached hereto as Exhibit 3.

43. Numerous additional communications and telephone calls followed as Foster, through its representatives at Wells Fargo and RKH, provided extensive information to XL about the facts and circumstances surrounding the Notice of Suspension and its financial cost to Foster.

44. The cockroach infestation giving rise to the Notice of Suspension at the Livingston facility satisfies the Policy's separate provisions providing coverage for "Accidental Contamination" and "Government Recall."

45. In connection with the Policy's "Accidental Contamination" coverage, the infestation and resulting Notice of Suspension was clearly an "error" on the part of Foster that occurred in the "manufacture, production, processing, [and] preparation," as well as "the storage [and] distribution" of Foster's Insured Products and the FSIS's letters are proof that such error would lead to "bodily injury, sickness, [and/or] disease" if those products were consumed. *See* Ex. 1 at Bates No. FPF000011.

46. The infestation and resulting Notice of Suspension also trigger coverage under the Policy's "Government Recall" provisions because the FSIS's January 8, 2014 letter makes clear that

the FSIS was withholding marks of inspection in order to "prevent the entry into commerce" of adulterated products. *See* Ex. 2. at Bates No. FPF000040.

47. This "recall" of Foster's food products "ar[o]se directly from a determination by the [FSIS] that there is a reasonable probability of Insured Products causing serious adverse health consequences or death to humans or animals." *See* Ex. 1 at Bates No. FPF000023.

**XL's Unsupported Denial of Claim**

48. In a letter dated March 14, 2014, XL denied coverage for the Notice of Suspension under the Policy's "Government Recall" coverage arguing that the Policy was not implicated because "Foster did not initiate a recall of Insured Products or conduct a recall of Insured Products in conjunction with or following the FSIS enforcement action."

49. A true and correct bates stamped copy of the March 14, 2014 letter is attached hereto as Exhibit 4.

50. In making its coverage determination under the "Government Recall" coverage of the Policy, XL never addressed the availability of coverage for the infestation and resulting Notice of Suspension under the Policy's "Accidental Contamination" coverage.

51. Accordingly, in a communication dated April 24, 2014, Foster, through RKH, requested that XL reevaluate the availability of coverage for its Loss resulting from the Notice of Suspension, including the availability of coverage under the Policy's "Accidental Contamination" coverage.

52. A true and correct bates stamped copy of the April 24, 2014 email and XL's response dated the same day are attached hereto as Exhibit 5.

53. In a communication dated April 24, 2014, XL reiterated its denial of coverage under the "Government Recall" portion of the Policy, but for the first time denied coverage under the

"Accidental Contamination" portion of the Policy asserting that Foster had provided no testing results establishing that its products had been actually contaminated.

54. In reaching these incorrect coverage positions, XL ignored the plain language of its Policy, choosing instead to invent a testing requirement as the only basis for satisfying the potential for "bodily injury" component of the "Accidental Contamination" definition.

55. Moreover, XL's coverage position is premised on an exceedingly narrow definition of the word "recall," a word used throughout the Policy but nevertheless undefined by XL.

56. In applying its narrow definition of "recall," XL creates at best an ambiguity with the broad definition of "Recall Expenses," which the Policy, as drafted by XL, defines to include eleven separate and wide-ranging types of "costs and expenses" related to the "recalling, withdrawing, reworking, destroying or replacing [of] Contaminated Products."

57. On May 20, 2014, Foster, through its counsel, sent a letter to XL setting forth Foster's arguments for coverage.

58. A true and correct bates stamped copy of the May 20, 2014 letter is attached hereto as Exhibit 6.

59. In response to the May 20, 2014 letter, XL sent a letter to Foster dated May 28, 2014, refusing to reconsider its erroneous coverage position.

60. A true and correct bates stamped copy of the May 28, 2014 letter is attached hereto as Exhibit 7.

61. Ignoring Foster's arguments based on the language of the Policy and the facts surrounding the Notice of Suspension, XL's May 28, 2014 letter reiterates the insurer's denial of coverage by alleging that Foster was required to demonstrate through test results that the product was in fact contaminated. And that despite the Policy's broad definition of "Recall Expenses" and applicable law interpreting coverage clauses and definitions broadly to satisfy the

reasonable expectations of the policyholder, the term "recall" as used in the "Government Recall" endorsement should be narrowly interpreted as only including an "order to return." *See* Ex. 7 at Bates No. FPF000059-60.

## COUNT I: DECLARATORY JUDGMENT

62. Foster repeats and re-alleges the allegations of paragraphs 1 through 61 as if set forth fully herein.

63. The Policy sets forth the terms and conditions of the insurance contract between XL and Foster, including the Insuring Agreement and the definitions of "Accidental Contamination" and "Government Recall."

64. The Policy's "Accidental Contamination" coverage is triggered when one (1) of three (3) separate components of the definition occur and that occurrence would lead to an Insured Product causing adverse health consequences if consumed.

65. Despite the plain language of the Policy, XL seeks to improperly and unilaterally modify this definition of "Accidental Contamination" to affirmatively require that contamination be demonstrated by test results.

66. The Policy's "Government Recall" coverage is triggered when a "recall" results "directly from a determination by the [FSIS] that there is a reasonable probability of Insured Products causing serious adverse health consequences or death to humans or animals."

67. Again, XL seeks to restrict the terms of the Policy by assuming an unduly restrictive definition of "recall," a term undefined by XL in the Policy, and one that is in conflict within the Policy's broad definition of "Recall Expenses."

68. Foster has not been compensated for its covered "Loss" arising out of the Notice of Suspension as a result of XL's improper attempt to amend the terms and conditions of the Policy once a claim has been asserted.

69. As a result of the foregoing, an actual and justiciable controversy presently exists between XL and Foster regarding the meaning of the Policy and XL's obligation to reimburse Foster for Loss arising from a covered Insured Event.

70. Foster is entitled to a declaration that XL is obligated to reimburse, subject to the Policy's limit of liability, Foster's Losses, including its reasonable and necessary expenses and lost profits that have been incurred to date and may be incurred in the future.

## **COUNT II: BREACH OF CONTRACT**

71. Foster repeats and re-alleges the allegations of paragraphs 1 through 70 as if set forth fully herein.

72. The Policy between Foster and XL constitutes a lawfully binding contract.

73. Foster has paid its premium in full to XL for the Policy.

74. Foster has satisfied all other conditions precedent to coverage under the Policy.

75. The Policy sets forth the terms and conditions of the insurance contract between XL and Foster, including the meaning of "Accidental Contamination" and "Government Recall."

76. Foster has suffered substantial Loss as a result of an Insured Event, triggering both the "Accidental Contamination" and "Government Recall" coverage in the Policy.

77. Foster has demanded performance under the contract.

78. Despite the plain language of the Policy set forth herein, XL has improperly and unilaterally breached the Policy by failing to reimburse Foster's covered Loss arising from the infestation and Notice of Suspension at its facility in Livingston, California.

79. As a direct and proximate result of XL's breach of its obligations under the Policy, Foster has suffered damages, and may suffer additional damages in the future.

## **PRAYER FOR RELIEF**

WHEREFORE, for the foregoing reasons, Foster respectfully requests judgment as follows:

a. With respect to Count One, an order declaring that XL is obligated to reimburse Foster, subject to the Policy's limit of liability, for Foster's Loss, including its reasonable and necessary expenses and lost profits that have been incurred to date and may be incurred in the future.

b. With respect to Count Two, a ruling that XL breached its contract with Foster, by denying coverage under the Policy's Insuring Agreement and the definitions of Accidental Contamination and Government Recall and an order requiring XL to pay damages to Foster in an amount to be established at trial.

## JURY DEMAND

Plaintiff, FOSTER POULTRY FARMS, INC., requests a jury trial in this proceeding.

DATED: June 18, 2014     DICKSTEIN SHAPIRO LLP

By: /S/ Marla H. Kanemitsu
Marla H. Kanemitsu (CA Bar No. 220703)
kanemitsum@dicksteinshapiro.com
DICKSTEIN SHAPIRO LLP
2049 Century Park East, Suite 700
Los Angeles, CA 90067-3109
Telephone: (310) 772-8300
Facsimile: (310) 772-8301

*Attorney for Plaintiff
Foster Poultry Farms, Inc.*