# Exhibit 1

FPF000001

# Market Reform Contract

| | | |
|---|---|---|
| **UMR / Policy No.** | **B0180 C131542** | **180**<br>**RKH** |

**Insured:**      **Foster Poultry Farms**

**Period:**      From :      **12.01 a.m. 25th May 2013**

               To:      **12.01 a.m. 25th May 2014**

               **both dates Local Standard Time**

| | |
|---|---|
| *Contract Order:* | *100%* |
| *No. Of Contract Documents:* | *One* |
| *Hereto Written:* | *100%* |
| *Total Written:* | *100%* |
| *Signing Percentage:* | *100%* |

**R K Harrison Insurance Brokers Limited**
**Appointed Representative of R K Harrison Group Limited**



FPF000002

## NOTICE:

1. THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.

2. THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.

3. THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.

4. THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER 1-800-927-4357. ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER. YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT WWW.NAIC.ORG .

5. FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

6. FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF

FPF000003

APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

7. CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV .

8. IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU

07/11
LSW1147D

FPF000004

## Product Contamination Policy – Food and Beverage
## Key Facts

### How this policy works

This Policy is made up of both insurance coverage as well as a crisis management service. Please read the Policy carefully and in its entirety and should you have any questions please contact your broker / agent.

### Response XL

This is an XL Insurance dedicated network of crisis management consultants. The **Response XL** page in this Policy gives you hotline numbers to call in order to access **Response XL's** core consultants. Please familiarise yourself with this page and ensure the relevant person(s) has a copy of the emergency numbers.

### Initial consultation

This Policy entitles you to a free initial consultation with one of our core consultants for the purpose of familiarising you with the services available through **Response XL**. You will be contacted by one of our consultants after coverage begins.

### What to do in the event of discovering an Insured Event

At the first sign of an **Accidental Contamination**, a **Malicious Contamination** or an **Extortion** demand you must call the hotline number on the **Response XL** page. **Response XL** consultants will assist you in responding to the situation and / or will work alongside your existing crisis management team.

**Please note that it is a condition precedent to liability under the Policy that you call Response XL immediately and notify the Underwriters accordingly. Please refer to clause 6. A. in the Policy.**

### How does the self insured retention work for Crisis Response?

Underwriters pay all **Crisis Response** fees and **NO** retention applies in respect of **Crisis Response**.

### Not sure that the crisis would be covered by the Policy?

This should not prevent you calling **Response XL**. Even if you are not sure if your contamination / extortion situation will be covered by the policy, immediate **Crisis Response** fees are still covered. **Please refer to clause 3. A. in the Policy.**

**These Key Facts should be read in conjunction with the Policy but are not intended to supersede or modify any of the provisions of the Policy. In the event of any conflict or inconsistency between the terms of these Key Facts and the Policy, the Policy will prevail.**

**XL** INSURANCE

Case 1:14-cv-00953-WBS-SAB Document 46-5 Filed 09/04/15 Page 6 of 59
Case 1:14-cv-00953-SAB Document 6 Filed 07/03/14 Page 6 of 40

FPF000005

## RESPONSE XL (AMENDED)

**Response XL** is a dedicated network of consultants who are made available to assist XL Insurance policyholders in the event of an **Insured Event** under this Policy. **Response XL** is available to respond to an XL Insurance policyholder's crisis situation on a priority basis and 24 hours a day.

Our network is co-ordinated through a core consultancy specialising in crisis and recall management – Leavitt Partners

Depending on the nature of the crisis our core consultancy will also engage one or several other specialist consultants within the network.

Once an XL Insurance policy is bound the policyholder will receive a free Initial Orientation with the core consultancy in order to familiarise the policyholder with the service provided by **Response XL**.

## WHAT TO DO IN THE EVENT OF DISCOVERING AN ACTUAL OR POTENTIAL INSURED EVENT:

Immediately call the hotline in accordance with clause 7.A of this policy.

The numbers below are dedicated hotline numbers for XL Insurance policyholders and are available 24 hours a day, 7 days a week. Calls will be routed to the core consultancy.

## FOR POLICYHOLDERS IN USA / CANADA

**USA**         **1-209-278-7865**

Your call will be routed to:
Leavitt Partners

Main contact:
David Acheson

For general enquiries please call 1-801-910-5795

## NOTICE OF LOSS:

Notification of a **Loss** to **Response XL** does not constitute a notification of a **Loss** to the Underwriters. All notice of **Loss** must be made immediately in accordance with clause 7.B of this Policy.

**Response XL** has no authority on behalf of the Underwriters to agree any matter relating to the Underwriters' liability, rights and obligations under this Policy. Any **Crisis Response** provided to respond to an **Insured Event** does not constitute any acceptance of liability for **Loss** by the Underwriters under clause 2. **Loss** of this Policy.



**Policy No. C131542**                                                                  **RKH 180**

### SCHEDULE TO THE CONTRACT OF INSURANCE

**Unique Market
Reference:**               B0180 C131542

**Type:**                   PRODUCT CONTAMINATION INSURANCE, as detailed in the Policy Wording.

**1.  Insured:**            Foster Poultry Farms

                            (Plus additional Insureds as listed on the Umbrella Policy;
                            less Dairy entities)

**2.  Address of
     Insured:**             1000 Davis Street,
                            PO Box 457,
                            Livingston,
                            CA 95334-0457,
                            USA.

**3.  Limit(s) of
     Liability:**           3.1 Section One:
                            **Accidental Contamination:**   USD 25,000,000    per **Insured Event** and in
                                                                              the aggregate.

                            3.2 Section Two:
                            **Malicious Contamination:**    USD 25,000,000    per **Insured Event** and in
                                                                              the aggregate.

                            3.3 Section Three:
                            **Product Extortion:**          USD 25,000,000    per **Insured Event** and in
                                                                              the aggregate.

                            3.4 Section One and Two
                            and Three Combined:             USD 25,000,000    overall Policy aggregate
                                                                              irrespective of the number of
                                                                              **Insured Events** and related
                                                                              **Crisis Response** fees.

**Sublimits:**              **Governmental Recall:**        Sublimited to USD 12,500,000
                                                            per **Insured Event** included within the overall
                                                            policy aggregate for policy period.

                            **Customer Loss of Profit:**    Sublimited to USD 2,500,000
                                                            per **Insured Event** included within the overall
                                                            policy aggregate for policy period.

                                                                              **XL 1209**

R K Harrison Insurance Brokers Limited                                        Page 1 of 30

| Policy No. C131542 | RKH 180 |

**4. Retention:**

4.1 Section One:  USD 2,000,000 each and every **Insured Event**

4.2 Section Two:  USD 2,000,000 each and every **Insured Event**

4.3 Section Three:  NIL

**Sublimit Retentions:**

**Governmental Recall:**  USD 2,000,000 each and every **Insured Event**

**Customer Loss of Profit:**  As per Main Deal

No **Retention** applies to **Product Extortion** or **Crisis Response** fees.

**5. Policy Period:**

From:  25th May 2013
To:  25th May 2014
Both days at 12.01 am Local Standard Time at the Insured's address stated in 2 above.

**Interest:**  Arising out of the Named Insured's Operations.

**Conditions:**  Wording: XLPR-CPI 001 (07/09) as attached, and as follows:

USD 24,493 is available for continued engagement with Dr Acheson on the recommendations arising out of the Colorado visit and report.

**Clauses applicable to this insurance:**

1. Governmental Recall Endorsement (as attached).

2. Customer Loss of Profit Endorsement (as attached).

3. LMA 5092 U.S. Terrorism Risk Insurance Act of 2002 as amended Not Purchased Clause (as attached) to apply.

4. LMA 5020 Service of Suit (U.S.A.), naming: *Messrs Mendes & Mount, 445 South Figueroa Street, 38th Floor, Los Angeles, CA 90071-1601, USA* (as attached) Court of competent jurisdiction in the U.S.A

5. LMA 3100 Sanctions Limitation Clause (as attached)

6. Excluding losses arising out of Avain Flu

7. Excluding losses arising out of Inter-Company related sales

8. Excluding losses arising out of live birds

**Conformity Clause**

Wherever the words "Assured" and "Insured" appear they have the same meaning.

Wherever the words "Underwriters" and "Insurers" appear they have the same meaning.

Wherever the words "this Policy" appears it shall be understood to mean "this Contract of Insurance".

FPF000008

**Policy No.  C131542**         **RKH 180**

6. **Premium:**       **USD 593,775** (100%) annual.

     **Premium Payment Terms:**       LSW 3000 Premium Payment Clause 60 days  - (as attached).

7. **Application Form Dated:**       4th March 2013

8. **Period of Loss of Gross Profits Indemnity:**       12 months.

> Premium:  $593,775.00
> Inspection Fee:  N/A
> Other Fee(s):  N/A
> Stamping Fee:  $1,187.55
> Surplus Lines Tax:  $17,813.25
> Premium Total:  $612,775.80

9. **Product Rehabilitation:**       50% of the respective **Insured Event** limit in 3. Above.

10. **Policy Territory:**       World-wide.

11. **Choice of Law and Jurisdiction:**       New York, in accordance 7.P Choice of Law and Jurisdiction clause of the Policy Wording., and as per LMA 5020 – any Court if competent Jurisdiction in the USA.

12. **Crisis Consultants:**       Leavitt Partners

13. **Notification of Loss to:**       Jonathan Kelly:
          XL Insurance, XL House, 70 Gracechurch Street, London EC3V OXL.

     **Notices:**       California Disclosure Notice LSW 1147D (as attached).

     **Express Warranties:**       None, other than as may exist in the policy wording or attached clauses.

     **Conditions Precedent:**       It is a Condition Precedent to Underwriters' Liability under this policy that there are no material changes to the application form dated 4th March 2013, provided to Underwriters by R K Harrison, and that the Insured is not aware of any facts, situation or circumstance that could give rise to a claim under the Policy.

     **Subjectivities:**       None




**Policy No. C131542**        **RKH 180**

**Taxes Payable by the Insured and Administered by Insurers:**     None applicable.

**Recording, Transmitting and Storing Information:**     Where R K Harrison Insurance Brokers Limited maintains risk and claim data/information/documents R K Harrison Insurance Brokers Limited may hold data/information/documents electronically.

**Insurer Contract Documentation:**     This document details the contract terms entered into by the Insurer(s), and constitutes the contract document.

For contract changes the Contract Endorsement(s) signed by (Re)Insurer(s) shall form the evidence of changes agreed.

R K Harrison Insurance Brokers Limited are authorised by Insurer(s) to provide the Insured with copies of all London market registered clauses applicable to this contract.

Case 1:14-cv-00953-WBS-SAB Document 46-5 Filed 09/04/15 Page 11 of 40
Case 1:14-cv-00953-WBS-SAB Document 8-16 Filed 07/03/14 Page 11 of 59

FPF000010

1.   INSURING AGREEMENT

In consideration of the premium paid by the **Insured** and in reliance upon the representations and warranties in the Application for this insurance, and materials submitted with the Application, and subject to the terms, conditions, limitations and exclusions of this Policy, the Underwriters agree:

A.   subject to the **Retention** and the Limits of Liability, to reimburse the **Insured** for all or any **Loss** arising out of **Insured Events** first discovered during the **Policy Period** and reported to the Underwriters during the **Policy Period**, or within 60 days thereafter and in accordance with the Conditions of this Policy, and

B.   to pay, or reimburse the **Insured** for, **Crisis Response** fees incurred in the rendering of crisis management services in response to an **Insured Event**.

The following are **Insured Events** covered by this Policy:

Section One:   **Accidental Contamination**

Section Two:   **Malicious Contamination**

Section Three: **Product Extortion**

2.   LOSS

**Loss** covered by this Policy shall be the following reasonable and necessary expenses incurred by the **Insured** within twelve months after the discovery by the **Insured** of an **Insured Event**, unless otherwise limited in the Schedule, and which arise solely and directly out of such **Insured Event**:

A.   **Pre-Recall Expenses;**

B.   **Recall Expenses;**

C.   **Third Party Recall Expenses;**

D.   **Loss of Gross Profit;**

E.   **Rehabilitation Expenses;**

F.   **Increased Cost of Working;**

G.   **Product Extortion Demand.**

3.   CRISIS RESPONSE

A.   **Crisis Response** fees covered under this Policy shall be:

i) Fees and expenses of **Response XL**, including additional consultants appointed by **Response XL**, incurred in assisting the **Insured** to respond to an **Insured Event** or fees and expenses of **Approved Consultants** reasonably and necessarily incurred in assisting the **Insured** to respond to an **Insured Event**.





ii) **Immediate Assistance:** reasonable and necessary fees and expenses of **Response XL** or **Approved Consultants** even if coverage hereunder for any loss has still to be confirmed by the Underwriters. The Underwriters' liability for such fees and expenses shall cease upon Underwriters' reasonable determination that the **Insured's** loss is not covered hereunder. In such an event the Underwriters' liability to pay such fees and expenses shall not exceed $100,000 or currency equivalent.

B.   **Crisis Response** fees covered under this Policy are not sublimited, other than for **Immediate Assistance** per A ii) above, and are provided up to and are included within the applicable limit stated in the Schedule.

C.   The **Retention** will not apply to **Crisis Response**.

D.   **Response XL**, any additional consultants appointed by **Response XL** and **Approved Consultants** have no authority on behalf of the Underwriters to agree any matter relating to the Underwriters' liability, rights and obligations under this Policy. Any **Crisis Response** provided to respond to an **Insured Event** does not constitute any acceptance of liability for **Loss** by the Underwriters under clause 2. of this Policy.

E.   The **Insured** shall immediately contact **Response XL** or **Approved Consultants** upon discovery of an **Insured Event**, in accordance with clause 7.A. of this Policy, and **Response XL** or **Approved Consultants** will be made available immediately to assist and work alongside the **Insured** in responding to an **Insured Event**.

4.   <u>DEFINITIONS</u>

A.   **Accidental Contamination**

    **Accidental Contamination** shall be:

Error in the manufacture, production, processing, preparation, assembly, blending, mixing, compounding, packaging or labelling (including instructions for use) of any **Insured Products**, or

the introduction into an **Insured Product** of an ingredient or component that is, unknown to the **Insured**, contaminated or unfit for its intended purpose, or

error by the **Insured** in the storage or distribution of any **Insured Products** whilst in the care
or custody of the **Insured**

provided that the use or consumption of such **Insured Products** has led to or would lead to:

i) bodily injury, sickness, disease or death of any person(s) or animal(s) physically manifesting itself within 365 days of use or consumption, or

ii) physical damage to or destruction of tangible property (other than the **Insured Products** themselves).

B.   **Adverse Publicity**

The reporting of **Malicious Contamination** during the **Policy Period** in local, regional or national media (including but not limited to newspapers, magazines, radio, television and internet) or a publication released by the government of any country where the **Insured Products** are sold or distributed, where either any of the **Insured Products**, or the **Insured**, is specifically identified as having been subject to a **Malicious Contamination**.

C.  **Approved Consultants**

Crisis management consultants, as specified in Item 12 of the Schedule, other than **Response XL** or consultants appointed by **Response XL**, appointed by the **Insured** to provide **Crisis Response**, including **Pre-Recall Expenses**, provided such consultants are agreed in writing by the Underwriters prior to the inception of the **Policy Period**.

D.  **Contaminated Products**

Those **Insured Products** which have been subject to **Accidental Contamination** or **Malicious Contamination**.

E.  **Gross Profit**

**Gross Profit** shall mean the difference between:-

i) the **Insured's** revenue that would have been reasonably projected, but which has been lost solely and directly as a result of an **Insured Event**, and

ii) the variable costs that would have been incurred, but which have been saved as a result of not making those sales (including the cost of raw materials, and all other saved costs).

F.  **Increased Cost of Working**

The following reasonable and necessary costs, excess of the ordinary cost of conducting business had the **Insured Event** not happened, to restore only the **Insured's** property(ies) where the **Insured Event** happened in order to resume operations and which are devoted exclusively to the purpose of reducing **Loss**:

i) cleaning and / or repairing of machinery and property;

ii) additional expense to maintain **Insured's** work force for a period up to six months after the **Insured Event**;

iii) additional expense of subcontracting the manufacturing of **Insured Products** to a third party during the restoration of the property.

G.  **Insured**

The entity, or entities, specified in Item 1 of the Schedule.

H.  **Insured Event**

**Insured Event** shall be **Accidental Contamination**, **Malicious Contamination** or **Product Extortion** falling within the terms and conditions of this Policy.

I.  **Insured Products**

Products, including their ingredients and components once incorporated therein, as declared to Underwriters in the application form and which are in production or have been manufactured, produced, processed, prepared, assembled, blended, mixed, compounded, packaged, labelled (including instructions for use) or distributed by the **Insured**, or on behalf of and to the order of the **Insured**.




J. **Loss of Gross Profit**

Loss of **Gross Profit**, incurred as a result of an actual and ascertainable reduction in the **Insured's** sales revenue caused solely and directly by an **Insured Event**, for the period:-

i) specified in Item 8 of the Schedule, following discovery of the **Insured Event**, or

ii) during which the **Insured's** sales revenue remains less than the level that would have been reasonably projected had the **Insured Event** not occurred

whichever shall be the period first to expire.

Any **Loss of Gross Profit** shall be computed in accordance with clause 7.G. - **Computation of Loss** of this Policy.

K. **Malicious Contamination**

The actual, alleged or threatened, intentional, malicious and illegal alteration or adulteration of any **Insured Products**, or the creation of **Adverse Publicity** implying such alteration or adulteration, so as to give the **Insured** and / or the public reasonable cause to believe that the **Insured Products** have been or are likely to be rendered dangerous or unfit for the use for which they were intended by the **Insured**.

L. **Policy Period**

The period specified in Item 5 of the Schedule.

M. **Pre-Recall Expenses**

Reasonable and necessary costs of chemical analysis and / or physical examination and / or other necessary laboratory testing in order to ascertain whether the **Insured Products** have been contaminated and / or to ascertain the potential effect of an **Insured Event**.

N. **Product Extortion**

Any threat that **Insured Products** will be subject to **Malicious Contamination** made in conjunction with a **Product Extortion Demand**.

O. **Product Extortion Demand**

Monies, or the monetary value of other consideration (net of any recoveries subsequently made) paid or delivered under duress away from the **Insured's** premises following receipt of a **Product Extortion**.

P. **Product Rehabilitation**

Sales and marketing expenses, including reasonable and customary shelf space and slotting fees, reasonably and necessarily incurred by the **Insured** to re-establish the sales level and the market share of **Insured Products** affected by an **Insured Event** to the level reasonably projected prior to the **Insured Event**, taking into account the reasonable projection had no **Insured Event** occurred and all material changes in market conditions of any nature whatsoever.





The Underwriters' liability in respect of **Product Rehabilitation** shall not exceed the sublimit stated in Item 9 of the Schedule.

Q. **Recall Expenses**

The following costs and expenses reasonably and necessarily incurred by the **Insured** arising solely and directly out of an **Insured Event** for the purpose of or in connection with recalling, withdrawing, reworking, destroying or replacing **Contaminated Products**:

i) expenses of communications including emergency incident phone lines, public relations specialists, radio, television, internet and media announcements, newspaper and magazine advertising;

ii) transportation costs in recalling and / or withdrawing **Contaminated Products**;

iii) expense for rent or hire of additional warehouse space;

iv) the cost of hire of additional persons, other than regular employees of the **Insured**, and of additional accommodation for such persons;

v) remuneration paid to employees of the **Insured** for overtime;

vi) out of pocket expenses incurred by personnel under paragraphs (iv) and (v) above, including transportation, other than to and from the employees' normal place of work;

vii) Reasonable and necessary costs incurred by retailers, wholesalers and distributors which are devoted exclusively to recalling **Contaminated Products** on behalf of the **Insured**;

viii) costs incurred by the **Insured** for the physical examination, reworking, relabelling and / or destruction and disposal of **Contaminated Products**, including destruction and disposal of packaging and labelling material that cannot be reused;

ix) costs incurred by the **Insured** in redistributing reworked or relabelled products provided that the cost of reworking and redistribution does not exceed the cost of replacing the **Contaminated Products**;

x) costs incurred by the **Insured** in replacing **Contaminated Products** which have been or will need to be disposed of or destroyed and delivering them to customers or their nominated agents, or costs incurred by the **Insured** for reimbursing the value of such **Contaminated Products**,
up to the amount received by or due to the **Insured** for such **Contaminated Products**, should replacement not be possible;

xi) similar directly related expenses.

R. **Retention**

The amount of any or all **Loss** that the **Insured** shall bear uninsured for each and every
**Insured Event** as specified in Item 4 of the Schedule. The Limit of Liability shall not be reduced by the amount of the **Retention**.

No **Retention** shall apply to **Crisis Response**.




Case 1:14-cv-00953-WBS-SAB Document 46-5 Filed 09/04/15 Page 16 of 59
Case 1:14-cv-00953-SAB Document 8-46 Filed 07/03/14 Page 16 of 40

FPF000015

S.   **Third Party Recall Expenses**

In the event that an **Insured Product**, which has been the subject of an **Insured Event**, becomes an ingredient or component in a product manufactured, processed or distributed by a customer of the **Insured**, coverage shall apply to reimburse the **Insured** for its liability to such customer for those **Recall Expenses** which are reasonably and necessarily incurred by such customer in recalling their contaminated product.

T.   **Response XL**

The Underwriters' retained crisis management consultants as detailed in the **Response XL** attachment to this Policy and as specified in Item 12 of the Schedule.

5.   <u>EXCLUSIONS</u>

The Underwriters shall not be liable in respect of any loss, damage, claim, cost or expense of any nature whatsoever caused by or arising from or attributable to any of the following:-

A.   An **Insured Event** or any circumstance that could give rise to an **Insured Event** which is discovered, known by or should reasonably have been known by the **Insured** prior to the inception of the **Policy Period**.

B.   Any accidental contamination or malicious contamination of the products of a competitor of the **Insured** or of products similar to the **Insured's**, including publicity thereof, or loss of public and / or governmental confidence and / or change of any applicable regulation regarding any **Insured Product** or any material or substance used in or similar to any **Insured Product**.

C.   A fraudulent or illegal or criminal act by a director or officer of the **Insured**, whether acting alone or in collusion with others.

D.   Any intentional violation by the **Insured** of any national, international, governmental or local laws and regulations regarding the manufacture, production, processing, preparation, assembly, blending, mixing, compounding, packaging, labelling (including instructions for use), storage, distribution or sale of an **Insured Product**, or use of ingredients, materials or substances in any **Insured Product** which have been banned by any national, international, governmental or local authority.

E.   An **Insured Event** not advised to the Underwriters during the **Policy Period** or within 60 days after the expiry of the **Policy Period**, but in accordance with clause 7.B. – **Notice of Loss** of this Policy.

F.   Liability to third parties (including employees of the **Insured** and their heirs) arising from bodily injury, sickness, disease or death of any person or animal, or from damage to or destruction of any property, including loss of use thereof, or any liability to third parties howsoever arising (other than for reimbursement of those specific costs covered elsewhere under this Policy), or any associated costs including the cost or expense of any litigation or judicial, governmental or regulatory enquiry as a result of an **Insured Event** or otherwise.

G.   Ionising radiations or contamination by radioactivity from any irradiated nuclear fuel or from any nuclear waste from the combustion of nuclear fuel, and / or the radioactive, toxic, explosive or other hazardous properties of any explosive nuclear assembly or nuclear component thereof.





H.   Loss or damage directly or indirectly occasioned by, happening through or in consequence of war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalisation or requisition or damage to property by or under the order of any government or public or local authority.

I.   Any **Accidental Contamination** arising from genetically modified organisms, carcinogens, or implicated in or connected with Creutzfeldt-Jacob Disease or any other spongiform encephalopathies.

J.   Loss of or diminution in value of crops, livestock, water or land

K.   Any fines, penalties or liquidated damages.

L.   Terrorism, per the following exclusion:

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any act of terrorism regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

For the purpose of this exclusion an act of terrorism means an act, including but not

limited to:-

i) the use of force or violence and/or the threat thereof, or

ii) the actual, threatened, feared or perceived use of any biological, chemical, radioactive or nuclear agent, material, device or weapon,

of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This exclusion also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to the above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the **Insured**.

This exclusion shall not apply when the **Insured** or an **Insured Product** is the sole, direct target of the individual or group described.

In the event that any portion of this exclusion is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

6.   <u>CONDITIONS PRECEDENT TO THE UNDERWRITERS' LIABILITY</u>

It is a condition precedent to the Underwriters' liability under this Policy that:





Case 1:14-cv-00953-WBS-SAB Document 46-5 Filed 09/04/15 Page 18 of 59
Case 1:14-cv-00953-SAB Document 8-46-5 Filed 07/03/14 Page 18 of 40

EPF000017

A.   **Co-operation**

the **Insured** co-operates fully with the Underwriters in the investigation of the claim, including but not limited to:

i) maintaining comprehensive records of the expenses incurred and actions taken to prevent, mitigate or minimize the amount of **Loss** covered under this insurance and furnishing them to the Underwriters upon request;

ii) providing the Underwriters with a signed, sworn proof of **Loss** containing all the relevant information the Underwriters request and require to investigate the claim;

iii) producing any documentary evidence, books of account, bills, invoices and other vouchers and copies of same that the Underwriters or their authorized representatives may require; and

iv) affording the Underwriters reasonable access to the **Insured's** premises.

v) retaining samples of any **Contaminated Products** for the purpose of establishing that an **Insured Event** has occurred.

B.   **Product Extortion Due Diligence**

for purposes of coverage under Section Three the **Insured** can demonstrate that, prior to compliance (partly or fully) with a **Product Extortion Demand**, the **Insured** has sought assistance from **Response XL** or **Approved Consultants** and has made every reasonable effort to determine positively that the threat of **Malicious Contamination** was genuine.

7.   <u>GENERAL CONDITIONS APPLICABLE TO ALL SECTIONS OF THE POLICY</u>

A.   **Crisis Response**

The **Insured** shall, upon discovery of an actual or potential **Accidental Contamination**, **Malicious Contamination** or **Product Extortion**, immediately contact **Response XL** or **Approved Consultants** using the procedure set out on page 2 of this Policy, "RESPONSE XL".

B.   **Notice of Loss**

The **Insured** shall provide the Underwriters, as specified in Item 13 of the Schedule, with immediate notice and details of the discovery of the **Accidental Contamination**, **Malicious Contamination** or **Product Extortion** or as soon as is reasonably practical thereafter.

C.   **Limits of Liability**

The Underwriters' liability shall not exceed the amounts stated for each **Insured Event** under Section One, Section Two and Section Three in Item 3 of the Schedule or any sublimited amounts stated in the Schedule and shall be in excess of the **Retention** amounts in Item 4 of the Schedule. However, irrespective of the number of **Insured Events** and **Losses** the total liability of the Underwriters under this Policy for Sections One, Two and Three and related **Crisis Response** fees combined shall be limited to the amount stated in Item 3.4 of the Schedule, and such limit shall apply in excess of any applicable **Retention** amounts stated in Item 4 of the Schedule.



For the purpose of this clause, individual acts of **Accidental Contamination**, **Malicious Contamination** or **Product Extortion** shall be considered one and the same **Insured Event** if:

i) as regards **Accidental Contamination**, such contamination was caused or contributed to by the same or substantially similar error; or introduction of a contaminated ingredient or component.

ii) as regards **Malicious Contamination** or **Product Extortion** the acts in question are threatened, committed or made by the same organisation, group, individual or entity as part of a single sustained or copycat campaign or activity.

D.   **Mitigation of Damages**

The **Insured** shall use due diligence and do and concur in doing all things reasonably practicable to avoid or diminish any **Loss** or **Insured Event**.

E.   **New Products**

i) In the event that the **Insured** introduces, during the **Policy Period**, any new product category, being products forming part of a new type of product, not previously declared to the Underwriters in the application for this insurance no coverage shall apply under this insurance for **Loss** incurred by the **Insured** arising out of an **Insured Event** relating to such products unless and until:

a)   the **Insured** provides the Underwriters with any material information regarding such new products as the Underwriters require, and

b)   the Underwriters agree to cover such new products and the **Insured** accepts any special terms, conditions and exclusions, and pays any additional premium charge as may be required by the Underwriters.

ii) New products introduced by the **Insured** during the **Policy Period** that fall within existing product categories, which were declared to the Underwriters in the application for this
insurance and are covered hereunder, do not need to be notified to the Underwriters until renewal of the Policy. However, in no event shall the Underwriters be liable for any **Loss** arising out of any such new products if the **Insured** knows or should reasonably know of any circumstances that could give rise to an **Insured Event** affecting such new products.

F.   **Cancellation**

i) This Policy may be cancelled by the **Insured** upon written notice at any time. This Policy may be cancelled by the Underwriters by mailing to the **Insured**, at the address shown in this Policy, written notice stating when not less than ninety (90) days thereafter such cancellation shall be effective, except in the instance of non-receipt of premium by the Underwriters, in which case ten (10) days written notice will be required.  The mailing of notice as aforesaid shall be sufficient proof of notice.  The effective date and hour of cancellation stated in the notice shall become the end of the **Policy Period**.

ii) In the event of cancellation by the **Insured**, the Underwriters shall retain the short rate portion of the premium hereon. In the event of cancellation by the Underwriters, the Underwriters shall retain the pro-rata portion of the premium hereon. Premium adjustment may be made either at the time that cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

iii) In the event that a **Loss** is notified under the Policy before the effective date of cancellation the premium shall be deemed fully earned at inception of the **Policy Period** and no return premiums shall be due from the Underwriters.

G.    **Computation of Loss**

i) In the event of any covered **Loss**, claims for payment by the Underwriters shall be made as soon as practicable and shall be accompanied by a computation of the **Loss**, which sets out in detail how the **Loss** has been calculated and what assumptions have been made. The **Insured** shall produce any documentary evidence, books of account, bills, invoices and other vouchers and copies of the same which the Underwriters or their representatives, including forensic accountants, may require, and the **Insured** shall afford them every assistance in their investigations including reasonable access to the **Insured's** premises, personnel and necessary documents for the purpose of the computation of the **Loss**.

ii) The Underwriters shall determine the amount of any covered **Loss**, taking into account any savings or recoveries or offsetting or make-up of **Loss** which have been made or which the **Insured** could reasonably have been expected to make, and the ability of the **Insured** to resume operations.

iii) **Loss of Gross Profit** shall be assessed by the Underwriters based on an analysis of the profits generated by the **Contaminated Products**, and other **Insured Products** which lost sales as a direct result of the **Insured Event**, during each month of the twelve months prior to the **Insured Event**, and taking into account:-

a)   the reasonable projection of the future profitability of such **Contaminated Products** and other affected **Insured Products** had no **Insured Event** occurred, and

b)   all material changes in market conditions of any nature whatsoever, including but not limited to changes in population, consumer tastes, seasonal variations and competitive environment, which would have affected the future marketing of and profits generated by the **Contaminated Products** or other affected **Insured Products**.

iv) In determining the amount of any covered **Loss** the Underwriters shall apply standard accounting principles as recognised by the relevant regulatory authorities in the **Insured's** jurisdiction. Where the **Insured** is present in more than one jurisdiction the relevant principles to be applied will be those of the jurisdiction in which the entity that has suffered the **Loss** is based.

v) Where any covered **Loss** is paid by the Underwriters in currency other than the currency in which the premium is paid, the rate of exchange for payment of **Loss** shall be based on the published wholesale exchange rate on the date written notice of the **Insured Event** is received by the Underwriters.

vi) Whether or not any interim payments have been made a final written statement of **Loss** shall be submitted to the Underwriters no later than 24 months after the discovery by the **Insured** of an **Insured Event**.

H.    **Interim Payments**

Following any **Insured Event**, and subject to the Underwriters' agreement of coverage applying to the **Insured's** claim, the Underwriters agree, if requested from time to time by the **Insured**, to make interim payments of a **Loss** duly proved as soon as practicable after receipt of an acceptable signed and sworn partial or final proof of **Loss** in respect of such **Insured Event**.

**I.    Mergers and Acquisitions**

The **Insured** shall advise the Underwriters of:-

i) Any consolidation or merger with another entity or the acquisition of a majority of all of the assets of another entity by the **Insured**, or

ii) the acquisition of a majority of all of the assets of the **Insured** by another entity or the acquisition of more than 50% of the outstanding voting securities of the **Insured** by any person or entity or control of the **Insured** being taken over by any government or by officials appointed by any government or local authority.

In respect of i) above, coverage shall only apply to those products declared to the Underwriters in the Application and materials submitted with the Application. Coverage shall only apply to products of the newly acquired or merged entities from the date of merger or acquisition upon agreement in writing by the Underwriters, subject to such further information and any special terms, conditions and exclusions and additional premium charge that the Underwriters may require.

In respect of ii) above, coverage shall only apply to products manufactured, produced, processed, prepared, assembled, blended, mixed, compounded, packaged, labelled (including instructions for use), stored or distributed by the **Insured** prior to the acquisition or take-over date unless agreed in writing by the Underwriters subject to such further information and any special terms, conditions and exclusions and additional premium charge that the Underwriters may require.

**J.    Inspection and Audit**

The Underwriters or their appointed representatives have the right, but are not obliged, to inspect the **Insured's** property and operations and examine and / or audit the **Insured's** books and records at any time as far as they relate to the subject matter of this Policy. Neither the Underwriters' or their appointed representatives' right to make inspections nor the making thereof nor any report shall constitute an undertaking on behalf of or for the benefit of the **Insured** or others, to determine or warrant that such property or operations are safe or comply with laws, regulations, codes or standards.

**K.    Other Insurance**

The insurance afforded by this Policy shall operate as primary insurance in relation to any other product contamination or product recall cover specifically named as such that is also purchased by the **Insured**, except when stated to apply in excess of or in coinsurance of such other insurance. When this insurance is primary and the **Insured** enjoys cover under other specific product contamination or product recall cover stated to be applicable to the **Loss** on an excess basis, the amount of the liability under this Policy shall not be reduced by the existence of such other insurance; however, the **Insured** must provide the Underwriters with details regarding such excess insurance at the inception date of this Policy.

The insurance afforded by this Policy shall be in excess of any other insurance capable of responding to (or which would but for the operation of this clause, be so capable) any **Loss** otherwise covered hereunder.

If, notwithstanding the foregoing, both this insurance and other insurance apply to the **Loss** on the same basis, whether primary, excess or contingent, the Underwriters shall not be liable under this Policy for a greater proportion of the **Loss** than that stated in the applicable contribution provision below.



(i) Contribution by Equal Shares. If all of such other valid and collectible insurance provides for contribution by equal shares, the Underwriters shall not be liable for a greater proportion of such **Loss** than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one Policy or the full amount of the **Loss** is paid, and with respect to any amount of **Loss** not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the **Loss** until each such insurer has paid its limit in full or the **Loss** is paid.

ii) Contribution by Limits. If any of such other insurance does not provide for contribution by equal shares, the Underwriters shall not be liable for a greater proportion of such **Loss** than the applicable limit of insurance under this Policy for such **Loss** bears to the total applicable limit of insurance of all valid and collectible insurance against such **Loss**.

L.      **Salvage and Recoveries**

All salvages, recoveries and payments recovered or received subsequent to a **Loss** settlement under this Policy shall be applied as if recovered or received prior to the said settlement and all necessary adjustments in the calculation of **Loss** hereunder shall be made by the parties hereto.

M.      **Subrogation**

The **Insured** shall at all times take all necessary and reasonable steps to preserve evidence and provide all other co-operation as may be reasonably required by the Underwriters in the event that they were to pursue a subrogated claim. For the avoidance of doubt this duty will apply both before and after any payment has been made by the Underwriters under this Policy.

If the Underwriters become liable for any payment under this Policy, the Underwriters shall be subrogated to the extent of such payment, to all the rights and remedies of the **Insured** against any party in respect of claims or **Loss** resulting in such payments and shall be entitled to sue in the name of the **Insured**. The **Insured** shall give the Underwriters all such assistance in their power as the Underwriters may require to secure their rights and remedies and at the Underwriters' request shall make relevant personnel available and execute all documents necessary to enable the Underwriters effectively to bring suit in the name of the **Insured**. Any amount recovered as a result of such proceedings shall, after deduction of all costs incurred in recovering such amount, be applied pursuant to clause 7. L. of this Policy.

If there should be no recovery, or recovery insufficient to pay the costs thereof in suits instituted solely on the initiative of the Underwriters, the costs, or excess costs thereof shall be paid by the Underwriters.

N.      **Changes**

No notice to any agent or knowledge possessed by any agent or by any other person shall be held to effect a waiver or change in any part of this Policy nor stop the Underwriters from asserting any right under the terms of this Policy, nor shall the terms of this Policy be waived or changed, except in writing agreed by the parties.

O.      **Non-Assignment**

No assignment of interest under this Policy shall bind the Underwriters unless their consent is endorsed hereon.





P.    **Choice of Law and Jurisdiction**

This Policy shall be construed according to the laws of the country, state or province as stated in the Schedule without giving consideration to principles of conflict of law, and the **Insured** and Underwriters irrevocably consent to the jurisdiction as stated in the Schedule, agree that any action relating to any dispute under this Policy shall only be brought in said courts, consent to the exercise of *in personam* jurisdiction by said courts over it , and further agree that any action to enforce a judgement of the said courts may be instituted in any jurisdiction..

Q.    **Confidentiality**

The **Insured** will not disclose the existence or terms of this Policy to any third party unless either the Underwriters have given their written consent or the **Insured** is under a legal or regulatory obligation to do so.

R.    **Third Party Rights**

It is agreed between the **Insured** and the Underwriters that it is their intention that no third party shall have any rights under this Policy, and to the extent permissible the rights of any such third parties are hereby excluded.

S.    **Policy Territory**

This Policy shall cover the **Insured** in respect of **Insured Events** happening anywhere in the world unless specifically stated otherwise in the Schedule or where prohibited by applicable law.

T.    **Reckless or Intentionally Unlawful Conduct**

Without prejudice to parties' duties of utmost good faith hereunder and their remedies in respect of any breach thereof, the **Insured** and Underwriters agree that this Policy shall be null and void from inception in the event of the recklessly or intentionally unlawful conduct of the **Insured** in respect of the purchasing of this insurance, any **Insured Products**, the **Insured's** interest in **Insured Products**, any otherwise **Insured Event** or in connection with any claim under this Policy, and that no premium shall be returnable by the Underwriters in such event.

# GOVERNMENT RECALL ENDORSEMENT

In consideration of PREMIUM INCLUDED IN THE OVERALL PREMIUM SHOWN IN THE SCHEDULE TO THE CONTRACT OF INSURANCE, it is hereby understood and agreed that **Government Recall** shall be added as an additional **Insured Event.**

A.     **Government Recall** shall be:

    1.     The recall of **Insured Products** which has been initiated

        (a)     voluntarily by the **Insured**, or

        (b)     as a result of an order by the Food and Drug Administration, the United States Department of Agriculture, the Canadian Food Inspection Agency or any other US or Canadian state or regulatory body with similar authority with regard to food safety (Regulatory Bodies), and

        where either of (a) and (b) above arise directly from a determination by the Regulatory Bodies that there is a reasonable probability of **Insured Products** causing serious adverse health consequences or death to humans or animals, or have otherwise been classified as Class I or Class II by the Regulatory Bodies, or

    2.     any order of suspension of registration of any of the **Insured's** facilities or operations, only in conjunction with or following the recall of **Insured Products** per Item 1. above, which arises directly from a determination by the Regulatory Bodies, that **Insured Products** which have been manufactured, processed, packed, received or held by the **Insured** at the same suspended facilities or operations have a reasonable probability of causing serious adverse health consequences or death to humans or animals, or have otherwise been classified as Class I or Class II by the Regulatory Bodies, or

    3.     outside the USA or Canada, the recall of **Insured Products** which has been ordered by any country's regularly constituted national, federal, state, provincial or local regulatory agency or judicial body pursuant to regulations on food safety but only in respect to the actual or likely threat of **Insured Products** causing physical bodily injury or death to humans or animals.

B.     **Legal Response**

    Section 3. CRISIS RESPONSE, Item A. is amended to include: **Legal Response.**

    **Legal Response** shall be reasonable and necessary legal costs incurred by the **Insured** provided by **Response XL** (or appointed by the **Insured** with the Company's prior written approval), arising in respect of any inquiry by the Regulatory Bodies into the determination of whether a **Government Recall** is required or not. The Company's liability to pay such costs will cease once a **Government Recall** has been initiated and shall not exceed such costs incurred for more than twenty-eight (28) days in total during the **Policy Period**.

C.      Sublimit, Indemnity Period, Retention, and Additional Premium

     i)      Sublimit:          The Company's liability for **Loss** arising out of **Government Recall** shall not exceed:

             AS STATED IN THE SCHEDULE TO THE CONTRACT OF INSURANCE.

             In the event that any **Loss** covered under **Government Recall** is also covered under any other **Insured Event** in this Policy then the higher Limit of Liability applicable to the **Loss**, as stated in Item 3 of the Declarations shall apply. In all instances the overall Policy aggregate shall remain and will not exceed the amount as stated in Item 3.4 of the Declarations.

             For the purpose of this endorsement, individual **Government Recalls** shall be considered one and the same **Insured Event** if, as regards **Government Recall**, such event was caused or contributed to by the same original order, determination or classification by the Regulatory Bodies.

     ii)     **Retention**:     AS STATED IN THE SCHEDULE TO THE CONTRACT OF INSURANCE.

     iii)    Additional Premium:     INCLUDED IN OVERALL PREMIUM FOR THIS POLICY STATED IN THE SCHEDULE 100% in full for the **Policy Period**.

D.      **Due Diligence**

     Section 6. CONDITIONS PRECEDENT TO THE COMPANY'S LIABILITY is amended to include: **Due Diligence**.

     The **Insured** has taken all reasonable steps to maintain records, carry out relevant testing and due diligence, including **Legal Response** as applicable, and has done and concurred in doing all things reasonably practicable to avoid or diminish a **Government Recall.**

E.      The following amendments shall also be made to the Policy:

     (i)     Section 4. DEFINITIONS, Item D. **Contaminated Products** is amended to include **Government Recall**.

     (ii)    Section 5. EXCLUSIONS, Item F shall not apply to **Legal Response**.

     (iii)   Section 5.EXCLUSIONS, Item I is amended to include **Government Recall**.

     (iv)    Section 7. GENERAL CONDITIONS APPLICABLE TO ALL SECTIONS OF THE POLICY, Item B. **Notice of Loss** is amended to include **Government Recall**.

All other terms, conditions and exclusions of this Policy remain unchanged.

# CUSTOMER LOSS OF GROSS PROFIT ENDORSEMENT

It is hereby understood and agreed, in consideration of the additional premium paid, that this Policy is amended to include **Customer Loss of Gross Profit**, as follows;

A. The Underwriters, in consideration of the payment of the additional premium, stated below, and subject to the Sublimit, Retention and Coinsurance, stated below, and all other terms and conditions of this Policy, hereby agree to reimburse the **Insured** for **Customer Loss of Gross Profit** arising out of **Insured Events** first discovered during the **Policy Period**, and reported to the Underwriters during the **Policy Period** or within 60 days thereafter and according to the Conditions of this Policy.

**Customer Loss of Gross Profit** shall mean loss of **Customer Gross Profit** incurred by a direct customer of the **Insured**, and for which the **Insured** has a legal obligation to reimburse or pay that customer, and which is caused solely and directly by an **Insured Event**, for the period:-

i) 12 months following discovery of the **Insured Event**, or

ii) during which the sales revenue of the **Insured's** direct customer remains less than the level that was or could have been reasonably projected had the **Insured Event** not occurred

whichever shall be the period first to expire.

**Customer Gross Profit** shall mean the difference between:-

i) the revenue of the **Insured's** direct customer that was or could have been reasonably projected prior to an **Insured Event**, but which has been lost solely and directly as a result of an **Insured Event**, and

ii) the variable costs that would have been incurred, but which have been saved as a result of not making those sales (including the cost of raw materials, and all other saved costs).

A. It is a condition precedent to Underwriters' Liability under this policy that the **Insured** provides satisfactory documentary evidence which sets out in detail how the **Customer Loss of Gross Profit** has been calculated by the **Insured's** direct customer(s). The **Insured** shall produce any such documentary evidence which Underwriters or their representatives, including forensic accountants, may require, and the **Insured** shall afford them every assistance in their investigations including reasonable access to the **Insured's** premises, personnel and necessary correspondence between the **Insured** and their direct customer(s) for the purpose of the computation of loss.

B. The Underwriters shall have the right but not the obligation to defend the **Insured** in any legal action seeking damages in relation to **Customer Loss of Gross Profit**. Any defence costs shall be included within the Sublimit and shall be subject to the Retention, Coinsurance stated below and the terms and conditions of the Policy. The Underwriters' liability for defence costs and **Customer Loss of Gross Profit** shall end once the Sublimit, stated below, has been exhausted.

C. The insurance afforded by this Policy shall apply in excess of any other insurance which is stated to be applicable to the loss.

D.  Sublimit, Retention, Coinsurance and Additional Premium:

i)  Sublimit:

AS STATED IN THE SCHEDULE TO THE CONTRACT OF INSURANCE.

This Sublimit is included within and not in addition to the Policy overall aggregate limit as stated in Item 3.4 of the Schedule.

ii)  Retention:

AS STATED IN THE SCHEDULE TO THE CONTRACT OF INSURANCE.

iii)  Coinsurance:

The **Insured** shall be liable for NIL % of the amount of each claim for **Customer Loss of Gross Profit**.

iv)  Additional Premium:

INCLUDED IN OVERALL PREMIUM.

All other terms, conditions and exclusions of this Policy remain unchanged.

**Policy No. C131542**                                                                    **RKH 180**

## PREMIUM PAYMENT CLAUSE

The (Re)Insured undertakes that premium will be paid in full to Underwriters within **60** days of inception of this policy (or, in respect of instalment premiums, when due).

If the premium due under this policy has not been so paid to Underwriters by the **60th** day from the inception of this policy (and, in respect of instalment premiums, by the date they are due) Underwriters shall have the right to cancel this policy by notifying the (Re)Insured via the broker in writing. In the event of cancellation, premium is due to Underwriters on a pro rata basis for the period that Underwriters are on risk but the full policy premium shall be payable to Underwriters in the event of a loss or occurrence prior to the date of termination which gives rise to a valid claim under this policy.

It is agreed that Underwriters shall give not less than 15 days prior notice of cancellation to the (Re)Insured via the broker. If premium due is paid in full to Underwriters before the notice period expires, notice of cancellation shall automatically be revoked. If not, the policy shall automatically terminate at the end of the notice period.

Unless otherwise agreed, the Leading Underwriter (and Agreement Parties if appropriate) are authorised to exercise rights under this clause on their own behalf and on behalf of all Underwriters participating in this contract.

If any provision of this clause is found by any court or administrative body of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability will not affect the other provisions of this clause which will remain in full force and effect.

Where the premium is to be paid through a London Market Bureau, payment to Underwriters will be deemed to occur on the day of delivery of a premium advice note to the Bureau.

11/01

**LSW3000**



## U.S. TERRORISM RISK INSURANCE ACT OF 2002 AS AMENDED
## NOT PURCHASED CLAUSE

*This Clause is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended as summarized in the disclosure notice.*

It is hereby noted that the Underwriters have made available coverage for "insured losses" directly resulting from an "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002", as amended ("TRIA") and the Insured has declined or not confirmed to purchase this coverage.

This Insurance therefore affords no coverage for losses directly resulting from any "act of terrorism" as defined in TRIA except to the extent, if any, otherwise provided by this policy.

All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

**LMA5092**
**21/12/2007**
Form approved by Lloyd's Market Association

## SERVICE OF SUIT CLAUSE (U.S.A.)

This Service of Suit Clause will not be read to conflict with or override the obligations of the parties to arbitrate their disputes as provided for in any Arbitration provision within this Policy. This Clause is intended as an aid to compelling arbitration or enforcing such arbitration or arbitral award, not as an alternative to such Arbitration provision for resolving disputes arising out of this contract of insurance (or reinsurance).

It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of the Insured (or Reinsured), will submit to the jurisdiction of a Court of competent jurisdiction within the United States. Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States.

It is further agreed that service of process in such suit may be made upon **Mendes and Mount, 445 South Figueroa Street, 38th Floor, Los Angeles, CA 90071-1601, USA** and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Insured (or Reinsured) to give a written undertaking to the Insured (or Reinsured) that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured (or Reinsured) or any beneficiary hereunder arising out of this contract of insurance (or reinsurance), and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

14/09/2005

**LMA5020**
Form approved by Lloyd's Market Association

### SANCTION LIMITATION AND EXCLUSION CLAUSE

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

15/09/10

**LMA3100**

Case 1:14-cv-00953-WBS-SAB Document 46-5 Filed 09/04/15 Page 32 of 59
Case 1:14-cv-00953-SAB Document 8-16 Filed 07/03/14 Page 32 of 59
FPF000031

**OTHER EXCLUSIONS:**

This policy excludes any loss arising out of

i)     Avian Influenza

ii)     Inter-Company Sales

iii)     Live Birds

All other terms, conditions and exclusions of this Policy remain unchanged.



FPF000032

**Policy No.** C131542        **RKH 180**

## INFORMATION

The following Information was provided to insurer(s) to support the assessment of the risk at the time of underwriting.

Client submission dated 4th March 2013 seen by all participants hereon and held on file by R K Harrison Insurance Brokers Limited

E-mails from Wells Fargo relating to the 2013 renewal of Foster Poultry Farms as held on file by R K Harrison Insurance Brokers.

FPF000033

| Policy No. C131542 | RKH 180 |
|---|---|

**Insurer's Liability:** **LMA 3333**

**(RE)INSURERS LIABILITY CLAUSE**

**(Re)insurer's liability several not joint**
The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any other member responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**
Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

**Order Hereon:** 100% of 100%

**Basis of Written Lines:** Percentage of whole.




Case 1:14-cv-00953-WBS-SAB Document 46-5 Filed 09/04/15 Page 35 of 59
Case 1:14-cv-00953-SAB Document 8-16 Filed 07/03/14 Page 35 of 59
FPF000034

**Signing Provisions:**     In the event that the written lines hereon exceed 100% of the order, any lines written "to stand" will be allocated in full and all other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order without further agreement of any of the (re)insurers.

However:

a)     in the event that the placement of the order is not completed by the commencement date of the period of insurance then all lines written by that date will be signed in full;

b)     the signed lines resulting from the application of the above provisions can be varied, before or after the commencement date of the period of insurance, by the documented agreement of the (re)insured and all (re)insurers whose lines are to be varied. The variation to the contracts will take effect only when all such (re)insurers have agreed, with the resulting variation in signed lines commencing from the date set out in that agreement.

**Written Lines:**     In a co-insurance placement, following (re)insurers may, but are not obliged to, follow the premium charged by the lead (re)insurer.

(Re)insurers may not seek to guarantee for themselves terms as favourable as those which others subsequently achieve during the placement.

**Signed Lines:**     **Written Lines:**

40 %



30%

30%

Syndicate *1206* ⅋ SAL 1206

| 1 | 3 | U | 2 | 3 | 2 | 7 | 3 | A | N | N | O |
|---|---|---|---|---|---|---|---|---|---|---|---|
| n | n | a | n | n | n | n | n | a | a | a | a |

SAL
21.05.13

## SUBSCRIPTION AGREEMENT SECTION

**Slip Leader:**                    XL Syndicate 1209 (Lloyd's)

**Basis of Agreement to
Contract Changes:**              GUA (October 2001) with Non Marine Schedule (October 2001).

**Other Agreement
Parties for Contract
Changes, for Part 2
GUA Changes Only:**         Part 2 changes may be agreed by Slip Leader only.

Any amendments extending "beyond 5 days" the settlement due dates shown in any Premium Payment Warranty, Premium Payment Condition, or LSW 3000 (as applicable to this contract) to be agreed by Slip Leader only, if required. All Insurers hereon will receive electronic transmission from R K Harrison Insurance Brokers Limited.

When required to do so by the Slip Leader only, R K Harrison Insurance Brokers Limited will provide details of agreed endorsements to following Insurers. If required, electronic transmission may be used by R K Harrison Insurance Brokers Limited for providing details of agreed endorsements, contractual changes or information to following Insurers as necessary.

Wherever practicable, between R K Harrison Insurance Brokers Limited and each (re)insurer which have at any time the ability to send and receive ACORD messages:

1.  R K Harrison Insurance Brokers Limited agrees that any proposed contract change will be requested via an 'ACORD message' or using an ACORD enabled electronic trading platform;

2.  whilst the parties may negotiate and agree any contract change in any legally effective manner, each relevant (re)insurer agrees to respond via an appropriate 'ACORD message' or using an ACORD enabled electronic trading platform;

3.  where a (re)insurer has requested to receive notification of any contract change R K Harrison Insurance Brokers Limited agrees to send the notification via an 'ACORD message' or using an ACORD enabled electronic trading platform.

**Agreement Parties for
Contract Changes, for
Their Proportion Only:**    None.

**Basis of Claims
Agreement:**                 Claims to be managed in accordance with

i)    The Lloyd's Claims Scheme (Combined), or as amended or any successor thereto.

ii)   IUA claims agreement practices.

iii)  The practices of any company(ies) electing to agree claims in respect of their own participation.

FPF000037

| Policy No. C131542 | RKH 180 |
|---|---|

**Claims Agreement Parties:**

    i)   <u>For Lloyd's syndicates</u>

The leading Lloyd's syndicate and, where required by the applicable Lloyd's Claims Scheme, the second Lloyd's syndicate and/or the Scheme Service Provider.

The second Lloyd's Syndicate is: _Ark 4020_ , if this is not completed, and there is Lloyd's participation of more than one Lloyd's syndicate, then the 2nd Lloyd's Syndicate which appears on the Security Details section shall be 'the second Lloyd's Syndicate'.

    ii)   <u>For IUA Companies</u>

Those companies acting in accordance with the IUA claims agreement practices, excepting those that may have opted out via iii) below.

    iii)   Those companies that have specifically elected to agree claims in respect of their own participation. *None, unless completed here.*

    iv)   <u>For Non Bureau Companies</u>

All other subscribing insurers that are not party to the Lloyd's/IUA claims agreement practices, each in respect of their own participation.

**Claims Administration:**   R K Harrison Insurance Brokers Limited and insurers agree that any claims hereunder (including any claims related costs/fees) will be notified and administered via ECF with any payment(s) processed via CLASS.

**Rules and Extent of Any Other Delegated Claims Authority:**   None.

**Expert(s) Fees Collection:**   R K Harrison Insurance Brokers Limited to collect fees.

**Settlement Due Date:**   **24th July 2013**

**Bureau Arrangements:**   Xchanging Ins-sure Services are authorised to sign premium from individual cedants / territories separately as and when received by R K Harrison Insurance Brokers Limited.

Premium payment requirements deemed met by presentation of premium / accounts to Ins-sure or Underwriters hereon as applicable on or before the Settlement Due Date(s) which deemed to be in compliance with Settlement Due Date(s) and will therefore not be recorded as a late signing or payment.

Where a Premium Payment Condition or Premium Payment Warranty requires payment by a date which is later than the Settlement Due Date, the Settlement Due Date is deemed to have been amended and shall be the same as the Premium Payment Condition or Premium Payment Warranty due date.

If Settlement Due Date (SDD) or any Premium Payment Warranty (PPW) or Premium Payment Condition (PPC) due date falls on a weekend or public holiday, presentation to Xchanging Ins-sure Services or Underwriters hereon as applicable on the next working day will be deemed in compliance with SDD, PPW or PPC.

**Non-Bureau Arrangements:**   None.





FPF000038

**Policy No. C131542**                                                                    **RKH 180**

## FISCAL AND REGULATORY SECTION

| | |
|---|---|
| **Tax Payable by Insurer(s):** | None applicable. |
| **Country of Origin:** | United States of America. |
| **Overseas Broker:** | Wells Fargo Insurance Services, 1301 East 9th Street, # 3800, Cleveland, OH 44114, USA |
| **Surplus Lines Broker:** | Jeremy Speckman Wells Fargo Insurance Services, 1301 East 9th Street, # 3800, Cleveland, OH 44114, USA |
| | Surplus Lines License # 0E19176 |
| **State of Filing:** | California |
| **US Classification:** | US Surplus Lines |
| **Allocation of Premium to Coding:** | 100% - PB |
| **Regulatory Client Classification:** | Large Risk. |

Case 1:14-cv-00953-WBS-SAB Document 46-5 Filed 09/04/15 Page 40 of 59
Case 1:14-cv-00953-SAB Document 8-1 Filed 07/03/14 Page 40 of 59
EPF000039

| Policy No. C131542 | RKH 180 |
|---|---|

**BROKER REMUNERATION & DEDUCTIONS SECTION**

XL
1209

**Fee Payable by Client?:**   No fee payable to R K Harrison Insurance Brokers Limited.

18. 5 %.

**Total Brokerage:**   ~~17.5%~~ (or net equivalent downwards).

21.
5
13

**Other Deductions from
Premium:**   None.

AB
4020
2
5
13

SM 1236
21.05.13

13
65
13

XL
1209

# Exhibit 2

## USDA

**United States Department of Agriculture**

Food Safety and
Inspection Service

December 6, 2013

Alameda District
620 Central Avenue,
Bldg. 2C
Alameda, CA  94501

Phone: (510) 769-5712
Fax:  (510) 337-5081

Mr. Ron Foster, CEO
Foster Poultry Farms
Establishment 6137 P
P.O. Box 457
Livingston, CA  95334

**CERTIFIED RETURN -
RECEIPT REQUESTED**

*Email: Robert.Oconnor@fosterfarms.com*

### LETTER OF CONCERN

Dear Mr. Foster:

The intent of this document is to raise your awareness and to inform you of the Food
Safety and Inspection Service (FSIS)'s serious concerns regarding the high incidence of
positive *Salmonella* results in weeks 3 and 4 of Phase 2 Intensified *Salmonella*
Verification Sampling occurring at your establishment.

On October 7, 2013, the Food Safety and Inspection Service (FSIS), Alameda District,
issued to your establishment a Notice of Intended Enforcement (NOIE), notifying you of
our intent to withhold the marks of inspection and suspend the assignment of inspectors
for the Slaughter, Raw Intact and Raw Non Intact processes at your establishment, in
accordance with FSIS Rules of Practice, Title 9 Code of Federal Regulations (CFR) Parts
500.4(a), 500.4(b) and 500.4(c).   This action was based on your establishment's failure
to operate in a manner that is consistent with the requirements of the Hazard Analysis and
Critical Control Points (HACCP) plan, Sanitation Standard Operating Procedures (SSOP)
program, and Sanitation Performance Standards (SPS) regulations, Title 9 Parts 417 and
416.  Your failure to operate in accordance with these regulations at Establishment 6137
P in Livingston, California, was evidenced by the fact that multiple poultry products
produced by your establishment have been implicated in an ongoing illness outbreak for
*Salmonella* Heidelberg, a pathogen of human health concern.

Since July 1, 2013, FSIS and the Centers for Disease Control and Prevention (CDC) have
been investigating an ongoing outbreak of human illness caused by *Salmonella*
Heidelberg beginning in March 2013, and continuing through November 2013. FSIS
conducted Phase 1 of Intensified *Salmonella* Verification testing at multiple Foster Farms
establishments, including Establishment 6137 P, from September 9, 2013, through
September 27, 2013 (three weeks total) whereby a high frequency of *Salmonella* positive
results and, specifically, a high frequency of one or more outbreak strains of serotype
*Salmonella* Heidelberg were found in your products. From October 10, 2013, through
October 11, 2013, your establishment made commitments and proffered corrective
actions to address the concerns detailed in the NOIE. After a thorough review and
evaluation of your proffered corrective actions and verbal commitments to control
*Salmonella*, including *Salmonella* serotypes of human health concern, the FSIS Alameda
District Office determined that your written submittals addressed the concerns as written

An Equal Opportunity Provider and Employer                         Page 1 of 5

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                   FOSTER 0006116

in the NOIE and placed the NOIE into deferral on October 10, 2013, pending successful implementation of your corrective actions and your achieving compliance.  FSIS Alameda District Office issued a Notice of Deferral dated October 11, 2013.

Since that time, you have been operating under a verification plan designed to verify that your establishment fully implements and follows all of the corrective actions and preventive measures your establishment proffered in your submittals. Additionally, FSIS began Phase 2 of Intensified *Salmonella* Verification Sampling on October 15, 2013,  of consumer ready packaged for retail chicken parts and whole birds at your facility (currently in the eighth week).

Phase 1 of intensified verification sampling of various consumer-ready packaged for retail chicken parts and whole birds demonstrated 40 samples (26.7%) confirmed as positive for *Salmonella* at the Livingston facility, Establishment 6137 P. After your establishment was placed into Deferral on October 10, 2013, FSIS began Phase 2 of Intensified *Salmonella* Verification Sampling of consumer ready packaged for retail chicken parts and whole birds. In the first 5 weeks (through November 15, 2013), since Phase 2 sampling began, results demonstrated a total of 46 samples (28.9%) confirmed positive for *Salmonella* in all products sampled and 31.2% positive in chicken parts samples. Please see attachment 1 for a break down of the data from Phase 1 and the first 5 weeks of Phase 2. On page 1 of attachment 1, the table shows the percentage of positive results by week for Phases 1 and 2, the table on page 2 shows the percentage of positive results by day for Phase 2, and the table on page 3 shows the percentage of positive results by day for Phases 1 and 2.   As illustrated in Attachment 1, weeks 3 and 4 showed an increase in the number of *Salmonella* positive results, which raises concerns regarding the long-term efficacy and the consistency of your corrective actions.   Although weeks 5 through 7 demonstrate a reduction in the number of *Salmonella* positives, your establishment is currently operating at a 23.3% positive incidence of *Salmonella* in all products sampled.   FSIS has concerns regarding your establishment's ability to consistently address the presence and incidence of *Salmonella* to ensure the safety of the products produced at your establishment. FSIS will continue to share data with Foster Farms as it becomes available.

On November 18, 2013, and November 25, 2013, Dr. Yudhbir Sharma, District Manager, held two face-to-face meetings with your Plant Management to discuss FSIS's concern of the high incidence of the number of *Salmonella* positives occurring at your establishment.

In addition, while operating under Deferral, from October 10, 2013, to present, FSIS in-plant personnel have issued your establishment a considerable number of Noncompliance Records (NRs) associated with HACCP and sanitation deficiencies.  The FSIS documented observations of instances of insanitary conditions may directly or indirectly contribute to the contamination of *Salmonella* in your establishment.  Specifically, FSIS in-plant inspection personnel observed live cockroaches near the ice machine and sanitizer dispenser box, flaking metal on a guide bar, metal splinters on a guide bar, and build-up of fat and feathers on food contact surfaces, including the Cecure antimicrobial

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    FOSTER 0006117

filtering/tumbler unit and piping at pre-operational sanitation inspection. FSIS in-plant personnel also observed condensation in the facility, and product affected by condensation. Further, your establishment failed to conduct re-checks for your failed Bio-Trace checks and failed to meet the frequencies as stated in your SSOP. You also failed to provide a product rinse after the application of Cecure antimicrobial, as required by your program. Additionally, FSIS in-plant personnel issued several NRs to your establishment for Zero Tolerance failures and your establishment failed to document corrective actions in response to some zero tolerance findings. Your establishment did not meet your CCP 2B monitoring frequency, the frequency for conducting Finished Product Standard (FPS) checks, or the frequency for applying the peracetic acid (PAA) treatment on the salvage parts. In addition, FSIS in-plant personnel observed that your establishment's spray of Cecure antimicrobial was not functioning. Further, your establishment employee failed to conduct and document verification activities and corrective actions in accordance with the written program and as required by the regulations. The failure of your establishment to conduct critical checks at the required frequencies, coupled with non-functioning anti-microbial interventions may have further contributed to the presence of *Salmonella* in your facility.

These noncompliances, combined with the previous and current positive rate of *Salmonella* at your establishment indicates a lack of system controls in your environment. Pathogens such as *Salmonella* are of serious public health concern that can cause a variety of serious illnesses. The organisms can cause a serious infection, which can lead to illnesses, including death. Without adequate implementation and supportable design of your program that would support the control of *Salmonella* in your process, FSIS cannot determine that your corrective actions have adequately addressed the hazards of concern and function to maintain sanitary conditions in your facility.

Because FSIS continues to have concerns with your establishment's continuing noncompliance, and the previous and current rate of positive *Salmonella*, FSIS is requesting that your establishment clarifies the additional actions, modifications, and measures you have already implemented or planned to implement based on this new data, to ensure consistent process control and reduction of incidence of *Salmonella* at your establishment. Please share any *Salmonella* sampling results you have obtained from September 9, 2013, to present. This information should include type of sample collected (i.e. rinsate), the date and time that the sample was collected, the pathogen (and/or indicator) for which the sample was tested, and the result of the assay. Please provide this information broken down by sample (not analyzed or consolidated by week or other period), preferably in Microsoft Excel (or similar) format. Further, please clarify any additional controls and/or modifications to your food safety system you plan to implement to prevent the contamination of product produced at your establishment and reduce the incidence of *Salmonella*. Additionally, please provide documentation to demonstrate any changes you have made to reduce the incoming load of *Salmonella* and indicator organisms in your establishment from re-hang through to final packaging, including any changes to your sanitary dressing program. Finally, please clarify if you

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                    FOSTER 0006118

have identified the source of the high incidence of positive *Salmonella* results during weeks 3 and 4 at your establishment.

Also, throughout the verification period, your establishment has continually modified your food safety programs and has failed to provide adequate notice to the Alameda District Office or to provide the modified programs for review prior to implementation. Please clarify when you plan to have your final antimicrobial treatment(s) in place and provide all documentation for review prior to implementation.

As a result of the high numbers of *Salmonella* positive results present at your establishment, FSIS is expanding the Intensified *Salmonella* Verification sampling beyond the original planned duration of 90 days. Additionally, FSIS is expanding the intensified *Salmonella* verification sampling to include environmental food contact surface swabbing of equipment and exterior swabbing of retail ready packages. FSIS is also considering sampling re-hang carcass rinsates and other pathways, which may introduce or spread contamination within your facility. FSIS strongly encourages you to expand your in-house sampling program in a similar manner to provide a clearer picture of the high incidence of *Salmonella* at your establishment.

As discussed, on October 7, 2013, the FSIS Alameda District Office notified your establishment of the intent to withhold the marks of inspection and suspend the assignment of inspectors. Your establishment proffered corrective actions from October 10, 2013, to October 11, 2013, in response to the NOIE. Based on those corrective actions, the FSIS Alameda District Office placed the NOIE in deferral on October 10, 2013.

In the Agency's review of the progress of the validation of your corrective actions, your establishment is not meeting the expectation of achievement. The continued implementation of ineffective corrective actions may result in FSIS' determination that the HACCP system is inadequate, which will support a suspension action at your establishment. The sampling data from weeks 3 and 4 reveals a high incidence in your establishment of *Salmonella* in products related to one or more ongoing outbreak clusters associated with *Salmonella* serotype Heidelberg. Although we are encouraged by the lower incidence of *Salmonella* positives observed in weeks 6 and 7, if your establishment is unable to consistently demonstrate effectiveness of your corrective actions through the remainder of the validation period, or if the rate of positive *Salmonella* takes a reversed direction, the agency may then initiate further enforcement actions at your facility, including suspension of the assignment of inspectors at your establishment.

FSIS in-plant personnel will continue to monitor the effectiveness of your proffered corrective actions and preventive measures in ensuring that safe products are produced and shipped by your establishment. FSIS will also continue to monitor and conduct Intensified *Salmonella* Verification sampling at your establishment.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    FOSTER 0006119

Finally, please be aware that FSIS Alameda District Office will be communicating with the CDC and the outbreak-affected States to discuss the status of the outbreak. FSIS will contact Foster Farms after the communication with our partners, CDC, and the affected states, and will share with you the feedback and outcome of the discussion.

If you have any questions, please call the Alameda District Office at (510) 769-5712.

Sincerely,

Yudhbir Sharma, DVM
District Manager

cc:
A. Amin, DDM, OFO
F.  Gillis DDM, OFO
V. Felix, DDM, OFO
L.  Wang, DCS, OFO
J. Scrivner, DCS, OFO
M. Tiojanco, SEIAO, OFO
C. Vu, SEIAO, OFO
G. Abreu, FLS, OFO
R. Flood, EIAO, OFO
M. Salazar, EIAO, OFO
USDA IIC, Est. 6137 P, OFO

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    FOSTER 0006120

# Exhibit 3



**USDA** United States Department of Agriculture

Food Safety and
Inspection Service

January 8, 2014

Alameda District
620 Central Avenue,
Bldg. 2C
Alameda, CA 94501

Mr. Ron Foster, CEO
Foster Poultry Farms
Establishment 6137 P
P.O. Box 457
Livingston, CA 95334

**CERTIFIED RETURN-
RECEIPT REQUESTED**

Phone: (510) 769-5712
Fax: (510) 337-5081

*Email: Robert.Oconnor@fosterfarms.com*

## NOTICE OF SUSPENSION

Dear Mr. Foster:

This letter confirms the verbal notification that was provided to your establishment on January 8, 2014, by the Food Safety and Inspection Service (FSIS), Alameda District, of the withholding of the marks of inspection and the suspension of the assignment of inspectors at your establishment in accordance with FSIS Rules of Practice, Title 9 Code of Federal Regulations (CFR), Part 500.3(a)(4). This action is initiated based on egregious insanitary conditions observed in your establishment whereby products produced at your facility may have been rendered adulterated in violation of the Poultry Products Inspection Act (PPIA) 21 U.S.C. 453 and 456, and the regulations promulgated thereunder, specifically Title 9 CFR 416. This is evidenced by findings of an infestation of live cockroaches in and around your production areas, that created insanitary conditions, and demonstrate that your firm failed to maintain an effective pest control program and other sanitary controls to assure that wholesome, unadulterated meat and poultry products are produced at your facility.

### Background/Authority

The Poultry Products Inspection Act (PPIA) (21 U.S.C. 451 et seq.) provides that it is essential in the public interest that the health and welfare of consumers be protected, by assuring that poultry products distributed to them are wholesome, not adulterated, properly marked, labeled and packaged. This Act gives FSIS the authority, as designated by the Secretary of the Department of Agriculture, to issue rules and regulations describing sanitation requirements for inspected establishments. The Act also provides FSIS program personnel the authority to refuse to allow poultry or poultry products to be labeled, marked, stamped, or tagged as "*inspected and passed*" and to prevent the entry of products into commerce when the sanitary conditions of any such establishment are such that products are adulterated and provide definitions for the term "*adulterated*." Furthermore, this Act provides FSIS the authority to appoint inspectors from time to time to examine and inspect products, including the

An Equal Opportunity Provider and Employer

Page 1 of 5

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

sanitary conditions of facilities. The Act also give FSIS program personnel the right to examine and inspect all carcasses and parts of carcasses that are further treated and prepared and the right to access and examine establishment records. When the sanitary conditions of a facility are not properly maintained, FSIS can refuse inspection and indefinitely withdraw inspection from an establishment, provided the establishment is afforded the right to an administrative hearing.

Under the authorities of the Act, FSIS has prescribed rules and regulations required for establishments producing poultry products including the requirements pertaining to Sanitation Standard Operating Procedures (SSOP) and Sanitation Performance Standards (SPS) (Title 9 CFR Part 416) and other matters. FSIS has also developed Rules of Practices regarding enforcement (Title 9 CFR, Part 500). The Rules of Practice describe the types of enforcement action that FSIS may take and include procedures for taking a withholding action and suspension, with or without prior notification, and for filing a complaint to withdraw a grant of Federal Inspection.

**Findings/Basis for Action**

On January 8, 2014, during production at 0350 hours, FSIS inspection personnel observed and documented findings of live cockroaches at the hand wash sink directly across from Inspection Station 7, line 2. At the time of the observation, slaughter operations were in progress, and exposed product was present on the kill floor. FSIS inspection personnel took a withholding action due to the presence of live cockroaches in the production area at your establishment.

Further, FSIS inspection personnel have documented noncompliances related to cockroaches in your production areas on four occasions between August 1, 2013, and January 8, 2014.

- On January 7, 2014, FSIS documented a noncompliance for live cockroaches found during production on a grey plastic tub that is a direct product contact surface.
- On December 28, 2013, FSIS documented a noncompliance for live cockroaches found during production to the left of the faucet of Inspection Station 7.
- On November 4, 2013, FSIS documented a noncompliance for live cockroaches found during production next to the sanitizer dispenser box, which is located on the wall next to the ice machine.
- On September 14, 2013, FSIS documented a noncompliance for live cockroaches found during production on the floor between the liver tumbler/belt and the wall.

FSIS Inspection has observed and documented cockroaches in your establishment on multiple days (including on two consecutive days), in multiple locations within your establishment. These recent findings of egregious insanitary conditions related to a

An Equal Opportunity Provider and Employer

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FOSTER 0006359

cockroach infestation in your facility indicate that your establishment is not being operated and maintained in sanitary condition, or in a manner to ensure that product is not adulterated. As demonstrated by the findings of pests in your facility, your establishment failed to prevent conditions that could lead to insanitary conditions, where products may have been rendered adulterated and/or injurious to health. These are regulatory noncompliances of Title 9 CFR 416.1, 416.2(a) and 416.2(b)(3).

On January 8, 2014, the Alameda District Office (ADO) verbally notified your establishment of the withholding of the marks of inspection and suspension of the assignment of inspectors based on the egregious insanitary conditions present within your facility.

Pests are highly unsanitary given that they can come in contact with decomposing garbage or other organic materials. Because animal-based organic materials and garbage are excellent breeding media, cockroaches and other pests can transmit disease-causing pathogens, including bacteria. Poorly maintained facilities and equipment that are not maintained to prevent entrance of pests, such as cockroaches, rats and flies, can and do harbor food borne pathogens, which can then multiply and be dispersed throughout the food processing environment, increasing the chances of product contamination rendering the product unsafe.

The Poultry Products Inspection Act, 21 U.S.C. 453(g)(4), states product is adulterated *"if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health."* Foster Poultry Farms failed to meet the sanitary measures required by the Sanitation Performance Standards regulatory requirements, creating insanitary conditions that may result in the production of products, which may have been rendered injurious to health.

The Poultry Products Inspection Act, 21 U.S.C. 456 states, *"the Secretary shall refuse to render inspection to any establishment whose premises, facilities, or equipment, or the operation thereof, fail to meet the requirements of this section."* Foster Poultry Farms failed to maintain sanitary conditions at its establishment, creating insanitary conditions that could result in the production of products, which may have been rendered injurious to health.

The Poultry Products Inspection Act, 21 U.S.C. 463 states, *"the Secretary shall make rules and regulations as are necessary for the efficient execution of the provisions of this Act and all inspections and examinations made under this Act shall be made in such manner as described in the rules and regulations."*. Foster Poultry Farms failed to abide by the rules and regulations promulgated under the Poultry Products Inspection Act.

An Equal Opportunity Provider and Employer

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    FOSTER 0006360

Based on the above findings of your failures to meet the SSOP and SPS regulatory requirements in accordance with Title 9 CFR, Part 416, your failure to implement effective corrective actions and preventive measures, and the existing insanitary conditions that may render product(s) at your establishment adulterated, FSIS is suspending the assignment of inspectors for all processes at your establishment.

The suspension will remain in effect until such time as you provide adequate written assurances of corrective and preventive measures to assure that meat and poultry products will be produced under sanitary conditions in accordance with the Poultry Products Inspection Act and the regulations promulgated there under.

Your corrective and preventive action plan should include at a minimum the following:

1- Identify the assessment process you intend to use to determine the nature and cause of the insanitary condition and the occurrence of pest infestation, including but not limited to the conditions of your facility and the level of repair performed at your facility.
2- Identify what the assessment revealed as the likely cause of pest problems in your establishment.
3- Describe what specific actions your establishment will take to correct and eliminate the causes.
4- Provide a pest control program that will describe the monitoring procedures and other activities that will ensure the prevention of future pest infestations.
5- Define the future monitoring activities that your firm intends to use to ensure that the changes and the preventive measures you initiated are effective.

In addition, failure to respond to this notice of suspension adequately, or failure to assure that the products produced at your establishment meet the requirements of the Poultry Products Inspection Act and the regulations promulgated there under, may result in further administrative enforcement actions. You may submit your response via facsimile to 510-337-5081 or by electronic mail (email) to virginia.molano@fsis.udsa.gov.

In accordance with Title 9 CFR 500.5(a)(5), you may appeal this action by contacting:

> Dr. Hany Sidrak
> Executive Associate for Regulatory Operations
> 1400 Independence Avenue, SW
> Room 3157-S
> Washington, DC   20250
> Phone:  202-205-4208

An Equal Opportunity Provider and Employer

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    FOSTER 0006361

In accordance with 9 CFR 500.5(d), you may request a hearing concerning this action by contacting:

> Director; Enforcement and Litigation Division
> Office of Investigation, Enforcement, and Audit
> Food Safety and Inspection Service
> United States Department of Agriculture
> Patriot Plaza III, 8th Floor, Cubicle 8-243A
> 355 E Street, SW
> Washington, DC 20024-3221
> Telephone: (202) 418-8872
> Facsimile Number: (202) 245-5097

If you have any questions, please call the Alameda District Office at 510-769-5712.

Sincerely,

Abdalla Amin
Deputy District Manager

cc:
Y. Sharma, DM
F. Gillis, DDM
V. Felix, DDM
J. Scrivner, DCS
L. Wang, DCS
M. Tiojanco, SEIAO
C. Vu, SEIAO
G. Abreu, FLS
M. Williams, EIAO
A. Khroustalev, RD, IEA
USDA, IIC, Est. 6137 P
FO/QER

An Equal Opportunity Provider and Employer

Page 5 of 5

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                                    FOSTER 0006362

# Exhibit 4

Foster Farms
1000 Davis Street
Livingston, CA 95334
Telephone: (209) 394-7901
Fax: (209) 394-6913



January 10, 2014

Dr. Yudhbir Sharma
District Manager
Food Safety and Inspection Service
U.S. Department of Agriculture
Alameda District Office
620 Central Ave
Building 2 C
Alameda, CA 94501
510-769-5712

Dear Dr. Sharma,

This letter is in response to the FSIS Notice of Suspension dated January 8, 2014 (hereinafter Notice) issued to Foster Poultry Farms, 843 Davis Street, Livingston, California 95334, Establishment P6137. Please be assured that at Foster Farms-Livingston, we take our responsibility to produce wholesome and safe products very seriously.

A Notice of Suspension was issued as a result of documented findings of German cockroach activity. The Notice outlined four incidences of a German cockroach sighting. The investigative findings and corrective actions for each incident are listed below. The referenced attachments include a description of the area and the service report detailing the method of treatment.

- September 14, 2013 (Attachment 1)
  - A German cockroach was observed on the floor in Plant 1 near the liver area.
  - The Pest Control Operator inspected the area on September 15, 2013. No harborages were identified and the area was treated.
  - A follow up inspection was performed on September 16, 2013. No activity was observed.

- November 4, 2013 (Attachment 2)
  - A German cockroach was observed in Plant 2 on the wall by the ice machine.
  - The Pest Control Operator inspected the area on November 5, 2013. Harborage areas were identified along the wall on the opposite side of the sighting. Maintenance covered the openings with silicone after the area was treated.
  - A follow up inspection was performed on September 6, 2013. No activity was observed.

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

Response – Notice of Suspension P6137
January 10, 2014
Page 2 of 5

- December 28, 2013 (Attachment 3)
  - A German cockroach was observed on a faucet in Plant 1.
  - The Pest Control Operator inspected the area on December 29, 2013. Activity was observed within a wall gap. The identified area was vacuumed, flushed, and treated. Maintenance sealed the openings with cement following treatment.
  - A follow up inspection was performed on December 30, 2013. No activity was observed.

- January 7, 2014 (Attachment 4)
  - A German cockroach was observed on the underside surface of a gray tub.
  - An intensive inspection of the Plant 1 evisceration area was performed by establishment management and the Pest Control Operator. A harborage was located in the picking area. The area was treated and sealed.
  - Cracks and crevices in the Plant 1 picking area were aggressively treated with insecticidal dust and/or bait.

On January 8, 2014, there was an additional sighting of one German cockroach in Plant 1. The establishment's corrective and preventative action plan is outlined below.

**Assessment**

A service team consisting of Orkin and Buzz Off Pest Control was assembled to conduct an assessment of the facility. This included all production areas, employee welfare areas, administrative offices, USDA areas, and maintenance shops. (Attachment 5) In areas where drop ceilings are present, the inspection included overhead crawl spaces. The key objectives were to:

- Identify areas of insect activity by flushing sites that could potentially support pest activity with contact insecticide. (Attachment 6)

- Identify harborage areas. These are areas with conditions conducive for breeding such as cracks and crevices, wall voids, electrical equipment, light fixtures, drop ceilings, etc.

- Develop intensified action program, to include corrective actions, preventative measures, and on-going monitoring procedures.

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

Response – Notice of Suspension P6137
January 10, 2014
Page 3 of 5

## Cause Analysis

The assessment team evaluated the activity observed as a result of the intensified treatment. The majority was localized to Plant 1 and 2 picking areas, maintenance shops, offal room, and boiler room. Activity was also noted in the USDA office, however this area is above the Plant 2 picking area. The second processing, packaging, rotisserie, and weigh and price areas were free of activity. (Attachment 7)

A review of the pest control program in conjunction with the observations of the intensified treatment identified that the method and frequency of routine treatment in the affected areas was not adequate to maintain effective pest control. The following deficiencies were identified:

- Elevated areas were not adequately addressed during routine treatment. The equipment used by the pest control provider for treatment in these areas was not designed to effectively deliver the insecticide.

- Electrical panels within auxiliary areas were not effectively treated. The interior of the electrical boxes was not sufficiently inspected due to safety concerns.

- The design of the pest control program did not include a formal internal verification procedure.

## Corrective Actions

- Cracks, crevices, and other harborage sites were treated with insecticidal dust and/or bait. Once cleaned and treated, the areas were sealed to eliminate harborage. (Attachment 8) All insecticides were applied by a licensed Pest Control Operator in accordance with California Food and Agricultural Code and Title 3 of the California Code of Regulations and are approved for use in a food manufacturing facility.

- The associated production areas were treated by applying residual insecticide with a power spray system. This ensured complete coverage of the area to include: ceilings, walls, light fixtures, etc. This high power spray treatment will be repeated prior to resuming operations in the affected areas. (Attachment 8) All insecticides are applied by a licensed Pest Control Operator in accordance with California Food and Agricultural Code and Title 3 of the California Code of Regulations and are approved for use in a food manufacturing facility.

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

Response – Notice of Suspension P6137
January 10, 2014
Page 4 of 5

- For the next two weeks, daily comprehensive treatments will be performed during non-production hours in Plant 1 and 2. Documentation of the treatments will be available to the agency. (Attachment 9) All insecticides are applied by a licensed Pest Control Operator in accordance with California Food and Agricultural Code and Title 3 of the California Code of Regulations and are approved for use in a food manufacturing facility.

- Insect Monitoring devices will be placed in the areas identified by the Pest Control Provider and monitored daily for two weeks. Observations will be documented on the Pest Control service logs. (Attachment 10, 11, and 12)

- A comprehensive inspection and review of the facility will be performed by a Board Certified Entomologist to recommend additional preventative measures. The review will begin on January 10, 2014. The results of this inspection will be available. (Attachment 13)

- The establishment will continuously monitor Plant 1 and 2 for the next three weeks for German cockroach activity. Two employees will be dedicated to each plant during operations. A procedure outlining the inspection program has been developed and each employee will be trained. The monitoring results will be documented and available for review by the agency. (Attachment 14 and 15)

- The establishment responsibility for managing the contracted Pest Control Operator will be assigned to the QA Manager. (Attachment 16)

**Preventive Measures**

- The facility identified that the Pest Control Operator was not able to effectively treat the electrical panels due to safety considerations. As a result, a comprehensive program will be outlined to ensure electrical panels located in auxiliary areas are treated at an established frequency. (Attachment 17) All insecticides are applied by a licensed Pest Control Operator in accordance with California Food and Agricultural Code and Title 3 of the California Code of Regulations and are approved for use in a food manufacturing facility.

- The pest control program has been formally reassessed (Attachment 18). The following modifications have been made:
  - The action threshold was modified so that identification of one cockroach on an Insect Monitoring device in a production area will require corrective actions. (Attachment 19)

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

    o  Space treatment equipment designed to apply flushing agents directly to potential harborage areas will be used. (Attachment 20) All insecticides are applied by a licensed Pest Control Operator in accordance with California Food and Agricultural Code and Title 3 of the California Code of Regulations and are approved for use in a food manufacturing facility.

    o  Hand and power spray equipment will be utilized for application of insecticides. (Attachment 20) All insecticides are applied by a licensed Pest Control Operator in accordance with California Food and Agricultural Code and Title 3 of the California Code of Regulations and are approved for use in a food manufacturing facility.

    o  An internal pest control verification program has been established. (Attachment 16)

**Verification**

- A weekly Pest Control meeting will be held with the Pest Control service technician to review inspection results. Topics discussed in the meeting will be documented and include activity by area, facility repairs, and treatment schedules. Documentation will be available for review. (Attachment 21)

- The QA Manager will formally meet with the contracted Pest Control Management team monthly. The meeting minutes will be documented and available for review. (Attachment 16)

In conclusion, we are confident that the corrective and preventative plan described above will collectively eliminate pest control issues. If you have any questions or need further information, please do not hesitate to contact me.

Sincerely,

Ron O'Bara
Livingston Plant Manager
P-6137

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

Foster Farms
1000 Davis Street
Livingston, CA 95334
Telephone: (209) 394-7901
Fax: (209) 394-6913



## Attachment List

| Attachment # | Attachment Description |
|:---:|:---|
| 1 | Service Report (September 14, 2013) – MSDS, Location Description |
| 2 | Service Report (November 4, 2013) – MSDS, Location Description |
| 3 | Service Report (December 28, 2013) – MSDS, Location Description |
| 4 | Service Report (January 7, 2014) – MSDS, Location Description |
| 5 | Facility Map |
| 6 | Orkin Action Plan |
| 7 | Map Identifying Harborage Locations with Descriptions of Locations |
| 8 | Service Reports (January 8, 2014) |
| 9 | Comprehensive Treatment Program |
| 10 | Insect Monitoring Device Procedure |
| 11 | Map with Insect Monitoring Locations |
| 12 | Example of Insect Monitoring Device |
| 13 | Entomologist Plan |
| 14 | Continuous Monitoring Procedure |
| 15 | Training Plan for Internal Monitoring |
| 16 | Internal Pest Control Program |
| 17 | Electrical Panel Treatment Program |
| 18 | Pest Control Reassessment |
| 19 | Scope of Service (Previous Version/Revised Version) |
| 20 | Description of New Equipment |
| 21 | Pest Control Meeting Procedure |

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER