1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10                                ----oo0oo----

11   FOSTER POULTRY FARMS, INC.,          CIV. No. 1:14-953 WBS SAB

12                Plaintiff,              MEMORANDUM AND ORDER RE: MOTIONS
                                          FOR SUMMARY JUDGMENT; MOTION TO
13        v.                              STRIKE

14   CERTAIN UNDERWRITERS AT

15   LLOYD'S, LONDON,

16

17                Defendants.

18

19

20                                ----oo0oo----

21        Plaintiff Foster Poultry Farms, Inc. ("Foster") brought

22   this action for declaratory relief and breach of contract against

23   defendants Certain Underwriters at Lloyd's, London ("Insurers").

24   Presently before the court are Foster's motion for partial

25   summary judgment on its declaratory relief claim and Insurers'

26   motion for summary judgment under Federal Rule of Civil Procedure

27   56, and Foster's motion to strike the deposition testimony and

28

                                        1

opinions of Thomas James Hoffman and Dr. William James under

Rules 30(d)(2) and 37(c)(1), respectively.

I.   Factual and Procedural Background

       Foster is a poultry producer with its largest chicken

processing plant in Livingston, California (the "Facility").

(O'Connor Decl. ¶ 4 (Docket No. 46-3); Lavella Decl. (Docket Nos.

46-4 to 46-6) Ex. 24 at 36:7-22.)   The Facility is comprised of

two processing areas called "Plant 1" and "Plant 2," which share

a common packaging floor.   (Lavella Decl. Ex. 24 at 38:20-40:3;

O'Connor Decl. ¶ 5.)   Insurers, a group of Lloyd's underwriters

organized into three syndicates,[1] issued a product contamination

insurance policy to Foster, effective May 25, 2013 to May 25,

2014 (the "Policy").   (Lavella Decl. Ex. 1 ("Policy"); Topp Decl.

(Docket Nos. 50-2 to 50-4) Ex. U at 12:17-13:3.)   The Policy is

governed by a New York choice of law provision.   (Id. at 8.)   The

Policy provides coverage for all "Loss" arising out of "Insured

Events" during the policy period.   (Id. at 10.)   Two types of

Insured Events under the Policy, which are at issue here, are

"Accidental Contamination" and "Government Recall."   (Id. at 10,

23.)

       On October 7, 2013, the United States Department of

Agriculture Food Safety and Inspection Service ("FSIS") issued a

Notice of Intended Enforcement ("NOIE") to suspend the assignment

---

[1]   "Lloyd's operates as a marketplace for the placement of
insurance. Syndicates made up of individual underwriters insure
risks on behalf of their members.  Normally, several syndicates
will provide insurance for a given risk by agreeing to cover a
percentage of that risk."  Alexander & Alexander Servs., Inc. v.
These Certain Underwriters at Lloyd's, London, England, 136 F.3d
82, 84 n.2 (2d Cir. 1998).

of inspectors at the Facility and withhold marks of inspection for products produced there, which are required for the products to be eligible for sale. (Lavella Decl. Ex. 8 ("NOIE").)[2] FSIS based its notice on the Facility's high prevalence of salmonella, its implication in a salmonella illness outbreak, and its noncompliance with federal sanitation regulations. (Id.) Foster proffered corrective actions in response to the NOIE. (Lavella Decl. Ex. 9). As a result, FSIS placed the NOIE in deferral to allow Foster an opportunity to implement those corrective actions and to achieve compliance. (Lavella Decl. Ex. 2 ("LOC") at 1-2.)

On December 6, 2013, FSIS issued Foster a Letter of Concern that noted Foster's continued failure to remedy the high incidence of salmonella at the Facility, and informed Foster of live cockroach sightings at the Facility. (See id.) On January 8, 2014, based on Foster's continued noncompliance and a German cockroach infestation at the Facility, FSIS issued Foster a Notice of Suspension ("NOS") suspending the assignment of inspectors at the Facility and withholding marks of inspection for the chicken produced there. (Lavella Decl. Ex. 3 ("NOS").) As a result, the Facility ceased production from January 8, 2014 to January 21, 2014. (O'Connor Decl. ¶¶ 9, 21.)

Five days after the issuance, FSIS held the NOS in abeyance pending Foster's implementation of a comprehensive

---

[2]      Under FSIS regulations, a "'withholding action' is the refusal to allow the marks of inspection to be applied to products. A withholding action may affect all product in the establishment or product produced by a particular process." 9 C.F.R. § 500.1(b). "A 'suspension' is an interruption in the assignment of program employees to all or part of an establishment." Id. § 500.1(c).

action plan that included fumigating the Facility. (Lavella Decl. Ex. 5.) Subsequently, Foster requested FSIS to apply marks of inspection to its chicken product that was produced on January 7 and 8, 2014. (Lavella Decl. Ex. 7.) FSIS granted Foster's request as to chicken produced exclusively in Plant 2 on January 8, but denied its request as to all remaining chicken produced at the Facility on January 7 and 8. (Id.; O'Connor Decl. ¶¶ 16-18.) Under FSIS supervision, Foster thus destroyed 1.3 million pounds of the denied chicken, which was ineligible for sale. (O'Connor Decl. ¶ 18-20; see Lavella Decl. Exs. 6, 7; O'Connor Tr. at 206:23-208:11, 209:25-211:8; Wolff Decl. (Docket Nos. 47-4 to 47-24) Ex. R at 7 ¶ 7.)

Foster submitted a coverage claim with Insurers for over $12 million in expenses that it claimed to have incurred as a result of the NOS. (Lavella Decl. Ex. 11 at 3; Wolff Decl. Ex. R at 4 ¶ 1.) Foster claimed coverage under the Policy's Accidental Contamination and Government Recall provisions, but Insurers denied Foster coverage under both. (Id. Exs. 12-14.)[3] Foster then instituted this action for declaratory relief and breach of the insurance contract. (Docket No. 1.) Foster now moves for partial summary judgment on its declaratory relief claim and Insurers move for summary judgment on both of Foster's claims. (Docket Nos. 46, 47.) Foster also moves to strike the deposition testimony and opinions offered by two of Insurers' expert witnesses, Thomas James Hoffman and Dr. William James.

---

[3]    Insurers admit that Foster satisfied the conditions precedent to coverage in Sections 6(A), 7(B), and 7(G)(i) of the Policy. (Docket No. 50-1 ¶ 19.)

(Docket No. 54.)

II.  <u>Analysis</u>

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable trier of fact to enter a verdict in the non-moving party's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). Alternatively, the moving party can demonstrate that the non-movant cannot produce evidence to support an essential element upon which it will bear the burden of proof at trial.  <u>Id.</u>

Once the moving party meets its initial burden, the burden shifts to the non-moving party to "designate specific facts showing that there is a genuine issue for trial."  <u>Id.</u> at 324.  To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  <u>Anderson</u>, 477 U.S. at 252.

5

1

2

3       In deciding a summary judgment motion, the court must
view the evidence in the light most favorable to the non-moving
4
party and draw all justifiable inferences in its favor.  Id. at
5
255.  "Credibility determinations, the weighing of the evidence,
6
and the drawing of legitimate inferences from the facts are jury
7
functions, not those of a judge" ruling on a motion for summary
8
judgment.  Id.  When parties submit cross-motions for summary
9
judgment, the court must consider each motion separately to
10
determine whether either party has met its burden, "giving the
11
nonmoving party in each instance the benefit of all reasonable
12
inferences."  ACLU of Nev. v. City of Las Vegas, 333 F.3d 1092,
13
1097 (9th Cir. 2003); see also Fair Hous. Council v. Riverside
14
Two, 249 F.3d 1132, 1136 (9th Cir. 2001) (when parties submit
15
cross-motions for summary judgment, "each motion must be
16
considered on its own merits" and "the court must review the
17
evidence submitted in support of each cross-motion").

        A.   Principles of Interpretation for Insurance Policies
18
             Under New York law, the threshold question of law for
19
the court to determine is whether a policy's terms are ambiguous.
20
Duane Reade Inc. v. St. Paul Fire and Marine Ins. Co., 411 F.3d
21
384, 390 (2d Cir. 2005).  An insurance "contract is unambiguous
22
if the language it uses has a definite and precise meaning" such
23
that it is reasonably susceptible to one interpretation.
24
Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170-71 (N.Y.
25
2002).  An unambiguous contract provision is enforced according
26
to the plain meaning of its terms, id., and courts commonly refer
27
to the dictionary to ascertain a provision's plain and ordinary
28

6

meaning, Ellicott Square Court Corp. v. Mountain Valley Indem. Co., 634 F.3d 112, 119 (2d Cir. 2011).

"Ambiguity is determined by looking within the four corners of the document, not to outside sources." Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P., 920 N.E.2d 359, 363 (N.Y. 2009). An insurance policy is ambiguous if "its terms are subject to more than one reasonable interpretation." Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 37 N.E.3d 78, 80 (N.Y. 2015). To determine whether an insurance contract is ambiguous, the court must interpret its terms "according to common speech and consistent with the reasonable expectations of the average insured." Cragg v. Allstate Indem. Corp., 950 N.E.2d 500, 500 (2011). In a case involving a policy issued to a business, the court must also examine the "reasonable expectation and purpose of the ordinary business [person] when making an ordinary business contract." Michaels v. City of Buffalo, 651 N.E.2d 1272, 1273 (N.Y. 1995) (citation omitted).

The court must take into account not only the policy's literal language, but whatever may be reasonably implied from that language, including "any promises which a reasonable person in the position of the promisee would be justified in understanding." Sutton v. E. River Sav. Bank, 435 N.E.2d 1075, 1078 (N.Y. 1982) (citation omitted). In construing policy terms according to these standards, the court should strive to give meaning and effect to every sentence, clause, and word of the contract. Northville Indus. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 679 N.E.2d 1044, 1048 (N.Y. 1997).

7

If the policy's language is susceptible to more than one reasonable interpretation, the language is "deemed to be ambiguous and thus interpreted in favor of the insured." Fed. Ins. Co. v. Int'l Bus. Machines Corp., 965 N.E.2d 934, 936 (N.Y. 2012); see also Handelsman v. Sea Ins. Co., 647 N.E.2d 1258, 1260 (N.Y. 1994) ("Where there is ambiguity as to the existence of coverage, doubt is to be resolved in favor of the insured and against the insurer.").[4]  When "an insurer wishes to exclude certain coverage from its policy obligations, it must do so 'in clear and unmistakable' language." Fed. Ins. Co., 965 N.E.2d at 938 (citation omitted).  Any such exclusions or exceptions must be specific and clear to be enforced: "[t]hey are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction." Id. (citation omitted).

"[B]efore an insurance company is permitted to avoid policy coverage, it must satisfy the burden which it bears of establishing that the exclusions or exemptions apply in the particular case, and that they are subject to no other reasonable interpretation." Dean v. Tower Ins. Co. of N.Y., 979 N.E.2d 1143, 1145 (N.Y. 2012) (citation omitted).  If an "insurance carrier drafts an ambiguously worded provision and attempts to limit its liability by relying on it," the court must construe the language against the carrier. Metro. Prop. & Cas. Ins. Co. v. Mancuso, 715 N.E.2d 107, 112 (N.Y. 1999).  This "exceptionally

---

[4]      New York follows the "well-settled maxim of contra proferentem" under which courts resolve ambiguities against the party who drafted the contract. Graff v. Billet, 477 N.E.2d 212, 213 (N.Y. 1985); 151 W. Assocs. v. Printsiples Fabric Corp., 460 N.E.2d 1344, 1345 (N.Y. 1984).

strong principle" is particularly enforced where the contract
includes non-negotiable, form policy language that was not chosen
by the insured.  <u>Mount Vernon Fire Ins. Co. v. Travelers Indem.
Co.</u>, 393 N.E.2d 974, 975 (N.Y. 1979).

        B.    "Accidental Contamination" Provision

            The Policy defines Accidental Contamination as an error
in the production, processing, or preparation of any Insured
Products "provided that" their use or consumption "has led to or
would lead to bodily injury, sickness, disease or death."
(Policy at 11.)[5]  It is undisputed that Foster's chicken products
are "Insured Products" under the Policy.  (<u>Id.</u> at 12.)  The plain
meaning of this provision thus requires that Foster show (1) an
error in the production of its chicken product (2) the
consumption of which "would lead to" bodily injury.  Insurers
here denied coverage on the ground that Foster failed to
establish the second element.  (Lavella Decl. Exs. 13, 14.)  The
court examines each element in turn.

---

            [5]    The court examines only the relevant part of the
definition applicable to the facts here.  The full definition
under the Policy provides: "Error in the manufacture, production,
processing, preparation, assembly, blending, mixing, compounding,
packaging or labelling (including instructions for use) of any
Insured Products, or the introduction into an Insured Product of
an ingredient or component that is, unknown to the Insured,
contaminated or unfit for its intended purpose, or error by the
Insured in the storage or distribution of any Insured Products
whilst in the care or custody of the Insured[;] provided that the
use or consumption of such Insured Products has led to or would
lead to: (i) bodily injury, sickness, disease or death of any
person(s) or animal(s) physically manifesting itself within 365
days of use or consumption, or (ii) physical damage to or
destruction of tangible property (other than the Insured Products
themselves)."  (Policy at 11.)

Foster states that its failure to comply with federal sanitation regulations, which resulted in a high incidence of salmonella and a cockroach infestation at the Facility, was an "error" in the production of its chicken products because the "sanitary conditions of a slaughter facility, including that facility's pest control service, is a fundamental component of a poultry producer's production process."  (Docket No. 51-1 at 13.) In common usage, an "error" means "a mistake" or "[s]omething incorrectly done through ignorance or inadvertence."  Error, Black's Law Dictionary (10th ed. 2014); Oxford English Dictionary Online, http://www.oed.com/viewdictionaryentry/Entry/64126 (last visited Oct. 8, 2015); accord  Merriam–Webster Online Dictionary, http://www.merriam-webster.com/dictionary/error (last visited Oct. 8, 2015) (defining "error" as "an act or condition of ignorant or imprudent deviation from a code of behavior").

In its NOIE dated October 2013, FSIS notified Foster of its failure to comply with sanitation regulations, 9 C.F.R. Parts 416 and 417, based on the Facility's high frequency of salmonella positives and implication in an "ongoing Salmonella Heidelberg illness outbreak."  (NOIE at 1-2.)  FSIS found that the Facility's control measures and antimicrobial interventions failed to prevent the production of chicken contaminated with salmonella, including strains of Salmonella Heidelberg, a serotype known to cause human illness.  (Id. at 4.)  The agency affirmed that adequate control measures and interventions, including "measures necessary to prevent the persistent recurrence of Salmonella, . . . are an important, fundamental,

10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

and integral aspect of an adequate food safety system." (Id.)

In its Letter of Concern dated December 2013, FSIS addressed the Facility's ongoing noncompliance with sanitary regulations due to ineffective process controls and the continuing high prevalence of salmonella in Foster's consumer-ready chicken products. (See LOC; Lavella Decl. Ex. 18 at 101:20-104:3.) One month later, FSIS issued the NOS because of the Facility's "egregious insanitary conditions," including a live cockroach infestation. (See NOS.) The Notice stressed that Foster was unable to ensure that its chicken product was not adulterated or injurious to health and noted Foster's overall failure "to abide by the rules and regulations promulgated under the Poultry Products Inspection Act." (See id.) These facts are undisputed and demonstrate that Foster "incorrectly" or "mistakenly" implemented sanitary measures that were required by federal regulations. As the FSIS affirmed, such measures were also vital to controlling food safety hazards during that production. (NOIE at 4.) Foster's failure is thus an "error" in the production of its chicken products.

The evidence also demonstrates that Foster's regulatory noncompliance lasted from October 7, 2013 to January 10, 2014. As indicated in the Letter of Concern, Foster's corrective actions in response to the NOIE were ineffective in addressing the noncompliances that the NOIE identified. (LOC at 3-4.) For example, the Facility's 26.7% rate of positive salmonella as of October 7 was comparable to its 23.3% rate of positive salmonella eight weeks later on December 6. (Id. at 2.) There is no

11

evidence that Foster achieved regulatory compliance in the one-month period before the NOS issued on January 8, 2014.  To the contrary, the evidence reveals that the Facility's new pest control operator, Orkin Pest Services, was employing ineffective pest control procedures during that time, which allowed pests to multiply.  (Lavella Decl. Ex. 21 at 109:25-110:17; Ex. 24 at 89:21-25, 96:23-97:19, 98:1-99:13.)  Foster's noncompliance ended on January 10, 2014 when FSIS notified it that the Facility "provided adequate corrective actions to address the noncompliances identified in the NOS."  (Id. Ex. 5 at 3.) Foster's chicken products from October 7, 2013 to January 10, 2014 were thus "erroneously produced" under the Policy.

The second element for Accidental Contamination coverage requires a showing that Foster's "erroneously produced" chicken product "would lead to bodily injury, sickness, disease or death."  (Policy at 11.)  The Policy, however, does not specify the manner in which Foster must establish this element. (See Policy at 11; Lavella Decl. Ex. 22 at 123:20-24.)  Insurers posit that to trigger coverage, Foster must prove actual contamination in that some harmful matter must have been introduced into the chicken product.  Insurers cite three cases to support this argument, all of which are distinguishable from the facts here.

In Ruiz Food Products, Inc. v. Catlin Underwriting U.S., Inc., Civ. No. 1:11-889 BAM, 2012 WL 4050001 (E.D. Cal. Sept. 13, 2012), the policy at issue provided coverage for "any accidental or unintentional contamination . . . provided that the

use or consumption of Insured product(s)" had resulted in or would result in bodily injury.  Id. at *7.  There, a downstream manufacturer of hydrolyzed vegetable protein ("HVP") issued a recall after a finished lot of its HVP product tested positive for salmonella.  Id. at *1.  A different lot of HVP subject to the recall was sent to a company that used it to produce a beef spice mix, which the plaintiff Ruiz incorporated into its food products.  Id. at *2.  The HVP constituted only .0007% of Ruiz's food product.  Id.

All three companies conducted sample testing on the HPV that was sent to Ruiz's supplier but the results were all negative for salmonella.  Id.  "Only one lot of [the manufacturer's] HPV tested positive for Salmonella, and that particular lot was not sent to [Ruiz's beef spice mix supplier], and thus, did not reach Ruiz."  Id.  Despite this, the FDA imposed a recall of Ruiz's food product and Ruiz claimed coverage under the policy.  Id.  The court held that the policy required objectively verifiable evidence of actual contamination: because all the samples tested by the three companies were negative for salmonella, there was no evidence that Ruiz's product was in fact contaminated with salmonella.  Id. at *7.  On that basis, Ruiz's product would not result in bodily injury and therefore was not covered.  Id.

In Wornick Co. v. Houston Casualty Co., Civ. No. 1:11-391, 2013 WL 1832671 (S.D. Ohio May 1, 2013), a company that manufactured dairy shake packets, which Wornick incorporated into its food products, issued a voluntary recall after salmonella was

found in a finished lot of its packets, causing Wornick to recall and replace 700,000 cases of its own food product.  Id. at *1-2. It was later determined that the tainted lot had not been sent to Wornick and that none of its food products contained salmonella. Id. at *2.  Wornick's insurer denied a claim under a product contamination policy similar to the one in Ruiz.  Id.  The court held that the term "contamination" in that policy required "that the insured's product be soiled, stained, corrupted, infected, or otherwise made impure by contact or mixture."  Id. at *6 (citing multiple dictionaries).  Because there was no evidence that Wornick's products came into contact with salmonella, they were not "contaminated" under the policy.  Id.

Lastly, in Little Lady Foods, Inc. v. Houston Cas. Co., 819 F. Supp. 2d 759 (N.D. Ill. 2011), Little Lady's testing revealed that its food products may be contaminated with a harmful bacteria.  Id. at 761.  Little Lady put its products on hold pending further analysis but tests ultimately concluded that the product contained a harmless bacteria.  Id.  The court held that Little Lady was not covered under a contamination policy similar to the one in Ruiz because none of its products were ever contaminated with harmful bacteria.  Id. at 762-63.

According to these cases, Insurers contend that a mere possibility that Foster's chicken product is contaminated is insufficient to trigger coverage for Accidental Contamination under the Policy.  None of these three cases, however, apply to the present facts.  The provision here does not contain the word "contamination."  It is triggered by an "error," not actual

contamination.  (See Policy at 11.)  Cases construing the meaning of the word "contamination" are therefore inapposite.

Even if the Policy required Foster to prove "actual contamination" with evidence that a foreign matter was introduced into its chicken, that requirement would have been met.  It is undisputed that the "[c]onsumption of food contaminated with Salmonella can cause salmonellosis, one of the most common bacterial foodborne illnesses."  (Wolff Decl. Ex. L.)  The organism can cause a serious infection that can lead to death and can also develop resistance to antibiotics.  (Id.; NOIE at 3; O'Connor Tr. at 74:4-12.)  The salmonella organism is introduced into processing facilities when lives birds are delivered for slaughter.  (O'Connor Dep. at 72:9-23, 87:15-24.)[6]

Unlike the cases cited, here, Foster's chicken product consistently tested positive for salmonella for half of a year before Foster destroyed the product for which it claims coverage. In October 2013, FSIS "identified multiple noncompliances including . . . direct product contamination" and documented Foster's failure "to prevent the [Facility's] production of products contaminated with Salmonella."  (NOIE at 4.)  In December 2013, FSIS also notified Foster that about a quarter of its chicken samples tested positive for salmonella.  (LOC at 2.) FSIS identified an array of insanitary conditions, including the presence of cockroaches, that could directly and indirectly

---

[6]    In response to FSIS's December 6, 2013 Letter of Concern, Foster acknowledged that live chickens containing salmonella were came into the Facility before processing began, which overwhelmed the systems in place to reduce the prevalence of salmonella.  (Wolff Decl. Ex. Y.)

1

2

spread salmonella at the Facility.  (Id. at 2-3.)

3        On the day of the NOS on January 8, 2014, three out of

4 eight chicken samples at the Facility tested positive for

5 salmonella.  (Lavella Decl. Ex. 21 at 126:21-127:18; O'Connor Tr.

6 at 32:22-33:22.)[7]  Further evidence of actual contamination is in

7 the high levels of salmonella that persisted at the Facility

8 after the NOS was lifted.  (Lavella Opp. Ex. 6 at 67:24-72:8,

9 78:8-81:24, 113:7-114:15; O'Connor Dep. at 66:2-68:13; Wolff

10 Decl. Exs. L, M.)  Foster eventually linked this high prevalence

11 to live birds that were coming into the Facility from particular

12 growing farms.  (Wolff Decl. Ex. W at 117:6-119:2.)

13        Unlike the food product in Insurers' cited cases, which

14 were never found to contain any harmful substances, it is

15 undisputed that Foster's chicken products were actually

16 contaminated with organisms able to cause a variety of serious

17 illnesses, infection, and death.  (LOC at 3.)  Foster even

18 ─────────────

19        [7]    Insurers object to Dr. O'Connor's statement regarding
the January 8, 2014 test results on the ground that it lacks
20 foundation and constitutes hearsay.  (Wolff Decl. Ex. G at
185:20-186:7, 198:25-199:9.)  Insurers also object to Charles
21 Giglio's expert opinion on the ground that it lacks factual basis
and is "based on speculation or conjecture."  (Docket No. 55-1 ¶
22 48.)
        Even if the non-moving party's evidence is presented in
23 a form that is currently inadmissible, such evidence may be
evaluated on a motion for summary judgment so long as the moving
24 party's objections could be cured at trial.  See Burch v. Regents
of Univ. of Cal., 433 F.Supp.2d 1110, 1119-20 (E.D. Cal. 2006).
25 Objections to evidence on the ground that the evidence is
irrelevant, speculative, argumentative, vague and ambiguous, or
26 constitutes an improper legal conclusion are all duplicative of
the summary judgment standard itself. (See id.)  Accordingly,
27 objections on any of these grounds are superfluous and the court
will overrule them.
28

satisfies the definition of contamination set forth in <u>Wornick</u> requiring that a "product be soiled, stained, corrupted, infected, or otherwise made impure by contact or mixture." Insurers' contention that Foster's destroyed product was not actually contaminated thus fails.

Insurers' next argument that the presence of salmonella in fresh chicken product does not by itself render the product harmful because normal cooking practices destroy the organism is equally unavailing.  In October 2013, FSIS identified the Facility as the likely source of an outbreak of Salmonella Heidelberg infections that began in March of that year.  (NOIE at 1-2; Lavella Decl. Ex. 21 at 126:21-127:18.)  By October 2013, over two hundred people from fifteen states were hospitalized for salmonella illness, eighty percent of whom reported that they consumed Foster's chicken.  (NOIE at 2; O'Connor Tr. at 76:1-17.)  An FSIS health alert issued in October 2013 also warned that an estimated 278 illnesses were reported in eighteen states, predominantly in California.  (Wolff Decl. Ex. L.)

In addition, on July 3, 2014, after the NOS, Foster recalled chicken products that were produced at the Facility from March 7 through March 13, 2014 because they were associated with a Salmonella Heidelberg illness outbreak in California.  (Lavella Opp. Ex. 1.)  In its official recall notice, FSIS stated that there was "a reasonable probability that the use of the product will cause serious, adverse health consequences or death."  (<u>Id.</u> at 17032.)  The record evidence establishes that chicken products containing Salmonella Heidelberg outbreak strains can cause

illness even where normal cooking practices are followed.  Even in Ruiz, the case cited by Insurers, the court found "no dispute that had plaintiff shown that the product was tainted or contaminated, that consumption 'would result in' injury."  Ruiz, 2012 WL 4050001, at *14.

Insurers also state that the provision's "provided that" connector requires a causal link between Foster's "error" and any injury that results upon consuming its product.  They argue that Foster must establish that the harm its product would have caused is directly related to the "error."  A plain reading of the provision, however, shows no such requirement.  As a conjunction, "provided" means "on the condition that," or "and." Provided, Black's Law Dictionary (10th ed. 2014); Merriam–Webster Online Dictionary, http://www.merriam-ebster.com/dictionary/provided (last visited Oct. 8, 2015); Oxford English Dictionary Online, http://www.oed.com/view/Entry/153449 (last visited Oct. 8, 2015). Black's Law Dictionary provides an example: "a railway car must be operated by a full crew if it extends for more than 15 continuous miles, provided that a full crew must consist of at least six railway workers."  "That one party to the agreement may attach a particular, subjective meaning to a term that differs from the term's plain meaning does not render the term ambiguous."  Slattery Skanska Inc. v. Am. Home Assur. Co., 885 N.Y.S.2d 264, 274 (App. Div. 2009).

Construing the words "provided that" as "and," Foster thus needs to prove only (1) that products were erroneously-

18

produced, and (2) that those products would have caused harm if consumed. There is no requirement which error or combination of errors in its production caused the harm. There is also no requirement stated in the Policy that Foster prove how its product would have caused harm. The Policy requires that Foster simply prove that the product was consumed. The Policy further does not require that Foster show what specific kind of harm would be caused by the consumption of its product. It states only that "bodily injury, sickness, disease or death" be shown.

As Foster points out, New York courts have construed the term "bodily injury" broadly in insurance policies. For example, in Lavanant v. General Accident Insurance Co. of America, 595 N.E.2d 819 (N.Y. 1992), the Court of Appeals held that the term "bodily injury, sickness or disease" in a comprehensive general liability policy permitted the insured to receive coverage for a claim involving emotional trauma that was unaccompanied by physical injury. Id. at 822.

More importantly, the provision does not use any language of causation. Courts generally decline requests by insurance companies to rewrite their policies to make them more restrictive. E.g., id. As the Court of Appeals recognized in Lavant, Insurers could have included language of causation in the Policy, but did not do so. See id.; Mount Vernon Fire Ins. Co., 393 N.E.2d at 975 (if the insurer intended to have a right under the policy, "it would have been a simple matter for it to have said so in so many words"). This is particularly true where coverage is set out in a "form" policy that was drafted by the

19

insurer and was non-negotiable.  Mount Vernon Fire Ins. Co., 393

N.E.2d at 975.  It is undisputed here that that the Policy uses

Insurers' standard form language for product contamination

policies.  (Lavella Decl. Ex. 22 at 101:9-102:21.)

Insurers spend a great deal of their briefs arguing

against Foster's assertion that cockroaches at the Facility may

have contributed to the prevalence of salmonella.  As explained

above, the plain language of the Policy does not require that

Foster prove a causal link between the error in production and

the harm that would result if erroneously-produced products were

consumed.  See Newmont Mines Ltd. v. Hanover Ins. Co., 784 F.2d

127, 135 (2d Cir. 1986) (under New York law, "words should be

given the meanings ordinarily ascribed to them").

Furthermore, Insurers contend that the words "would

lead to bodily injury" require conclusive evidence that Foster's

chicken product would have necessarily caused harm if consumed.

By extension, this means that Foster would need to prove that all

of the chicken that it destroyed would have caused injury to have

received coverage.  The court must "construe the policy in a way

that affords a fair meaning to all of the language employed by

the parties in the contract and leaves no provision without force

and effect."  Platek v. Town of Hamburg, 26 N.E.3d 1167, 1171

(N.Y. 2015).  "Reasonable effort must be made to harmonize all of

the terms of the contract."  Hartford Ins. Co. of Midwest v.

Halt, 646 N.Y.S.2d 589, 594 (App. Div. 1996).

Here, coverage under the Government Recall provision

requires a "reasonable probability" that Foster's chicken product

20

will cause "serious adverse health consequences or death."  Since the benefits under Government Recall and Accidental Contamination are congruent throughout much of the Policy, it is logical that the parties intended the words "would lead to bodily injury" to have a comparable meaning.

The average insured reading the Policy would not reasonably expect that to receive coverage in the event its product was contaminated, it would have to prove that each and every one of its products would cause harm if consumed; a reasonable probability of such harm occurring would be sufficient.  The construction that the Policy requires a "likelihood" or "reasonable probability" that products will cause harm also gives effect to the words "would lead to," since otherwise, insureds would be held to an unreasonably difficult standard.  It is rarely the case that every single product produced by a producer is contaminated such that it will cause harm if consumed.  "An insurance contract should not be read so that some provisions are rendered meaningless." County of Columbia v. Cont'l Ins. Co., 634 N.E.2d 946, 950 (1994).  Taking into account not just the provision's literal language, but the inferences that an average insured may be draw from it, it would be unreasonable for the parties to have intended that Foster bear such a high burden to receive coverage under this provision.

It would also be unreasonable to imply that a product must first be put into commerce and injure somebody before the policy will provide coverage.  The parties could not have reasonably interpreted the policy to encourage a producer to sell

goods that have been deemed unfit for consumption, risking the public welfare and subjecting itself to civil liability and criminal prosecution.  Thus, FSIS's consistent findings of sanitary noncompliance at the Facility since from October 2013 to January 2014, its findings linking the Facility's chicken to a salmonella illness outbreak, and its finding of "egregious sanitary conditions" such that "products may have been rendered adulterated and/or injurious to health" should be sufficient here to satisfy the second element here.

Even if Insurers' interpretation was reasonable, that would subject the words at issue to more than one reasonable interpretation.  The ambiguity would thus be construed in favor of Favor and against Insurers and the result would be the same. White v. Cont'l Cas. Co., 878 N.E.2d 1019, 1021 (N.Y. 2007).

Accordingly, because Foster has established that both elements of this provision are met and there are no genuine issues of material fact, the court must grant Foster's motion for partial summary judgment and deny Insurers' motion for summary judgment as to Foster's claim for Accidental Contamination coverage.

C.  "Government Recall" Provision

The Policy defines Government Recall as (1) a voluntary or compulsory recall of Insured Products arising directly from a Regulatory Body's[8] determination that there is a reasonable

---

[8] "Regulatory Bodies" are defined as "the Food and Drug Administration, the United States Department of Agriculture [or any other U.S.] regulatory body with similar authority with regard to food safety."  (Policy at 23.)

probability that Insured Products will cause "serious adverse health consequences or death," or (2) a voluntary or compulsory recall of Insured Products arising directly from a Regulatory Body's determination that Insured Products at Foster's facilities "have a reasonable probability of causing serious adverse health consequences or death" and an order suspending the registration of those facilities issued in conjunction with or following the recall.  (Policy at 23.)[9]

The Policy does not define the term "recall."  But it

[9]    The court examines only the relevant part of the definition applicable to the facts here.  The full definition under the Policy provides: "(1) The recall of Insured Products which has been initiated (a) voluntarily by the Insured, or (b) as a result of an order by the Food and Drug Administration, the United States Department of Agriculture, the Canadian Food Inspection Agency or any other US or Canadian state or regulatory body with similar authority with regard to food safety (Regulatory Bodies), and where either of (a) and (b) above arise directly from a determination by the Regulatory Bodies that there is a reasonable probability of Insured Products causing serious adverse health consequences or death to humans or animals, or have otherwise been classified as Class I or Class II by the Regulatory Bodies, or
(2) any order of suspension of registration of any of the Insured's facilities or operations, only in conjunction with or following the recall of Insured Products per Item 1. above, which arises directly from a determination by the Regulatory Bodies, that Insured Products which have been manufactured, processed, packed, received or held by the Insured at the same suspended facilities or operations have a reasonable probability of causing serious adverse health consequences or death to humans or animals, or have otherwise been classified as Class I or Class II by the Regulatory Bodies, or
(3) outside the USA or Canada, the recall of Insured Products which has been ordered by any country's regularly constituted national, federal, state, provincial or local regulatory agency or judicial body pursuant to regulations on food safety but only in respect to the actual or likely threat of Insured Products causing physical bodily injury or death to humans or animals."  (Policy at 23.)

23

defines a type of Loss called "Recall Expenses" as "costs and expenses reasonably and necessarily incurred by [Foster] arising solely and directly out of an Insured Event for the purpose of or in connection with recalling, withdrawing, reworking, destroying or replacing Contaminated Products."  (Id. at 14, 23.)  "Contaminated Products" are defined as "Insured Products which have been subject to Accidental Contamination [or Government Recall]."  (Id. at 12, 24.)  Insurers denied coverage under the Government Recall provision on the ground that Foster's destruction of its product did not constitute a "recall" because, they argue, a recall applies only to products that had first left Foster's control.  (Lavella Decl. Exs. 12, 14.)

Foster voluntarily destroyed the product produced on January 7 and 8.  Because the NOS was issued before Foster's alleged "recall," and not in conjunction with or following it, Foster may claim coverage only under Item (1) of the provision. Foster's "recall" arose directly from FSIS's determination that there was a reasonable probability that Foster's chicken product at the Facility could cause serious adverse health consequences. Aside from product that was produced exclusively in Plant 2 on January 8, FSIS rejected Foster's request for marks of inspection on all remaining product produced at the Facility on January 7 and 8, on the ground that Foster did not provide substantial evidence the product was unadulterated.  (Id. Ex. 7 at 1.)

Foster argues that because the term "recall" should be interpreted as "cancel" or "revoke," the term encompasses the voluntary destruction of Insured Product that did not leave

Foster's possession.  Insurers contend that the term "recall" is unambiguous and applies only to product that has left Foster's control.  They argue that no "recall" occurred because the destroyed product never left Foster's possession or entered commerce.[10]  Both parties contend that their definitions comport with the plain and ordinary meaning of the term "recall."

Foster's broader interpretation of "recall" is logical when read in the context of the Policy's other provisions.  The word "Recall" in "Recall Expenses" appears to be defined as "recalling, withdrawing, reworking, destroying or replacing" Contaminated Products, i.e., products subject to Accidental Contamination or Government Recall.  (Lavella Decl. Ex. 1 at 12, 14, 24.)  Foster could thus get coverage for Recall Expenses if it voluntarily (1) destroys product that would lead to "bodily

---

[10]  Insurers rely on the definition used in FSIS Directive 8080.1 and incorporated in Foster's federally-mandated Recall Program.  (O'Connor Dep. at 185:7-186:1, 186:24-187:10; Wolff Decl. Ex. J ("Recall Program"); Ex. K.)  The definition states that a "recall" is the voluntary removal of product <u>from commerce</u> when there is reason to believe that it is adulterated under the PPIA.  (Recall Program at 630 (emphasis added).)  The definition also states that it does not include a "stock recovery," which is "the removal or correction of product that has not been marketed or that has not left the direct control of the firm."  (<u>Id.</u>)

The court is not bound, however, to apply a regulatory definition to construe a policy term.  <u>See</u> <u>Mostow v. State Farm Ins. Cos.</u>, 668 N.E.2d 392, 394-95 (N.Y. 1996); <u>City of Albany v. Standard Acc. Ins. Co.</u>, 165 N.E.2d 869, 874 (N.Y. 1960); <u>Ins. Co. of N. Am. v. Godwin</u>, 361 N.Y.S.2d 461 (App. Div. 1974).  In addition, a multifaceted term that is undefined in an insurance contract "is not given a narrow, technical definition by the law."  <u>Michaels</u>, 651 N.E.2d at 1273 (citation).  "It is construed, rather, in accordance with its understanding by the average person who . . . relates it to the factual context in which it is used."  <u>Michaels</u>, 651 N.E.2d at 1273 (citation and alterations omitted).

25

injury, sickness, disease or death," regardless whether they were still in Foster's possession, or (2) destroys product because FSIS determined that it has a reasonable probability of causing serious adverse health consequences.  If the product is in Foster's possession at the time it is destroyed, Insurers' interpretation would allow for coverage under the first fact pattern, but deny it under the second.  This construction would appear inconsistent in the context of the entire Policy because the benefits under Accidental Contamination and Government Recall are otherwise congruent throughout much of the Policy.  Foster's interpretation is thus a reasonable one.

An interpretation is also reasonable if it gives effect and meaning to the terms in a contract.  Mellon Bank, 31 F.3d at 115.  Several Loss categories appear to contemplate coverage if Foster destroys product that is still in its possession.  "Gross Profit" considers variable costs that are saved from not selling the destroyed product.  "Recall Expenses" anticipate the costs of destroying "packaging and labeling material that cannot be reused," which reasonably applies to product not yet sold.  (Id. at (Q)(viii).)  "Pre-Recall Expenses" are defined as the costs of ascertaining whether Foster's product is contaminated and the potential effects of such contamination.  It is reasonable that Foster would conduct this inquiry on product that is still in its control.  And because Pre-Recall Expenses focus only on the act of ascertaining, one could reasonably infer that any action Foster takes after that, including destroying the product if it is contaminated, constitutes a "recall."

Insurers' more restrictive construction could also be supported by the Policy's language.  Recall Expenses subpart (Q)(ii) suggests that recalling a product may be synonymous with withdrawing it--an action likely taken when the product has already left Foster's possession.  Subpart (Q)(vii) covers costs incurred by retailers, wholesalers, and distributors acting on behalf of Foster.  Thus, it refers to costs associated with products that have already entered commerce.  Subpart (Q)(x) governs Foster's costs for replacing or reimbursing the value of Contaminated Products already in customers' possession.  From the Policy's language, a reasonably intelligent person could infer that "recall" applies only to product that has been sold and left the Facility.  Insurers' interpretation is thus also not unreasonable.

Although Insurers could have expressly done so, they did not limit the definition of "recall" to products that left Foster's possession.  "Where the risk is well known and there are terms reasonably apt and precise to describe it, the use of substantially less certain phraseology, upon which dictionaries and common understanding may fairly differ, is likely to result in interpretations favoring coverage rather than exclusion." Vargas v. Ins. Co. of N. Am., 651 F.2d 838, 841 (2d Cir. 1981) (citation omitted).  Because the term "recall" is reasonably subject to more than one interpretation, it is "deemed to be ambiguous and thus interpreted in favor of the insured." Fed. Ins. Co., 965 N.E.2d at 936.  As a result, the court concludes that Foster's destruction of its chicken product constituted a

recall under the terms of the Government Recall provision. Accordingly, the court must grant Foster's motion for summary judgment and deny Insurers' motion for summary judgment as to Foster's claim for coverage under the Government Recall provision.

D. Foster's Motion to Strike

Foster moves to strike the deposition testimony and opinions offered by two of Insurers' expert witnesses, Thomas James Hoffman and Dr. William James.  Foster also requests that the court exclude these witnesses' trial testimony.  Because the court did not rely on the witnesses' testimony or opinions in this Order, the court denies Foster's motion to strike as moot for purposes of summary judgment.

As to trial, Foster's request is a premature motion in limine.  It is the court's practice to provide a schedule for all matters relating to the trial in the Final Pretrial Order.  With regard to the propriety of motions in limine, counsel are advised that such motions are to be reserved only for those matters that cannot be resolved during the course of trial and for which the bell truly cannot be "un-rung."

All other legal points can be sufficiently addressed in the trial briefs, and the court generally hears Daubert motions during the trial while the expert is on the stand and can be questioned about considerations relevant to the court's ruling. See, e.g., Betts v. City of Chicago, 784 F. Supp. 2d 1020, 1023 (N.D. Ill. 2011) ("[E]videntiary rulings should [ordinarily] be deferred until trial so that questions of foundation, relevancy

and potential prejudice may be resolved in proper context.")
(citation and alterations omitted).  The court will therefore
deny Foster's request to exclude the witnesses' trial testimony
without prejudice to the matter being addressed in the parties'
trial briefs and any necessary motions in limine being refiled
after the Final Pretrial Conference.

        IT IS THEREFORE ORDERED that:

        (1) Foster's motion for partial summary judgment on its
declaratory relief claim (Docket No. 46) be, and the same hereby
is, GRANTED;

        (2) Insurers' motion for summary judgment on both of
Foster's claims (Docket No. 47) be, and the same hereby is,
DENIED; and

        (3) Foster's motion to strike (Docket No. 54) be, and the
same hereby is, DENIED as moot as to summary judgment and DENIED
without prejudice as to trial.

Dated:  October 9, 2015

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE