UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

FOSTER POULTRY FARMS, INC.,

        Plaintiff,

   v.

CERTAIN UNDERWRITERS AT
LLOYD'S, LONDON,

        Defendants.

CIV. No. 1:14-953 WBS SAB

**AMENDED** MEMORANDUM AND ORDER RE:
MOTIONS FOR SUMMARY JUDGMENT;
MOTION TO STRIKE

----oo0oo----

     Plaintiff Foster Poultry Farms, Inc. ("Foster") brought
this action for declaratory relief and breach of contract against
defendants Certain Underwriters at Lloyd's, London ("Insurers").
Presently before the court are Foster's motion for partial
summary judgment on its declaratory relief claim and Insurers'
motion for summary judgment under Federal Rule of Civil Procedure
56, and Foster's motion to strike the deposition testimony and

1

opinions of Thomas James Hoffman and Dr. William James under

Rules 30(d)(2) and 37(c)(1), respectively.

I.   <u>Factual and Procedural Background</u>

Foster is a poultry producer with its largest chicken

processing plant in Livingston, California (the "Facility").

(O'Connor Decl. ¶ 4 (Docket No. 46-3); Lavella Decl. (Docket Nos.

46-4 to 46-6) Ex. 24 at 36:7-22.)   The Facility is comprised of

two processing areas called "Plant 1" and "Plant 2," which share

a common packaging floor.   (Lavella Decl. Ex. 24 at 38:20-40:3;

O'Connor Decl. ¶ 5.)   Insurers, a group of Lloyd's underwriters

organized into three syndicates,[1] issued a product contamination

insurance policy to Foster, effective May 25, 2013 to May 25,

2014 (the "Policy").   (Lavella Decl. Ex. 1 ("Policy"); Topp Decl.

(Docket Nos. 50-2 to 50-4) Ex. U at 12:17-13:3.)   The Policy is

governed by a New York choice of law provision.   (<u>Id.</u> at 8.)   The

Policy provides coverage for all "Loss" arising out of "Insured

Events" during the policy period.   (<u>Id.</u> at 10.)   Two types of

Insured Events under the Policy, which are at issue here, are

"Accidental Contamination" and "Government Recall."   (<u>Id.</u> at 10,

23.)

On October 7, 2013, the United States Department of

Agriculture Food Safety and Inspection Service ("FSIS") issued a

Notice of Intended Enforcement ("NOIE") to suspend the assignment

---

[1]   "Lloyd's operates as a marketplace for the placement of
insurance. Syndicates made up of individual underwriters insure
risks on behalf of their members.  Normally, several syndicates
will provide insurance for a given risk by agreeing to cover a
percentage of that risk."  <u>Alexander & Alexander Servs., Inc. v.
These Certain Underwriters at Lloyd's, London, England</u>, 136 F.3d
82, 84 n.2 (2d Cir. 1998).

of inspectors at the Facility and withhold marks of inspection for products produced there, which are required for the products to be eligible for sale. (Lavella Decl. Ex. 8 ("NOIE").)[2]  FSIS based its notice on the Facility's high prevalence of salmonella, its implication in a salmonella illness outbreak, and its noncompliance with federal sanitation regulations. (Id.)  Foster proffered corrective actions in response to the NOIE. (Lavella Decl. Ex. 9).  As a result, FSIS placed the NOIE in deferral to allow Foster an opportunity to implement those corrective actions and to achieve compliance. (Lavella Decl. Ex. 2 ("LOC") at 1-2.)

On December 6, 2013, FSIS issued Foster a Letter of Concern that noted Foster's continued failure to remedy the high incidence of salmonella at the Facility, and informed Foster of live cockroach sightings at the Facility. (See id.)  On January 8, 2014, based on Foster's continued noncompliance and a German cockroach infestation at the Facility, FSIS issued Foster a Notice of Suspension ("NOS") suspending the assignment of inspectors at the Facility and withholding marks of inspection for the chicken produced there. (Lavella Decl. Ex. 3 ("NOS").)  As a result, the Facility ceased production from January 8, 2014 to January 21, 2014. (O'Connor Decl. ¶¶ 9, 21.)

Five days after the issuance, FSIS held the NOS in abeyance pending Foster's implementation of a comprehensive

---

[2]    Under FSIS regulations, a "'withholding action' is the refusal to allow the marks of inspection to be applied to products.  A withholding action may affect all product in the establishment or product produced by a particular process."  9 C.F.R. § 500.1(b).  "A 'suspension' is an interruption in the assignment of program employees to all or part of an establishment."  Id. § 500.1(c).

action plan that included fumigating the Facility.  (Lavella Decl. Ex. 5.)  Subsequently, Foster requested FSIS to apply marks of inspection to its chicken product that was produced on January 7 and 8, 2014.  (Lavella Decl. Ex. 7.)  FSIS granted Foster's request as to chicken produced exclusively in Plant 2 on January 8, but denied its request as to all remaining chicken produced at the Facility on January 7 and 8.  (Id.; O'Connor Decl. ¶¶ 16-18.) Under FSIS supervision, Foster thus destroyed 1.3 million pounds of the denied chicken, which was ineligible for sale.  (O'Connor Decl. ¶ 18-20; see Lavella Decl. Exs. 6, 7; O'Connor Tr. at 206:23-208:11, 209:25-211:8; Wolff Decl. (Docket Nos. 47-4 to 47-24) Ex. R at 7 ¶ 7.)

Foster submitted a coverage claim with Insurers for over $12 million in expenses that it claimed to have incurred as a result of the NOS.  (Lavella Decl. Ex. 11 at 3; Wolff Decl. Ex. R at 4 ¶ 1.)  Foster claimed coverage under the Policy's Accidental Contamination and Government Recall provisions, but Insurers denied Foster coverage under both.  (Id. Exs. 12-14.)[3] Foster then instituted this action for declaratory relief and breach of the insurance contract.  (Docket No. 1.)  Foster now moves for partial summary judgment on its declaratory relief claim and Insurers move for summary judgment on both of Foster's claims.  (Docket Nos. 46, 47.)  Foster also moves to strike the deposition testimony and opinions offered by two of Insurers' expert witnesses, Thomas James Hoffman and Dr. William James.

---

[3]    Insurers admit that Foster satisfied the conditions precedent to coverage in Sections 6(A), 7(B), and 7(G)(i) of the Policy.  (Docket No. 50-1 ¶ 19.)

4

(Docket No. 54.)

II.  Analysis

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable trier of fact to enter a verdict in the non-moving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Alternatively, the moving party can demonstrate that the non-movant cannot produce evidence to support an essential element upon which it will bear the burden of proof at trial.   Id.

Once the moving party meets its initial burden, the burden shifts to the non-moving party to "designate specific facts showing that there is a genuine issue for trial."  Id. at 324.  To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  Anderson, 477 U.S. at 252.

5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

          In deciding a summary judgment motion, the court must
view the evidence in the light most favorable to the non-moving
party and draw all justifiable inferences in its favor.  Id. at
255.  "Credibility determinations, the weighing of the evidence,
and the drawing of legitimate inferences from the facts are jury
functions, not those of a judge" ruling on a motion for summary
judgment.  Id.  When parties submit cross-motions for summary
judgment, the court must consider each motion separately to
determine whether either party has met its burden, "giving the
nonmoving party in each instance the benefit of all reasonable
inferences."  ACLU of Nev. v. City of Las Vegas, 333 F.3d 1092,
1097 (9th Cir. 2003); see also Fair Hous. Council v. Riverside
Two, 249 F.3d 1132, 1136 (9th Cir. 2001) (when parties submit
cross-motions for summary judgment, "each motion must be
considered on its own merits" and "the court must review the
evidence submitted in support of each cross-motion").

     A.   Principles of Interpretation for Insurance Policies

          Under New York law, the threshold question of law for
the court to determine is whether a policy's terms are ambiguous.
Duane Reade Inc. v. St. Paul Fire and Marine Ins. Co., 411 F.3d
384, 390 (2d Cir. 2005).  An insurance "contract is unambiguous
if the language it uses has a definite and precise meaning" such
that it is reasonably susceptible to one interpretation.
Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170-71 (N.Y.
2002).  An unambiguous contract provision is enforced according
to the plain meaning of its terms, id., and courts commonly refer
to the dictionary to ascertain a provision's plain and ordinary

                                6

meaning, Ellicott Square Court Corp. v. Mountain Valley Indem.
Co., 634 F.3d 112, 119 (2d Cir. 2011).

        "Ambiguity is determined by looking within the four
corners of the document, not to outside sources." Riverside S.
Planning Corp. v. CRP/Extell Riverside, L.P., 920 N.E.2d 359, 363
(N.Y. 2009).  An insurance policy is ambiguous if "its terms are
subject to more than one reasonable interpretation." Universal
Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 37 N.E.3d
78, 80 (N.Y. 2015).  To determine whether an insurance contract
is ambiguous, the court must interpret its terms "according to
common speech and consistent with the reasonable expectations of
the average insured." Cragg v. Allstate Indem. Corp., 950 N.E.2d
500, 500 (2011).  In a case involving a policy issued to a
business, the court must also examine the "reasonable expectation
and purpose of the ordinary business [person] when making an
ordinary business contract." Michaels v. City of Buffalo, 651
N.E.2d 1272, 1273 (N.Y. 1995) (citation omitted).

        The court must take into account not only the policy's
literal language, but whatever may be reasonably implied from
that language, including "any promises which a reasonable person
in the position of the promisee would be justified in
understanding." Sutton v. E. River Sav. Bank, 435 N.E.2d 1075,
1078 (N.Y. 1982) (citation omitted).  In construing policy terms
according to these standards, the court should strive to give
meaning and effect to every sentence, clause, and word of the
contract.  Northville Indus. Corp. v. Nat'l Union Fire Ins. Co.
of Pittsburgh, 679 N.E.2d 1044, 1048 (N.Y. 1997).

7

1

2          If the policy's language is susceptible to more than

3   one reasonable interpretation, the language is "deemed to be

4   ambiguous and thus interpreted in favor of the insured." Fed.

5   Ins. Co. v. Int'l Bus. Machines Corp., 965 N.E.2d 934, 936 (N.Y.

6   2012); see also Handelsman v. Sea Ins. Co., 647 N.E.2d 1258, 1260

7   (N.Y. 1994) ("Where there is ambiguity as to the existence of

8   coverage, doubt is to be resolved in favor of the insured and

9   against the insurer.").[4]  When "an insurer wishes to exclude

10  certain coverage from its policy obligations, it must do so 'in

11  clear and unmistakable' language." Fed. Ins. Co., 965 N.E.2d at

12  938 (citation omitted).  Any such exclusions or exceptions must

13  be specific and clear to be enforced: "[t]hey are not to be

14  extended by interpretation or implication, but are to be accorded

15  a strict and narrow construction." Id. (citation omitted).

16          "[B]efore an insurance company is permitted to avoid

17  policy coverage, it must satisfy the burden which it bears of

18  establishing that the exclusions or exemptions apply in the

19  particular case, and that they are subject to no other reasonable

20  interpretation." Dean v. Tower Ins. Co. of N.Y., 979 N.E.2d

21  1143, 1145 (N.Y. 2012) (citation omitted).  If an "insurance

22  carrier drafts an ambiguously worded provision and attempts to

23  limit its liability by relying on it," the court must construe

24  the language against the carrier. Metro. Prop. & Cas. Ins. Co.

25  v. Mancuso, 715 N.E.2d 107, 112 (N.Y. 1999).  This "exceptionally

26      [4]   New York follows the "well-settled maxim of contra
    proferentem" under which courts resolve ambiguities against the
27  party who drafted the contract. Graff v. Billet, 477 N.E.2d 212,
    213 (N.Y. 1985); 151 W. Assocs. v. Printsiples Fabric Corp., 460
28  N.E.2d 1344, 1345 (N.Y. 1984).

strong principle" is particularly enforced where the contract includes non-negotiable, form policy language that was not chosen by the insured. <u>Mount Vernon Fire Ins. Co. v. Travelers Indem. Co.</u>, 393 N.E.2d 974, 975 (N.Y. 1979).

B.   "Accidental Contamination" Provision

Plaintiff contends that the January 8, 2014 NOS and the conditions described in it constitute an Insured Event under the Policy because they satisfy the Policy's definition of "Accidental Contamination."   The Policy defines "Accidental Contamination" as an "error" in the production, processing, or preparation of any Insured Products "provided that" their use or consumption "has led to or would lead to bodily injury, sickness, disease or death."   (Policy at 11.)[5]   It is undisputed that Foster's chicken products are "Insured Products" under the Policy.   (<u>Id.</u> at 12.)   The plain meaning of this provision thus requires that Foster show (1) an error in the production of its chicken product (2) the consumption of which "would lead to"

---

[5]   The court examines only the relevant part of the definition applicable to the facts here.   The full definition under the Policy provides: "Error in the manufacture, production, processing, preparation, assembly, blending, mixing, compounding, packaging or labelling (including instructions for use) of any Insured Products, or the introduction into an Insured Product of an ingredient or component that is, unknown to the Insured, contaminated or unfit for its intended purpose, or error by the Insured in the storage or distribution of any Insured Products whilst in the care or custody of the Insured[;] provided that the use or consumption of such Insured Products has led to or would lead to: (i) bodily injury, sickness, disease or death of any person(s) or animal(s) physically manifesting itself within 365 days of use or consumption, or (ii) physical damage to or destruction of tangible property (other than the Insured Products themselves)."   (Policy at 11.)

bodily injury or sickness.

In the NOS, the FSIS suspended assignment of its inspectors at the Facility because of the "egregious insanitary conditions observed . . . whereby products produced at [the] facility may have been rendered adulterated in violation of the Poultry Products Inspection Act . . . ."  (NOS at 1.)  This decision was based on the FSIS's finding "of an infestation of live cockroaches in and around [the] production areas, that created insanitary conditions, and demonstrate that [Foster] failed to maintain an effective pest control program and other sanitary controls to assure that wholesome, unadulterated meat and poultry products are produced at [the] facility."  (Id.)

Defendant appears to concede that Foster's failure to comply with the federally mandated pest control and sanitation standards constituted an "error" under the Policy.  (Defs.' Opp'n at 4:8-10.)  This court agrees.  An "error" means "a mistake" or "[s]omething incorrectly done through ignorance or inadvertence." Error, Black's Law Dictionary (10th ed. 2014); Oxford English Dictionary Online, http://www.oed.com/viewdictionaryentry/Entry/64126 (last visited Oct. 8, 2015); accord  Merriam–Webster Online Dictionary, http://www.merriam-webster.com/dictionary/error (last visited Oct. 8, 2015) (defining "error" as "an act or condition of ignorant or imprudent deviation from a code of behavior").  In addition to the USDA's finding in the NOS that Foster failed to maintain an adequate pest control program and other sanitary controls, the evidence confirms that the Facility's new pest

control operator, Orkin Pest Services, was employing ineffective pest control procedures during that time, which allowed pests to multiply.  (Lavella Decl. Ex. 21 at 109:25-110:17, Ex. 24 at 89:21-25, 96:23-97:19, 98:1-99:13.)

The second element for Accidental Contamination coverage requires a showing that Foster's erroneously produced chicken product "would lead to bodily injury, sickness, disease or death."  (Policy at 11.)  The Policy does not articulate the standard under which to assess whether the Insured Products "would lead to" bodily injury, sickness, disease, or death.  Insurers contend that the words "would lead to" require conclusive evidence that Foster's chicken product would have necessarily caused harm if consumed.

One could never know with certainty, however, whether a product would lead to bodily injury or sickness if consumed unless and until that person consumed the product and waited for any adverse effects.  It would not be a reasonable interpretation of the policy to require that a product must first be put into commerce and injure somebody before triggering coverage.  Indeed, a Policy requiring the insured to subject the public to the consumption of potentially contaminated products would probably be against public policy.  It is accordingly not a reasonable interpretation to require an insured to send questionable products into the market for public consumption in order to confirm whether the products "would lead to" bodily injury or sickness.  The parties could not have reasonably interpreted the Policy to encourage a producer to sell goods that have been

11

deemed unfit for consumption, risking the public welfare and subjecting the insured to civil liability and criminal prosecution.

The Policy must therefore be interpreted to require a showing of something less than an absolute certainty of bodily injury or sickness from eating the erroneously produced chicken. The court finds a reasonable interpretation to be the standard which the government relies upon when deciding whether a risk of contamination is significant enough to preclude public consumption of the product.  As this case demonstrates, the government tolerates some risk of contamination and bodily injury or sickness as it regularly approved the sale of chicken after finding significant levels of salmonella at the Facility over the several months preceding its issuance of the NOS.

In the NOS, however, the FSIS found that the "egregious insanitary conditions" resulted in the production of chicken that was "prepared, packaged, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health."  (NOS at 1, 3 (emphasis omitted).)  Interpreting "would lead to" under the Policy consistent with the standard the FSIS applies to determine whether food is safe for human consumption is an entirely reasonable interpretation of the Policy.

It would also be reasonable to interpret "would lead to" as "likely to cause" as the court did in Ruiz Food Products, Inc. v. Catlin Underwriting U.S., Inc., Civ. No. 1:11-889 BAM, 2012 WL 4050001, at *7-8 (E.D. Cal. Sept. 13, 2012).  Another

reasonable interpretation of "would lead to" is the Policy's "reasonable probability" requirement from the Government Recall provision.  Since the benefits under Government Recall and Accidental Contamination are congruent throughout much of the Policy, it is logical that the parties intended the words "would lead to" bodily injury or sickness to have a comparable meaning.

Taking into account not just the provision's literal language, but the inferences that a reasonable insured may draw from it and the practical consequences of the Insurers' proposed interpretation, it would be unreasonable for the parties to have intended that Foster prove with absolute certainty that its erroneously produced chicken "would lead to" bodily injury or sickness.  Even if Insurers' interpretation was reasonable, the words at issue are subject to more than one reasonable interpretation, and this ambiguity must be interpreted against the Insurers.  See Fed. Ins. Co. v. Int'l Bus. Machines Corp., 965 N.E.2d at 936; Handelsman, 647 N.E.2d at 1260.  The court therefore finds that erroneously produced chicken "would lead to" bodily injury or sickness if the government determines the chicken cannot be sold because it may cause bodily injury or sickness or the plaintiff shows that bodily injury or sickness is likely or reasonably probable as a result of consumption.

Insurers also argue that Foster must prove actual contamination in that some harmful matter must have been introduced into the chicken product.  Insurers cite three cases to support this argument, all of which are distinguishable from the facts here.

In Ruiz Food Products, Inc., the policy at issue provided coverage for "any accidental or unintentional contamination . . . provided that the use or consumption of Insured product(s)" had resulted in or would result in bodily injury.  2012 WL 4050001, at *7.  There, a downstream manufacturer of hydrolyzed vegetable protein ("HVP") issued a recall after a finished lot of its HVP product tested positive for salmonella.  Id. at *1.  A different lot of HVP subject to the recall was sent to a company that used it to produce a beef spice mix, which the plaintiff Ruiz incorporated into its food products.  Id. at *2.  The HVP constituted only .0007% of Ruiz's food product.  Id.

All three companies conducted sample testing on the HPV that was sent to Ruiz's supplier but the results were all negative for salmonella.  Id.  "Only one lot of [the manufacturer's] HPV tested positive for Salmonella, and that particular lot was not sent to [Ruiz's beef spice mix supplier], and thus, did not reach Ruiz."  Id.  Despite this, the FDA imposed a recall of Ruiz's food product and Ruiz claimed coverage under the policy.  Id.  The court held that the policy required objectively verifiable evidence of actual contamination: because all the samples tested by the three companies were negative for salmonella, there was no evidence that Ruiz's product was in fact contaminated with salmonella.  Id. at *7.  On that basis, Ruiz's product would not result in bodily injury and therefore was not covered.  Id.

In Wornick Co. v. Houston Casualty Co., Civ. No. 1:11-

391, 2013 WL 1832671 (S.D. Ohio May 1, 2013), a company that manufactured dairy shake packets, which Wornick incorporated into its food products, issued a voluntary recall after salmonella was found in a finished lot of its packets, causing Wornick to recall and replace 700,000 cases of its own food product.  Id. at *1-2. It was later determined that the tainted lot had not been sent to Wornick and that none of its food products contained salmonella. Id. at *2.  Wornick's insurer denied a claim under a product contamination policy similar to the one in Ruiz.  Id.  The court held that the term "contamination" in that policy required "that the insured's product be soiled, stained, corrupted, infected, or otherwise made impure by contact or mixture."  Id. at *6 (citing multiple dictionaries).  Because there was no evidence that Wornick's products came into contact with salmonella, they were not "contaminated" under the policy.  Id.

        Lastly, in Little Lady Foods, Inc. v. Houston Casualty Co., 819 F. Supp. 2d 759 (N.D. Ill. 2011), Little Lady's testing revealed that its food products may be contaminated with harmful impurities.  Id. at 761.  Little Lady put its products on hold pending further analysis but tests ultimately concluded that the product contained a harmless bacteria.  Id.  The court held that Little Lady was not covered under a contamination policy similar to the one in Ruiz because none of its products were ever contaminated with harmful bacteria.  Id. at 762-63.

        Unlike the policies in those cases, which required "contamination" but did not define the term, the Policy in this case specifically defines "actual contamination" simply as an

15

error in production that would lead to bodily injury or sickness. Because none of the products in those three other cases were contaminated, in the sense of actually being infected with harmful bacteria, the courts in each of those cases found no coverage.  In this case, however, the court is dealing with a different definition of contamination, and for the reasons discussed above, the product here was in fact contaminated within the meaning of that definition.

Accordingly, because Foster has shown that the NOS and the conditions described in it constitute Accidental Contamination under the Policy as a matter of law, the court must grant Foster's motion for partial summary judgment and deny Insurers' motion for summary judgment as to Foster's claim for Accidental Contamination coverage.

C.   "Government Recall" Provision

The Policy defines Government Recall as (1) a voluntary or compulsory recall of Insured Products arising directly from a Regulatory Body's[6] determination that there is a reasonable probability that Insured Products will cause "serious adverse health consequences or death," or (2) a voluntary or compulsory recall of Insured Products arising directly from a Regulatory Body's determination that Insured Products at Foster's facilities "have a reasonable probability of causing serious adverse health consequences or death" and an order suspending the registration

---

    [6]   "Regulatory Bodies" are defined as "the Food and Drug Administration, the United States Department of Agriculture [or any other U.S.] regulatory body with similar authority with regard to food safety."  (Policy at 23.)

of those facilities issued in conjunction with or following the recall.  (Policy at 23.)[7]

The Policy does not define the term "recall."  But it defines a type of Loss called "Recall Expenses" as "costs and expenses reasonably and necessarily incurred by [Foster] arising solely and directly out of an Insured Event for the purpose of or in connection with recalling, withdrawing, reworking, destroying or replacing Contaminated Products."  (Id. at 14, 23.) "Contaminated Products" are defined as "Insured Products which

---

[7]     The court examines only the relevant part of the definition applicable to the facts here.  The full definition under the Policy provides: "(1) The recall of Insured Products which has been initiated (a) voluntarily by the Insured, or (b) as a result of an order by the Food and Drug Administration, the United States Department of Agriculture, the Canadian Food Inspection Agency or any other US or Canadian state or regulatory body with similar authority with regard to food safety (Regulatory Bodies), and where either of (a) and (b) above arise directly from a determination by the Regulatory Bodies that there is a reasonable probability of Insured Products causing serious adverse health consequences or death to humans or animals, or have otherwise been classified as Class I or Class II by the Regulatory Bodies, or

(2) any order of suspension of registration of any of the Insured's facilities or operations, only in conjunction with or following the recall of Insured Products per Item 1. above, which arises directly from a determination by the Regulatory Bodies, that Insured Products which have been manufactured, processed, packed, received or held by the Insured at the same suspended facilities or operations have a reasonable probability of causing serious adverse health consequences or death to humans or animals, or have otherwise been classified as Class I or Class II by the Regulatory Bodies, or

(3) outside the USA or Canada, the recall of Insured Products which has been ordered by any country's regularly constituted national, federal, state, provincial or local regulatory agency or judicial body pursuant to regulations on food safety but only in respect to the actual or likely threat of Insured Products causing physical bodily injury or death to humans or animals."  (Policy at 23.)

have been subject to Accidental Contamination [or Government Recall]." (Id. at 12, 24.) Insurers denied coverage under the Government Recall provision on the ground that Foster's destruction of its product did not constitute a "recall" because, they argue, a recall applies only to products that had first left Foster's control. (Lavella Decl. Exs. 12, 14.)

Foster voluntarily destroyed the product produced on January 7 and 8. Because the NOS was issued before Foster's alleged "recall," and not in conjunction with or following it, Foster may claim coverage only under Item (1) of the provision. Foster's "recall" arose directly from FSIS's determination that there was a reasonable probability that Foster's chicken product at the Facility could cause serious adverse health consequences. Aside from product that was produced exclusively in Plant 2 on January 8, FSIS rejected Foster's request for marks of inspection on all remaining product produced at the Facility on January 7 and 8, on the ground that Foster did not provide substantial evidence the product was unadulterated. (Id. Ex. 7 at 1.)

Foster argues that because the term "recall" should be interpreted as "cancel" or "revoke," the term encompasses the voluntary destruction of Insured Product that did not leave Foster's possession. Insurers contend that the term "recall" is unambiguous and applies only to product that has left Foster's control. They argue that no "recall" occurred because the destroyed product never left Foster's possession or entered commerce.[8] Both parties contend that their definitions comport

---

[8]    Insurers rely on the definition used in FSIS Directive

18

with the plain and ordinary meaning of the term "recall."

Foster's broader interpretation of "recall" is logical when read in the context of the Policy's other provisions.  The word "Recall" in "Recall Expenses" appears to be defined as "recalling, withdrawing, reworking, destroying or replacing" Contaminated Products, i.e., products subject to Accidental Contamination or Government Recall.  (Lavella Decl. Ex. 1 at 12, 14, 24.)  Foster could thus get coverage for Recall Expenses if it voluntarily (1) destroys product that would lead to "bodily injury, sickness, disease or death," regardless whether they were still in Foster's possession, or (2) destroys product because FSIS determined that it has a reasonable probability of causing serious adverse health consequences.  If the product is in Foster's possession at the time it is destroyed, Insurers' interpretation would allow for coverage under the first fact

8080.1 and incorporated in Foster's federally-mandated Recall Program.  (O'Connor Dep. at 185:7-186:1, 186:24-187:10; Wolff Decl. Ex. J ("Recall Program"); Ex. K.)  The definition states that a "recall" is the voluntary removal of product from commerce when there is reason to believe that it is adulterated under the PPIA.  (Recall Program at 630 (emphasis added).)  The definition also states that it does not include a "stock recovery," which is "the removal or correction of product that has not been marketed or that has not left the direct control of the firm."  (Id.)

The court is not bound, however, to apply a regulatory definition to construe a policy term.  See Mostow v. State Farm Ins. Cos., 668 N.E.2d 392, 394-95 (N.Y. 1996); City of Albany v. Standard Acc. Ins. Co., 165 N.E.2d 869, 874 (N.Y. 1960); Ins. Co. of N. Am. v. Godwin, 361 N.Y.S.2d 461 (App. Div. 1974).  In addition, a multifaceted term that is undefined in an insurance contract "is not given a narrow, technical definition by the law."  Michaels, 651 N.E.2d at 1273 (citation).  "It is construed, rather, in accordance with its understanding by the average person who . . . relates it to the factual context in which it is used."  Michaels, 651 N.E.2d at 1273 (citation and alterations omitted).

pattern, but deny it under the second.  This construction would appear inconsistent in the context of the entire Policy because the benefits under Accidental Contamination and Government Recall are otherwise congruent throughout much of the Policy.  Foster's interpretation is thus a reasonable one.

An interpretation is also reasonable if it gives effect and meaning to the terms in a contract.  <u>Mellon Bank</u>, 31 F.3d at 115.  Several Loss categories appear to contemplate coverage if Foster destroys product that is still in its possession.  "Gross Profit" considers variable costs that are saved from not selling the destroyed product.  "Recall Expenses" anticipate the costs of destroying "packaging and labeling material that cannot be reused," which reasonably applies to product not yet sold.  (<u>Id.</u> at (Q)(viii).)  "Pre-Recall Expenses" are defined as the costs of ascertaining whether Foster's product is contaminated and the potential effects of such contamination.  It is reasonable that Foster would conduct this inquiry on product that is still in its control.  And because Pre-Recall Expenses focus only on the act of ascertaining, one could reasonably infer that any action Foster takes after that, including destroying the product if it is contaminated, constitutes a "recall."

Insurers' more restrictive construction could also be supported by the Policy's language.  Recall Expenses subpart (Q)(ii) suggests that recalling a product may be synonymous with withdrawing it--an action likely taken when the product has already left Foster's possession.  Subpart (Q)(vii) covers costs incurred by retailers, wholesalers, and distributors acting on

behalf of Foster.   Thus, it refers to costs associated with products that have already entered commerce.   Subpart (Q)(x) governs Foster's costs for replacing or reimbursing the value of Contaminated Products already in customers' possession.   From the Policy's language, a reasonably intelligent person could infer that "recall" applies only to product that has been sold and left the Facility.   Insurers' interpretation is thus also not unreasonable.

Although Insurers could have expressly done so, they did not limit the definition of "recall" to products that left Foster's possession.   "Where the risk is well known and there are terms reasonably apt and precise to describe it, the use of substantially less certain phraseology, upon which dictionaries and common understanding may fairly differ, is likely to result in interpretations favoring coverage rather than exclusion." Vargas v. Ins. Co. of N. Am., 651 F.2d 838, 841 (2d Cir. 1981) (citation omitted).   Because the term "recall" is reasonably subject to more than one interpretation, it is "deemed to be ambiguous and thus interpreted in favor of the insured."   Fed. Ins. Co., 965 N.E.2d at 936.   As a result, the court concludes that Foster's destruction of its chicken product constituted a recall under the terms of the Government Recall provision. Accordingly, the court must grant Foster's motion for summary judgment and deny Insurers' motion for summary judgment as to Foster's claim for coverage under the Government Recall provision.

D. Foster's Motion to Strike

21

Foster moves to strike the deposition testimony and opinions offered by two of Insurers' expert witnesses, Thomas James Hoffman and Dr. William James.  Foster also requests that the court exclude these witnesses' trial testimony.  Because the court did not rely on the witnesses' testimony or opinions in this Order, the court denies Foster's motion to strike as moot for purposes of summary judgment.

As to trial, Foster's request is a premature motion in limine.  It is the court's practice to provide a schedule for all matters relating to the trial in the Final Pretrial Order.  With regard to the propriety of motions in limine, counsel are advised that such motions are to be reserved only for those matters that cannot be resolved during the course of trial and for which the bell truly cannot be "un-rung."

All other legal points can be sufficiently addressed in the trial briefs, and the court generally hears Daubert motions during the trial while the expert is on the stand and can be questioned about considerations relevant to the court's ruling.  See, e.g., Betts v. City of Chicago, 784 F. Supp. 2d 1020, 1023 (N.D. Ill. 2011) ("[E]videntiary rulings should [ordinarily] be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context.") (citation and alterations omitted).  The court will therefore deny Foster's request to exclude the witnesses' trial testimony without prejudice to the matter being addressed in the parties' trial briefs and any necessary motions in limine being refiled after the Final Pretrial Conference.

22

IT IS THEREFORE ORDERED that:

(1) Foster's motion for partial summary judgment on its declaratory relief claim (Docket No. 46) be, and the same hereby is, GRANTED;

(2) Insurers' motion for summary judgment on both of Foster's claims (Docket No. 47) be, and the same hereby is, DENIED; and

(3) Foster's motion to strike (Docket No. 54) be, and the same hereby is, DENIED as moot as to summary judgment and DENIED without prejudice as to trial.

This Order supersedes and replaces the court's previous Order of October 9, 2015 (Docket No. 59), 2015 WL 5920289, nunc pro tunc.

Dated:  January 20, 2016

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE