1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                      EASTERN DISTRICT OF CALIFORNIA

10                            ----oo0oo----

11
FOSTER POULTRY FARMS, INC.,        Civ. No. 1:14-953 WBS SAB
12
                Plaintiff,         MEMORANDUM OF DECISION
13
14        v.

15   CERTAIN UNDERWRITERS AT
     LLOYD'S, LONDON,
16
                Defendant.
17

18                            ----oo0oo----

19          After conducting a four-day bench trial, hearing

20   extended closing arguments, and considering the parties' post-

21   trial briefing, the court finds in favor of plaintiff Foster

22   Poultry Farms, Inc. ("Foster") on its breach of contract claim in

23   the amount of $2,706,398.00.  This memorandum constitutes the

24   court's findings of fact and conclusions of law pursuant to

25   Federal Rule of Civil Procedure 52(a).

26   I.   Factual and Procedural Background

27          Foster is a poultry producer with its largest chicken

28   processing plant in Livingston, California.  The Livingston

1   facility is comprised of two processing areas ("Plant 1" and

2   "Plant 2") that share a common packaging floor.  Defendant

3   Certain Underwriters at Lloyd's, London, issued a product

4   contamination insurance policy to Foster that was effective May

5   25, 2013 to May 25, 2014 (the "Policy").  (Ex. 1 ("Policy").)

6   The Policy is governed by New York law.

7           On October 7, 2013, the United States Department of

8   Agriculture Food Safety and Inspection Service ("USDA" or "FSIS")

9   issued a Public Health Alert after 278 illnesses had been

10  reported due to a continuing salmonella outbreak.  (Ex. 261.)

11  The Public Health Alert warned consumers that "consumption of

12  Foster Farms brand chicken and other brand chicken produced by

13  Foster Farms plants [were] the likely source of this outbreak of

14  Salmonella Heidelberg infections."  (Id.)  It is undisputed that

15  the Public Health Alert significantly affected Foster's

16  reputation and sales, but Foster does not claim coverage for any

17  losses sustained as a result of the Public Health Alert in this

18  action.

19          On January 8, 2014, the FSIS issued a Notice of

20  Suspension ("NOS") that suspended the assignment of its

21  inspectors at the Livingston facility and withheld marks of

22  inspection for chicken produced there.  (Ex. 4 ("NOS").)  The

23  FSIS issued the NOS because of "egregious insanitary conditions

24  observed . . . whereby products produced at [the] facility may

25  have been rendered adulterated in violation of the Poultry

26  Products Inspection Act."  (Id. at 1.)  As a result of the NOS,

27  the FSIS denied Foster's request to apply marks of inspection to

28

2

1  1.3 million pounds of chicken produced at the Livingston facility

2  on January 7 and 8, 2014.

3        After the FSIS approved Foster's Verification Plan in

4  response to the NOS, the FSIS verbally placed the NOS in abeyance

5  on January 10, 2014 and sent a written "Notice of Suspension Held

6  in Abeyance" ("Abeyance Notice") on January 13.  Foster resumed

7  operations in Plant 2 on January 11 and 12 and completed two full

8  production shifts.  Late in the morning on January 12, Foster

9  voluntarily ceased operations at the Livingston facility and did

10  not resume operations until January 22, 2014.

11        Foster submitted a coverage claim with defendant for

12  over $12 million in losses purportedly incurred as a result of

13  the NOS.  Foster claimed coverage under the Policy's Accidental

14  Contamination and Government Recall provisions, but defendant

15  denied Foster coverage under both provisions.  Foster then

16  instituted this action for declaratory relief and breach of the

17  insurance contract.

18        The parties filed cross-motions for summary judgment on

19  Foster's declaratory relief claim to resolve whether Foster was

20  entitled to coverage under the Policy.  In its Amended Order

21  granting Foster's motion for summary judgment and denying

22  defendant's motion for summary judgment, which is herein

23  incorporated by reference, the court found that Foster was

24  entitled to coverage as a matter of law.  (Jan. 20, 2016 Am.

25  Order (Docket No. 117).)  The court first held that the January

26  8, 2014 NOS and the conditions described in it constituted an

27  Insured Event under the Accidental Contamination provision.

28

1  (Id. at 9:6-16:14.)  Alternatively, the court concluded that

2  Foster's destruction of the 1.3 million pounds of chicken as a

3  result of the NOS constituted an Insured Event under the

4  Government Recall provision.  (Id. at 16:15-22:27.)

5        The parties proceeded to a bench trial before the

6  undersigned to determine Foster's loss under the Policy.  Because

7  the court already found that Foster is entitled to coverage under

8  the Policy, it is entitled to judgment in its favor on its breach

9  of contract claim if it sustained loss covered by the Policy.

10  The Policy defines "Loss" the same for the Accidental

11  Contamination and Government Recall provisions, and Foster is

12  seeking the same damages under either coverage provision.

13  Because the January 8, 2014 NOS essentially resulted in a single

14  Insured Event entitling Foster to damages under either coverage

15  provision and Foster seeks the same damages under either

16  provision, the court need not distinguish between the Accidental

17  Contamination and Government Recall provisions for purposes of

18  these findings of fact and conclusions of law.

19  II.  Analysis

20        A.   The "Insured Event"

21        A pivotal dispute between the parties is whether the

22  Insured Event extends for the entire duration the Livingston

23  facility was not processing chicken from January 8 to 22.  Foster

24  contends there was a single shutdown from January 8 to 22 and

25  that this entire period constitutes the Insured Event.

26  Defendant, on the other hand, argues that if the Insured Event

27  was the initial shutdown mandated by the NOS as the court found

28

4

1    at summary judgment, the second voluntary shutdown Foster elected

2    to impose is not part of that Insured Event.

3           1.  <u>The NOS and Abeyance Notice</u>

4           The USDA issued the five-page NOS to Foster on January

5    8 and thereby withheld marks of inspection and suspended the

6    assignment of inspectors at the Livingston facility.  (NOS); <u>see</u>

7    <u>also</u> 9 C.F.R. § 500.1(c) ("A 'suspension' is an interruption in

8    the assignment of program employees to all or part of an

9    establishment.").  As the grounds for the NOS, the USDA stated:

10

11          This action is initiated based on egregious insanitary
            conditions  observed  in  your  establishment  whereby
12          products  produced  at  your  facility  may  have  been
            rendered  adulterated  in  violation  of  the  Poultry
13          Products  Inspection  Act  (PPIA)  .  .  .  .  This  is
            evidenced  by  findings  of  an  infestation  of  live
14          cockroaches  in  and  around  your  production  areas,  that
            created  insanitary  conditions,  and  demonstrate  that
15          your  firm  failed  to  maintain  an  effective  pest  control
            program  and  other  sanitary  controls  to  assure  that
16          wholesome,  unadulterated  meat  and  poultry  products  are
            produced  at  your  facility.
17

18   (NOS at 1.)

19          The USDA informed Foster in the NOS that FSIS

20   inspection personnel had found "live cockroaches at the hand wash

21   sink directly across from Inspection Station 7, line 2" while

22   slaughter operations were in progress.  (<u>Id.</u> at 2.)  The NOS

23   further memorialized four occasions on which the USDA had issued

24   notices of noncompliance based on its discovery of live

25   cockroaches in production areas.  (<u>See</u> <u>id.</u> (indicating that the

26   FSIS found live cockroaches (1) on January 7, 2014 "during

27   production on a grey plastic tub that is a direct product contact

28

5

surface"; (2) on December 28, 2013 "during production to the left of the faucet of Inspection Station 7"; (3) on November 4, 2013 "during production next to the sanitizer dispenser box, which is located on the wall next to the ice machine"; and (4) on September 14, 2013 "during production on the floor between the liver tumbler/belt wall").)

In the NOS, the USDA informed Foster that the "suspension will remain in effect until such time as you provide adequate written assurances of corrective and preventative measures to assure that meat and poultry products will be produced under sanitary conditions in accordance with the Poultry Products Inspection Act and the regulations promulgated there under."  (Id. at 4); see also 9 C.F.R. § 500.5 ("FSIS may hold a suspension in abeyance and allow the establishment to operate under the conditions agreed to by FSIS and the establishment.").

Foster "submitted [its] first response" to the NOS via email that same day.  (Ex. 9 at 1.)  After a "thorough review and evaluation" of Foster's "first submittal," the Alameda District Office of the USDA ("ADO") determined that "additional information and clarification was needed in order to determine regulatory compliance."  (Id.)  The ADO had conference calls with Foster on January 8 and 9 to "discuss the items of concern." (Id.)

On January 10, Foster submitted its "second response via email to the NOS" to address the ADO's concerns and inquires. (See id. at 1-3.)  The ADO had a further conference call with Foster "to discuss the remaining items that required

6

clarification," and Foster "provided an addendum to [its] second submittal" that same day.  (Id. at 3.)

On January 10, the ADO verbally notified Foster that it would hold the NOS in abeyance.  The following day, on January 11, Foster resumed operations in Plant 2 and ran two full production shifts and started a third shift early Sunday morning on January 12.  During the time Plant 2 was in production, Foster employees found two dead or dying cockroaches in a production area of Plant 2.  Specifically, at 11:27 p.m. on January 11, Foster employees sighted a cockroach "in the pinning area behind the hock nicker" and, at 12:38 a.m. on January 12, Foster employees sighted a cockroach on the "evisceration wall between the evisceration and chiller."  (Ex. 27 at 1.)  Approximately ten hours later, at 10:37 a.m., Foster's plant manager at the Livingston facility, Ronald O'Bara, decided to "temporarily cease operations."  (Id.)

That same day, O'Bara notified the ADO District Manager, Dr. Yudhbir Sharma, in writing of the two sightings in the production area of Plant 2 and of Foster's decision to temporarily cease operations.  (Id.)  In that same letter, O'Bara informed Dr. Sharma that "the corrective actions" taken in response to the sightings "were sufficient to maintain sanitary conditions."  (Id.)  He assured Dr. Sharma that the chicken produced was safe for sale and consumption:

> All sightings reported as part of the Internal Pest Control Management Program did not pose a risk to product for the following reasons:
>
> • Plant 2 was monitored continuously throughout

7

the production shifts.

- Sightings were identified on non-food contact sites.

- Corrective actions were immediately implemented to ensure containment within the specific area.

(Id. at 2.)  It is undisputed that the USDA approved the 1.25 million pounds of chicken produced on January 11 and 12 for sale and that Foster sold it.

In the detailed Abeyance Notice dated January 13, the USDA stated, "On January 12, 2014, your plant management notified the ADO of your intent to voluntarily stop operations to implement further interventions."  (Ex. 9 ("Abeyance Notice") at 3.)  As the grounds for holding the NOS in Abeyance, however, the USDA informed Foster:

> Based on your written and verbal commitments provided on January 8, 2014, through January 10, 2014, in response to the NOS, the ADO has determined that your establishment has provided adequate corrective actions to address the noncompliance identified in the NOS. Therefore, we have decided to hold the Notice of Suspension in Abeyance to afford your establishment the opportunity to implement your proffered corrective actions and preventative measures.  This confirms the verbal notification provided to you on January 10, 2014, by the FSIS Alameda District Office.

(Id.)

    2.   The Insured Event Does Not Include the Second
         Voluntary Shutdown

It is undisputed that when the USDA sent the Abeyance Notice on January 13, it knew Foster had found two dead or dying cockroaches in a production area and had chosen to cease its operations.  Nonetheless, the USDA expressly limited its grounds for placing the suspension in abeyance on the "written

8

1  and verbal commitments provided on January 8, 2014, <u>through</u>

2  <u>January 10, 2014</u>, in response to the NOS." (<u>Id.</u> (emphasis

3  added).)  Significantly, the USDA referenced the January 10 date

4  in its Abeyance Notice directly after it recognized that Foster

5  had notified it of Foster's "intent to <u>voluntarily</u> stop

6  operations to implement <u>further interventions</u>" on January 12.

7  (<u>Id.</u> (emphasis added).)  The USDA did not identify the voluntary

8  closure on January 12 or any further interventions as grounds for

9  holding the NOS in abeyance.

10       None of the evidence at trial establishes that the

11  USDA's decision to place the NOS in abeyance was dependent on or

12  influenced by Foster's decision to voluntarily cease operations

13  on January 12.  The court therefore finds that the USDA did not

14  rely on Foster's decision to voluntarily cease operations or

15  complete any "further interventions" communicated on January 12

16  when deciding that Foster's Verification Plan was sufficient to

17  place the NOS in abeyance.  Foster was thus entitled to begin

18  processing chicken upon the USDA's verbal abeyance of the NOS.

19       Despite the written correspondence showing that the

20  USDA issued the Abeyance Notice with knowledge of the two

21  cockroaches found in a production area on January 12, Foster

22  claims the USDA employees had orally informed Foster that it

23  would be shut down if the USDA found another cockroach.  Foster's

24  head of quality control and health and safety, Dr. Robert

25  O'Connor, testified that after operations ceased on January 12,

26  he called Dr. Sharma for directions.  According to Dr. O'Connor,

27  Dr. Sharma orally warned him that if the USDA found a live, dead,

28

1    or dying cockroach in a production area, the USDA would suspend

2    Foster's operations.  O'Bara also testified that Dr. Gregory

3    Abreu, an inspector for the ADO, told him on January 11 that the

4    USDA would shut Foster down if the USDA found a cockroach, even

5    if it was outside of a production area.

6         As a threshold matter and as the court made clear to

7    counsel at trial, the court cannot consider these hearsay

8    statements for the truth of the matters asserted.  See Fed. R.

9    Evid. 801(c).  Given the weight Foster sought to attribute to

10   these undocumented conversations at trial,[1] it is surprising that

11   Foster did not at least attempt to secure the testimony of Dr.

12   Sharma or Dr. Abreu for trial.

13        Nonetheless, even if the court considers these oral

14   statements when evaluating Foster's state of mind and what it

15   believed the USDA would do upon finding another cockroach, Foster

16   has not met its burden of showing that the USDA would have

17   actually shut it down or that Foster actually believed the USDA

18   would shut it down if it found one more cockroach, especially if

19   that cockroach was not in a production area.

20        As previously discussed, the USDA knew Foster had found

21   two cockroaches in a production area on January 12 and

22   nonetheless approved that chicken for sale and issued the

23   Abeyance Notice.  It is not reasonable to infer that the USDA

24   would not place any significance on cockroaches reported to it

25   but would suspend the facility immediately if its inspectors, not

26   Foster, found a single cockroach.

27   _____

28   [1]   In its post-trial briefing, Foster seems to distance
     itself or cease relying on this testimony.

1       The evidence at trial also revealed that Foster and the

2   USDA understood that the "seek and destroy" method memorialized

3   in Foster's lengthy Verification Plan would cause cockroaches to

4   come out of their harborages and would not achieve immediate

5   success.  The uncontroverted evidence from Dr. O'Connor and

6   O'Bara was that that Foster understood its proposed remediations

7   in the Verification Plan would take two to three weeks.  This is

8   consistent with the Verification Plan, which represented that

9   Foster would apply "comprehensive treatments" for two weeks,

10  inspect "Insect Monitoring Devices" for two weeks, and

11  "continuously monitor Plant 1 and 2 for the next three weeks."

12  (Ex. 208 at FOSTER 0020105.)  It strains reason to believe that

13  the USDA thoroughly reviewed and approved a Verification Plan

14  that it knew would cause cockroaches to come out of their

15  harborages and would require two to three weeks to implement, but

16  then changed course one day later and decided that a single

17  cockroach sighting required an immediate closure of the facility.

18  The court is also not persuaded that Foster was able to determine

19  that a plan it believed would take two to three weeks was

20  entirely failing on only its second day of implementation.

21      The Verification Plan also stated, "The action

22  threshold was modified so that identification of one cockroach on

23  an Insect Monitoring device in a production area will require

24  corrective actions."  (Id.)  The court infers that the USDA

25  considered the action threshold significant in approving the

26  Verification Plan because the Abeyance Notice memorialized that

27  the "FSIS required clarification on the threshold for escalation

28

11

and treatment." (NOS at 3.) Foster therefore represented, and the USDA approved, that the sighting of a single cockroach in a production area would "require corrective actions." (Ex. 208 at FOSTER 0020105.) Nothing in the Verification Plan or Abeyance Notice even remotely suggests that the "corrective action" Foster or the USDA anticipated was the complete closure of the facility. To the contrary, the Verification Plan explains that if the pest control operator found a cockroach on an insect monitoring device, the area "will be re-inspected and treated as appropriate" and the "treatments will be documented on service reports and reviewed with plant management at the time of service." (Ex. 208 at FOSTER 0020109 (emphasis omitted).) The USDA was thus aware of the possibility that cockroaches would be found in a production area and agreed to a plan that treated the area with insecticide upon finding a cockroach without any suggestion that a plant shutdown would be required.

It is also undisputed that the cockroaches found on January 12 were dead or dying. Dr. Sharma's alleged oral statement that the USDA would treat dead or dying cockroaches the same as live cockroaches is inconsistent with the USDA's repeated reference to "live" cockroaches in the NOS. If the USDA did not attribute some significance to the fact that a cockroach is alive, it seems unlikely that they would repeatedly refer to the finding of "live" cockroaches in the NOS. (See NOS at 1-2.)

Furthermore, the controlling regulations, which ensure that the USDA comports with due process in suspending a facility, do not empower a single USDA employee to abandon the procedures

1    outlined in the regulations and make rogue decisions as to

2    whether a facility can remain open.  For example, while the USDA

3    can suspend a facility without notice, see 9 C.F.R. § 500.3, it

4    is required to give prompt written notice to the facility that

5    includes particular information.  See id. § 500.5(a) ("If FSIS

6    takes a withholding action or imposes a suspension, the

7    establishment will be notified orally and, as promptly as

8    circumstances permit, in writing.  The written notification will:

9    (1) State the effective date of the action(s), (2) Describe the

10   reasons for the action(s), (3) Identify the products or processes

11   affected by the action(s), (4) Provide the establishment an

12   opportunity to present immediate and corrective action and

13   further planned preventive action; and (5) Advise the

14   establishment that it may appeal the action as provided in §§

15   306.5 and 381.35 of this chapter.").)

16        Moreover, while the USDA may take a lesser regulatory

17   control action because of "[i]nsanitary conditions or practices,"

18   id. § 500.2, it can suspend a facility without prior notice based

19   on insanitary conditions only if the "[s]anitary conditions are

20   such that products in the establishment are or would be rendered

21   adulterated."  Id. § 500.3.  The court does not believe that a

22   company as sophisticated as Foster would accept without challenge

23   the decisions of one or two USDA employees outside the scope of

24   their authority and inconsistent with controlling regulations.

25        Nor is Foster's effort to paint its decision to cease

26   operations on January 12 as mandated by threats from the USDA

27   consistent with the numerous and repeated statements it made on

28

13

1   January 12 and the following weeks emphasizing that its decision

2   to close the facility was "voluntary."  For example, in its

3   memorandum to employees on January 12, Foster indicated it had

4   "voluntarily and temporarily put operations at [the] Livingston

5   [facility] . . . on hold" and that it was "choosing to dedicate

6   additional time" to its preventative plan.  (Ex. 212.)  Foster

7   placed the same emphasis on the voluntariness of its decision in

8   a press release and notices to its customers.  (Ex. 209; Ex. 211

9   at 2-3; see also Ex. 212 at 4 (email from Ron Foster on January

10  16 addressing the "self-imposed shutdown").)

11          The evidence also does not persuade the court that the

12  USDA believed the two cockroaches found in the production area on

13  January 12 in Plant 2 resulted or would result in adulterated

14  chicken.  Not only did Foster assure the USDA that "corrective

15  actions were sufficient to maintain sanitary conditions," (Ex. 27

16  at 1), the USDA necessarily agreed because it issued its marks of

17  inspection for all chicken produced on January 11 and 12 despite

18  the presence of cockroaches.  See 21 U.S.C. § 456(b) ("The

19  Secretary shall refuse to render inspection to any establishment

20  whose premises, facilities, or equipment, or the operation

21  thereof, fail to meet the requirements of this section.").  It is

22  disingenuous for Foster to argue that the sighting of the two

23  cockroaches in the production area was of such grave concern and

24  mandated an immediate closure of the facility when Foster assured

25  the USDA that the chicken was not affected by the cockroaches and

26  should be approved for sale.

27          The court therefore finds that the USDA did not require

28

1   Foster to cease operations after it placed the NOS in abeyance on

2   January 10 and Foster could not have reasonably believed that it

3   was required under the NOS to cease operations in light of the

4   two cockroaches found on January 12 or the ongoing cockroach

5   infestation.  The Insured Event is thus limited to the first

6   shutdown imposed by the NOS and does not include the second

7   shutdown that Foster voluntarily imposed.

8            3.   The Second Voluntary Shutdown Does Not Come Within

9                 the Accidental Contamination Coverage Provision

10          Foster also argues that the voluntary closure to

11  "employ more effective pest control measures" nonetheless

12  constitutes "the Insured Event of Accidental Contamination"

13  because the same unsanitary conditions that gave rise to the NOS

14  continued to persist.  This argument seeks to broaden the Insured

15  Event beyond the terms of the Policy.

16          The Policy defines Accidental Contamination as an

17  "error" in the production, processing, or preparation of any

18  Insured Products "provided that" their use or consumption "has

19  led to or would lead to bodily injury, sickness, disease or

20  death."  (Policy § 4.A.)  At summary judgment, the parties

21  strongly disagreed about what the Policy required Foster to show

22  to establish that the consumption of chicken "would lead to"

23  bodily injury or sickness.  As a matter of contract

24  interpretation, the court concluded that "[t]he Policy must [] be

25  interpreted to require a showing of something less than an

26  absolute certainty of bodily injury or sickness from eating the

27  erroneously produced chicken."  (Jan. 20, 2016 Am. Order at 12:4-

28

7.)  After discussing possible reasonable interpretations, the court held that "erroneously produced chicken 'would lead to' bodily injury or sickness if the government determines the chicken cannot be sold because it may cause bodily injury or sickness or the plaintiff shows that bodily injury or sickness is likely or reasonably probable as a result of consumption."  (Id. at 13:18-23.)

The FSIS's finding "that the 'egregious insanitary conditions' resulted in the production of chicken that was 'prepared, packaged, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health'" was therefore crucial to the court's determination that the NOS constituted an Insured Event.  (Id. at 12:15-19 (quoting NOS at 1, 3).)[2]  Absent that finding, Foster could not have shown that the chicken subject to the NOS "would lead to" bodily injury or sickness.

Foster cannot, however, extract the explicit finding made in the NOS and subsequently apply it simply because the cockroach infestation continued to exist.  The undisputed evidence at trial was that the USDA determined that the Verification Plan provided adequate assurances to the USDA that

_____

[2]    Although in the NOS the FSIS repeatedly stated that the chicken "may have become" contaminated, the controlling regulations actually mirrored the Policy's requirement of a finding that products "are or would be rendered adulterated."  See 9 C.F.R. § 500.3 ("Sanitary conditions are such that products in the establishment are or would be rendered adulterated.").  This only strengthens the court's conclusion at summary judgment that the finding in the NOS satisfied the Policy's Accidental Contamination requirement that "the use of consumption of such Insured Products has led to or would to" bodily injury or sickness.  (Policy § 4.A.)

16

the chicken produced would not lead to bodily injury or sickness. Foster did not put forth a single piece of evidence from which the court could find that the chicken produced after the NOS was placed in abeyance "would lead to" bodily injury or sickness. Although it argues it had "the understanding that FSIS had determined that any chicken processed under such unsanitary conditions would be deemed 'adulterated' and unfit for human consumption," the USDA's approval of the chicken produced on January 12 despite its knowledge of the cockroaches in the production area defeats this argument. Any suggestion that Foster actually believed the chicken produced after the NOS was held in abeyance was adulterated is belied by Foster's assurances to the USDA that the chicken produced on January 12 was safe for consumption.

Foster's invocation of public policy is also misplaced. Foster argues that it should not have been forced to process chicken unless and until the FSIS reinstated the NOS in order for coverage to be triggered. Foster neglects to reconcile this concern with the fact that it assured the USDA that the chicken produced on January 12 under the very "unsanitary conditions" it claims required immediate closure was safe to sell. (Ex. 27; accord Ex. 30 (January 12 memorandum notifying its employees of the voluntary shutdown and assuring them that "[n]o product, packaging or line was in any way affected"). If Foster truly believed that the chicken it produced on January 12 was "adulterated" because of the cockroach infestation, it would have violated federal law when it assured the USDA the chicken was

safe and then sold it to the public.  <u>See</u> 21 U.S.C. §

458(a)(2)(A) ("No person shall . . . sell . . . any poultry

products which are capable of use as human food and are

adulterated or misbranded at the time of such sale . . . ."); <u>see</u>

<u>also</u> 21 U.S.C § 453(g)(4) (defining "adulterated" to include

product that has been "prepared, packed, or held under insanitary

conditions whereby it may have become contaminated with filth, or

whereby it may have been rendered injurious to health").

     Foster has not and cannot argue that preventative

measures taken to avoid the risk of an Insured Event are covered

under the Policy.  Nor has Foster cited authority articulating a

strong public policy against an insurance agreement like the one

in this case that covers certain events, but does not cover costs

incurred to prevent those very events.  <u>See generally</u> <u>Int'l</u>

<u>Techs. Mktg., Inc. v. Verint Sys., Ltd.</u>, Civ. No. 1:15-2457 GHW,

2016 WL 344977, at *7 (S.D.N.Y. Jan. 27, 2016) ("Where an

agreement is unambiguous, as it is here, its reasonableness is

beside the mark.  Although plaintiff may regret the terms that it

plainly agreed to, [a]bsent some violation of law or

transgression of a strong public policy, the parties to a

contract are basically free to make whatever agreement they wish,

no matter how unwise it might appear to a third party." (internal

citation and quotation marks omitted)).[3]  Even assuming that the

_____

     [3]  In the order granting Foster's motion for summary
judgment, the court relied on public policy when <u>interpreting</u> the
language of the Policy and rejecting defendant's argument that a
product must first be put into commerce and injure someone before
triggering coverage.  (<u>See</u> Jan. 20, 2016 Am. Order at 11:14-
12:3.)  The court did so in the context of interpreting what the
plaintiff had to show in order to prove that a product "would

18

1   closure to fumigate was in the best interest of the public or a

2   good business decision, public policy cannot be used to re-write

3   the terms of a policy under the circumstances of this case.

4          Accordingly, because there was no evidence that chicken

5   produced after the NOS was placed in abeyance would lead to

6   bodily injury or sickness, the court finds that the second

7   voluntary closure was not an Insured Event of Accidental

8   Contamination.

9       B.   Loss Under the Policy

10         Under New York law, "the insured has the burden of

11  proving that the claimed loss falls within the scope of the

12  policy." Atl. Cas. Ins. Co. v. Value Waterproofing, Inc., 918 F.

13  Supp. 2d 243, 257 (S.D.N.Y. 2013).  To carry this burden,

14  plaintiff must put forth credible evidence and cannot rely on

15  mere speculation, conjecture, or unfounded assumptions.

16         In this case, both parties sought to prove the

17  coverable loss under the Policy through expert witnesses.  After

18  hearing the testimony of both experts, the court finds that in

19  general defendant's expert, Michael Diliberto III, provided more

20  credible and reliable calculations and analyses of the claimed

21  losses in this case.  For example, Diliberto relied on generally

22  accepted accounting principles (GAAP), which provide a tangible

23  means for understanding and evaluating the principles and methods

24  he utilized.  (Cf. Policy § 7.G(iv) ("[I]n determining the amount

25  of any covered Loss the Underwriters shall apply standard

26  _____

27  lead to" bodily injury or sickness.  There was no credible
    evidence at trial that Foster or the USDA thought the chicken
    produced after the NOS was placed in abeyance "would lead to"

28  bodily injury or sickness.

1   accounting principles as recognized by the relevant regulatory

2   authorities in the Insured's jurisdiction.").)  Foster's expert

3   Ned S. Barnes, on the other hand, indicated that he utilized only

4   "commonly accepted accounting principles," which are not as

5   defined as GAAP and thus give the court less confidence in or

6   understanding of the basis for his opinions.  (Ex. 271 at 5.)

7         The testimony at trial also revealed that Barnes almost

8   entirely accepted the calculations Foster's Chief Financial

9   Officer provided him and did not meaningfully test the

10   reliability of her calculations.  While it became clear during

11   discovery that the parties hotly disputed whether losses incurred

12   from the second shutdown were covered under the Policy, and

13   Diliberto explicitly addressed this issue and provided

14   alternative calculations that excluded those losses in his expert

15   report, Foster never requested Barnes to offer alternative

16   calculations based on this significant distinction.  For all of

17   these reasons and after observing both experts testify during

18   trial, the court gives greater weight to the calculations and

19   opinions proffered by Diliberto.

20         Foster is entitled to seek only those losses covered by

21   the Policy, which the Policy defines in relevant part as

22   "reasonable and necessary expenses incurred by the Insured . . .

23   and which arise solely and directly out of [the] Insured Event."

24   (Policy § 2.)  "Solely" means "without another" and "to the

25   exclusion of all else."  Merriam-Webster Online Dictionary,

26   http://www.merriam-webster.com (last visited Feb. 2, 2016).

27   Directly means "in a direct manner" and "in immediate physical

28

1    contact."  Id.

2         Although the court has found that the Insured Event

3    concluded when the NOS was placed in abeyance, Foster argues that

4    it is still entitled to recover losses sustained during the

5    second shutdown because the second shutdown itself arose solely

6    and directly out of the Insured Event.  The court will first

7    address this argument and then consider the specific losses

8    Foster seeks.

9              1.   The Second Voluntary Shutdown Did Not Arise Solely

10                  and Directly Out of the Insured Event

11        To be covered under the Policy, Foster's decision to

12   voluntarily cease operations on January 12 must arise "solely and

13   directly" out of "the NOS and the conditions described in it."

14   (Jan. 20, 2016 Am. Order at 16:9-11 (emphasis added).)  Foster

15   attempts to suggest that any losses would be covered if they

16   arose solely and directly out of the "NOS or the unsanitary

17   conditions of the Facility described therein."  (Pl.'s Post-Tr.

18   Brief at 8:5-6 (emphasis added).)  The court's January 20, 2016

19   Amended Order makes clear that, absent the FSIS's finding in the

20   NOS that the chicken would lead to bodily injury or sickness, the

21   unsanitary conditions described in the NOS could not have

22   amounted to Accidental Contamination under the Policy.  (See Jan.

23   20, 2016 Am. Order at 11:5-13:22.)  Foster therefore cannot

24   simply extract the unsanitary conditions described in the NOS and

25   broadly treat the cockroach infestation as the Insured Event.

26        For the reasons previously discussed, the NOS did not

27   require Foster to cease operations on January 12 and the FSIS's

28

                                21

1   Notice of Abeyance was not dependent on Foster's decision to

2   voluntarily cease operations.  Nor was the FSIS's decision to

3   place the NOS in abeyance conditioned upon Foster's commitment to

4   undertake any efforts, such as fumigation, that were not

5   identified in the Verification Plan.  Because neither the NOS nor

6   the Abeyance Notice required Foster to cease operations on

7   January 12, it is hard to imagine how Foster's voluntary and

8   independent decision to cease operations can be considered to

9   have arisen solely and directly out of the Insured Event.

10         Foster nonetheless argues that its voluntary shutdown

11  and the fumigation "were necessary to . . . comply with the

12  federal regulations, as required and directed by the FSIS in the

13  NOS."  (Pl.'s Post-Trial Br. at 10:5-7.)  In the Abeyance Notice,

14  the USDA reminded Foster of its independent responsibility to

15  ensure that its facility complied with sanitary regulations:

16          You are reminded that as an operator of a federally
          inspected facility, you are expected to comply with
17          FSIS regulations and to take appropriate actions to
          prevent the production or shipment of contaminated or
18          adulterated product.  The regulations require
          establishments to take appropriate action(s) when
19          either the establishment or FSIS identifies regulatory
          non-compliance or that the plant's sanitation, HACCP
20          or other systems may be ineffective.
21

22  (Abeyance Notice at 4 (emphasis added).)  This warning simply

23  reiterates the existing regulations that governed Foster as an

24  operator of a federally inspected facility.

25         Foster acknowledges that it is governed by the Poultry

26  Products Inspection Act, which requires that Foster maintain its

27  facilities "in accordance with such sanitary practices, as are

28  required by regulations promulgated by the Secretary for the

1   purpose of preventing the entry into or flow or movement in

2   commerce or burdensome effect upon commerce, of poultry products

3   which are adulterated."  21 U.S.C. § 456(a); see also 21 U.S.C. §

4   458(a)(2)(A) ("No person shall . . . sell . . . any poultry

5   products which are capable of use as human food and are

6   adulterated or misbranded at the time of such sale . . . .").

7   Even in the absence of the NOS, Foster was required to maintain

8   its facility in a sanitary condition and was prohibited from

9   selling chicken it believed was adulterated.  That the NOS

10   reminded Foster of its obligation to comply with existing laws

11   and regulations that governed it regardless of the NOS cannot

12   establish that Foster's decision to cease operations arose solely

13   and directly out of the NOS.

14           Although the NOS was undoubtedly a factor leading to

15   Foster's decision to voluntarily cease operations, additional

16   evidence at trial confirmed that it was not the sole factor.  For

17   example, there was substantial testimony from which the court

18   infers that, by January 12, Foster realized the infestation was

19   much worse than it originally believed and that its pest control

20   operator, Orkin, was not performing adequately.  The evidence at

21   trial showed that Foster was concerned about the possibility of

22   another government shutdown if the USDA discovered the extent of

23   the infestation.  Not only was the NOS and cockroach infestation

24   receiving media attention, the evidence at trial showed that at

25   the time it decided to voluntarily cease operations, Foster was

26   still recovering from the damage it suffered as a result of the

27   unrelated Public Health Alert from October 7, 2013.  The court

28

1  finds that Foster made the deliberate and calculated business

2  decision to voluntarily cease operations in an effort to repair

3  and preserve its brand.

4          This business decision is reflected in Foster's

5  numerous press releases and communications that repeatedly

6  emphasized that its decision was "voluntary" and that Foster was

7  "choosing to dedicate additional time to ensuring its

8  preventative plan is fully realized with the most effective

9  technology and treatments available."  (Ex. 209 (emphasis

10  added).)  These communications with the public also reflect a

11  conscious effort to emphasize Foster's family values in the hopes

12  of saving and rebuilding the brand's image.  (See, e.g., id.

13  ("Foster Farms President Ron Foster said, 'On behalf of my

14  family, I made a commitment to making this right . . . . Foster

15  Farms is a company that strives for excellence.'"); Ex. 211 at 2

16  ("On behalf of the company and the thousands of good, dedicated

17  people in our Central Valley workforce, I want to assure you that

18  we are fully committed to making this right.").)

19          Foster's communications to its employees, customers,

20  and public during the second shutdown also show that Foster was

21  striving to do more than what the government required.  For

22  example, Foster explained it was ceasing operations to "further

23  expand our USDA-approved safe manufacturing procedures and

24  monitoring systems" and was using the time to "properly implement

25  new measures" to ensure "the most stringent and effective

26  treatment protocols in place."  (Ex. 212; accord Exs. 209, 211 at

27  2 (providing the same explanation in the January 12 press release

28

24

1    to the public and notices to customers).)  In a January 13 email,

2    Foster's Senior Vice President of Human Resources explained that,

3    "[o]ut of an abundance of caution," Foster decided to "initiate[]

4    an intense remediation" to ensure the "facility would exceed

5    sanitary standards approved by the USDA."  (Ex. 212 at 3

6    (emphasis added).)  It is hard to believe that Foster felt

7    compelled to shut down and engage in significantly more extreme

8    methods in response to the NOS when it repeatedly emphasized that

9    it was choosing to go above and beyond what was required.

10         There was also evidence and suggestions from both sides

11   that it was not simply the two cockroaches found on January 12

12   that led to the voluntary closure, but the "many" other

13   cockroaches found that day that were not reported to the USDA.

14   The testimony gave rise to the inference that Foster elected to

15   voluntarily shut down before the government or the public

16   realized the extent of the infestation at the Livingston

17   facility.

18         While the NOS and Notice of Abeyance were undoubtedly

19   looming over Foster when it decided to cease operations on

20   January 12, the court finds that its concern for doing the least

21   damage to its brand while eradicating the facility-wide

22   infestation was the key consideration leading to its decision to

23   voluntarily cease operations.  Accordingly, Foster has not

24   carried its burden of proving that the second shutdown arose

25   solely and directly out of the NOS and conditions described in

26   it.

27              2.   Items of Loss Foster Seeks Under the Policy

28

                                25

1         Foster seeks loss under the Policy for "Recall

2  Expenses," "Loss of Gross Profit," and "Increased Cost of

3  Working."  The court will address each category of loss in turn.

4               a.   <u>Recall Expenses</u>

5         The Policy provides coverage for Recall Expenses, which

6  it defines in relevant part as:

> The following costs and expenses reasonably and
> necessarily incurred by the Insured arising solely and
> directly out of an Insured Event for the purpose of or
> in connection with recalling, withdrawing, reworking,
> destroying or replacing Contaminated Products:
>
> i)  expenses of communications including . . . public
> relations specialist;
>
> ii) transportation costs in recalling and / or
> withdrawing Contaminated Products;
>
> vii) costs incurred by the Insured for the physical
> examination, reworking, relabeling, and / or
> destruction and disposal of Contaminated Products,
> including the destruction and disposal of packaging
> and labeling materials that cannot be reused.

18  (Policy § 4.Q.)  Foster seeks and defendant does not dispute the

19  award of Recall Expenses in the amount of **$11,733** in landfill

20  fees to dispose of the chicken produced on January 7 and 8 and

21  **$7,500** in trucking fees to move that chicken to the landfill.

22         Foster also seeks $74,791 in public relations ("PR")

23  expenses and introduced the itemized invoice from its PR firm.

24  The invoice describes the numerous tasks the firm completed in

25  response to the "LIVINGSTON PLANT SHUTDOWN: JANUARY 8-22, 2014."

26  (Ex. 100.)  While the invoice reflects a total of 443.5 hours,

27  the firm charged the lump sum of $74,791 for those hours without

28  attributing the time spent to the tasks described in the invoice

or indicating when the discrete tasks were completed.  It is therefore impossible for the court to distinguish the PR expenses that arose solely and directly out of the Insured Event from those that were incurred, at least in part, from the second shutdown.  Diliberto opines that only $14,958 arose solely and directly out of the first shutdown and the remaining $59,833 are attributable to the second shutdown, which he calculated "based on a pro-rata share of the monthly invoice."  (Ex. 267 at 5.)  The amount Diliberto attributes to the first shut down is approximately 20% of the total PR expenses.

The court does not doubt that Foster would have continued to incur PR expenses after the NOS was held in abeyance even if Foster never voluntarily ceased operations because the public concern over the NOS would have continued past the Abeyance Notice.  Nonetheless, while the court believes attributing 20% of the total PR expenses may be a low estimate, Diliberto was the only witness who undertook to isolate PR expenses that arose solely and directly out of the Insured Event.  Neither Foster nor its expert attempted to distinguish which charges arose solely and directly out of the Insured Event or requested the PR firm to delineate tasks between the Insured Event and voluntary shutdown.  Because Foster has the burden of proof and the only evidence before the court is that the PR expenses arising solely and directly out of the Insured Event are limited to **$14,958,** the court will award Foster that amount.

b.  <u>Loss of Gross Profit</u>

"Loss of Gross Profit" under the Policy includes the

loss "incurred as a result of an actual and ascertainable
reduction in the Insured's sales revenue caused solely and
directly by an Insured Event."  (Policy § 4.J.)  In calculating
Loss of Gross Profit, the Policy provides:

> iii) Loss of Gross Profit shall be assessed by the
> Underwriters based on an analysis of the profits
> generated by the Contaminated Products, and other
> Insured Products, which lost sales as a direct result
> of the Insured Event, during each month of the twelve
> months prior to the Insured Event, and taking into
> account:-
>
> a) the reasonable projection of the future
> probability of such Contaminated Products and other
> affected Insured Products had no Insured Event
> occurred, and
>
> b) all material changes in market conditions of
> any nature whatsoever, including but not limited to
> changes in population, consumer tastes, seasonal
> variations and competitive environment, which would
> have affected the future marketing of and profits
> generated by the Contaminated Products or other
> affected Insured Products.
>
> iv) in determining the amount of any covered Loss the
> Underwriters shall apply standard accounting
> principles as recognized by the relevant regulatory
> authorities in the Insured's jurisdiction.

(Id. § 7.G(iii)-(iv).)

### 1.    Destroyed Chicken

It is undisputed that Foster's inability to sell the
1.3 million pounds of chicken that the USDA refused to approve
for sale arose solely and directly out of the Insured Event.  The
loss attributed to this chicken is $536,352 for the chicken sent
to the landfill; $504,434 for the chicken processed in the
rendering plant; and $6,914 for rendered chicken that had to be

1  sent to the landfill.  While Diliberto does not dispute those

2  claimed values, he excluded them from his calculations because he

3  did not believe they came within any of the Policy's definitions

4  of Loss.  (See Ex. 267 at 9.)  However, defendant concedes and

5  the court agrees that it would be reasonable to conclude that the

6  cost of the 1.3 million pounds of chicken is an element of

7  "revenue that would have been reasonably projected" under the

8  Policy's definition of Loss of Gross Profit.  The court will

9  therefore award Foster **$1,047,700**[4] in loss of gross profit based

10  on the 1.3 million pounds of chicken that did not receive the

11  USDA's marks of inspection pursuant to the NOS.

12                2.  Downgraded Product

13          According to the evidence at trial, Foster produces

14  organic and conventional chicken and is able to sell organic

15  chicken at a higher profit margin.  While the Livingston facility

16  was not processing chicken in January, Foster elected to process

17  organic chicken as conventional chicken.

18          The reason Foster elected to process organic chicken as

19  conventional chicken while the Livingston facility was not

20  operating was not entirely clear at trial.  Dr. O'Connor

21  testified that only the Livingston facility was certified to

22  process organic chicken, thus organic chicken processed at the

23  Cherry and Belgravia facilities could not be certified as

24  organic.  Other testimony suggested that processing organic

25  _____

26          [4]   Although Diliberto's trial exhibit and defendant's
   post-trial briefing indicates the amount is $1,047,650 (see Ex.

27  298; Def.'s Resp. Post-Trial Br. at 5:11), the court based the
   total on the amounts itemized in Diliberto's expert report, (see

28  Ex. 267 at 9).

                              29

1   chicken is a slower process and requires that the organic chicken

2   be entirely segregated from conventional chicken during

3   processing.  Because processing organic chicken for sale as

4   organic would have decreased production, witnesses explained that

5   Foster comingled the organic and conventional chicken in order to

6   process the greatest quantity of chicken in the shortest amount

7   of time.   When called as a rebuttal witness, Foster's Chief

8   Financial Officer, Caryn Doyle, explained for the first time that

9   Foster might have had to euthanize birds if it slowed down

10  production in order to process organic chicken.

11           Despite the apparently inconsistent reasons provided,

12  none of the evidence suggested that it was an unreasonable

13  business decision to process the organic chicken as conventional

14  chicken or that doing so did not mitigate Foster's damages.  If

15  the lost revenue from processing and selling organic chicken as

16  conventional chicken arose solely and directly out of the Insured

17  Event, the court finds that the revenue lost from doing so would

18  be recoverable as a loss of gross profit under the Policy.

19  Barnes opined that downgrading the organic chicken and processing

20  it as conventional chicken caused Foster to lose $866,381 in lost

21  revenue, which he calculated based on the difference between the

22  sales value of the product had it been produced as organic and

23  the actual sales value for conventional chicken.

24           The court cannot determine from the evidence presented

25  at trial, however, what amount of organic chicken was downgraded

26  to conventional solely and directly as a result of the Insured

27  Event.  Not only is it possible that all or most of the chicken

28

1  was downgraded during the second shutdown, Barnes also indicates

2  that "Foster incurred similar losses on downgraded organic

3  product at the Livingston facility in the period after the

4  facility resumed operation."  (Ex. 271 at 9.)  Diliberto opined

5  that, with the exception of $3,726 arising solely and directly

6  out of the Insured Event, the remainder of the claimed loss is

7  attributable to the second shutdown "based on the overall

8  duration of the shutdown" and thus is not covered under the

9  Policy.  (Ex. 267 at 5.)  Because Foster did not submit any

10 evidence challenging this allocation, the court will award

11 plaintiff only **$3,726** for its claimed loss of gross profit

12 resulting from downgrading its organic chicken.

13                    3.   <u>Unfilled Orders</u>

14            Barnes opines that as a result of both shutdowns,

15 Foster was unable to fill a substantial number of firm orders for

16 chicken.  Diliberto explained at trial and in his report why he

17 believes Barnes' calculations significantly overestimate the loss

18 of gross profit from unfilled orders, which were primarily based

19 on additional labor savings that Barnes did not consider in his

20 calculations.  (See id. at 12-13.)  After these adjustments,

21 Diliberto calculates that the loss of gross revenue from unfilled

22 orders is $1,276,397 and attributes $346,164 of that amount as

23 arising solely and directly out of the Insured Event, with the

24 remainder attributable at least in part to the second shutdown.

25 Because the court finds that Diliberto's calculations are more

26 reliable, the court will award plaintiff **$346,164** in loss of

27 gross profit based on unfilled orders.

28

                                31

1

### 4.   Customer Claims and Credits

2      Foster also seeks loss of gross profit in the amount of

3  $264,569 for customer credits and claims resulting from the

4  shutdowns.  Diliberto accepted the claimed valuation of the

5  customer claims, but opined that only $54,241 arose solely and

6  directly out of the Insured Event, with the remaining

7  attributable at least in part to the second shutdown.  Foster did

8  not undermine the accuracy of this allocation.  The court will

9  therefore award Foster **$54,241** in loss of gross profit for

10 customer claims and credits.

11

### 5.   Sales Ads

12      Foster seeks $42,804 in loss of gross profit

13 attributable to the incremental volume of sales that Foster

14 expected to achieve from a number of specific ad programs that it

15 had booked, but had to cancel because of the shutdowns.  Foster's

16 Vice President of Retail Sales, Kevin Mooney, explained at trial

17 that Foster canceled these promotional ads because it could not

18 supply the necessary product without the ability to process at

19 the Livingston facility.  While Mooney's testimony sufficiently

20 established that Foster canceled ads because of its limited

21 ability to process chicken as a result of the shutdowns, there

22 was no testimony or evidence showing that the necessity to cancel

23 those ads arose solely and directly out of the Insured Event and

24 not the second shutdown.  Diliberto does not dispute the claim

25 calculation, but opines that these losses were not covered

26 because there was no documentation showing that the cancelled ads

27 were related to the shutdowns or when these ads were created or

28

1  cancelled.  Because plaintiff did not carry its burden on this
2  issue, the court cannot award it loss of gross profit
3  attributable to any canceled ads.

4                     6.   Commodity Sales

5          Foster also seeks $512,082 for loss of gross profit
6  incurred as result of certain birds that would have been utilized
7  to fill customer orders but were redirected to the commodity
8  market.  (Ex. 270 at 15.)  A loss of gross profit based on having
9  to sell chicken on the commodity market is consistent with the
10  undisputed evidence at trial that chicken sold on the commodity
11  market is sold for significantly less per pound than chicken sold
12  on the retail market.  (See Jan. 13-14, 2016 Tr. at 14:14-18,
13  109:17-18.)  Diliberto explained at trial that he nonetheless
14  excluded these losses because he did not believe there were
15  adequate records to support them, and the court finds this
16  testimony credible.

17          Moreover, Mooney repeatedly testified that Foster
18  resorts to the commodity market only when it has "excess product"
19  that it otherwise could not sell on the retail market.  (Id. at
20  11:1-12, 14:7-13.)  Mooney also explained, however, that one of
21  the leading problems from both shutdowns was that Foster was not
22  able to process enough chicken and had to short customers.

23          Although he referred to potential excess product, none
24  of Mooney's testimony is consistent with commodity sales arising
25  solely and directly out of the Insured Event.  While he testified
26  that Foster had a "surplus" of chicken after losing the Ralphs
27  business, the sales to Ralphs were not that substantial and

28

                              33

Mooney explained that Foster offered discounts "to move the product and avoid it going to the commodity market." (Id. at 42:13-18 (emphasis added).) He also testified that Foster continued to offer discounts in January and early February of 2014 because it was still trying to move the excess product it had after Kroger canceled its business because of the Public Health Alert in October 2013 without giving Foster the customary 12-week cancellation time. (Id. at 26:17-23, 41:7-14.)

Not only is it inconsistent for Foster to have incurred significant losses from having to sell excess chicken on the commodity market at the same time it was having to short customers, the evidence suggests that any excess Foster had was a result of canceled orders from the earlier Public Health Alert, not the Insured Event. Foster has thus failed to carry its burden to show that any commodity sales resulted in an "actual and ascertainable" loss of gross profit that arose solely and directly out of the Insured Event. (See Policy § 4.J.)

### 7.   Winco's Early Exit

Foster also seeks over $1 million as a result of Winco's alleged decision to cease ordering certain chicken products sooner than it had agreed because of the NOS. Jonathan Foster, who handled Foster's account with Winco, testified that Winco had decided before the Insured Event to discontinue its "ValBest" line of product with Foster, in part due to the packaging format Foster offered. Jonathan Foster testified, however, that Winco had agreed to a 12-week exit of the business before the NOS. Mooney explained that the dynamics of the live

34

1   chicken business require about a 12-week lead time before Foster

2   can fulfill a significant new business or withdraw a contracted

3   business, and thus it was standard for customers to commit to a

4   12-week exit of the business.  (Jan. 13-14, 2016 Tr. at 15:21-

5   16:4, 17:7-17:12.)

6        Despite Jonathan Foster's credible testimony that Winco

7   had previously committed to a 12-week exit, he testified that

8   when the NOS was issued on January 8, Winco's representative

9   informed him that it would no longer commit to the 12-week exit

10  and would cease doing business with Foster within 10 days.  (See

11  Ex. 274 at 2 (Jan. 9, 2014 email) ("[W]e will be moving forward

12  with the transition to Sanderson Farms . . . . In light of the

13  last days events we feel that it is imperative that we do so as

14  quickly as possible and plan on making that change effective

15  1/19.").)  Based on Winco's non-hearsay statements evidencing its

16  intent to provide a 12-week exit and then retracting that

17  commitment in light of the NOS, the court finds it more likely

18  than not that Foster's loss of 9 weeks of committed sales from

19  Winco arose solely and directly out of the Insured Event.

20       While Diliberto does not dispute the total pounds

21  attributable to Winco's early exit, he contends that the profit

22  margin used to calculate the loss was inflated.  At trial,

23  however, Doyle testified in rebuttal that the reduced variable

24  margin that Diliberto relied on accounted for a credit Foster

25  applied to the Winco account in period 13.[5]  The credit was for

26

27       [5]   Foster does not account for its sales by month, but
    utilizes 13 periods per year.  Period 13 thus included the credit
28  issued in December.

1  chicken Winco destroyed after the Public Health Alert and not for

2  discounted pricing of chicken sold in December 2013 or January

3  2014.  Doyle explained that considering that credit in

4  calculating Foster's actual variable margins artificially lowered

5  the resulting variable margin.

6           The court finds Doyle's undisputed testimony on this

7  question credible.  A substantial credit to Winco in period 13 is

8  also consistent with Diliberto's report, which notes that

9  Foster's prices were about 23% lower for period 13 than the

10 prices Barnes used in his calculations and the actual variable

11 margin for that period showed a net loss of 14.74%.  (Ex. 267 at

12 14.)  His schedules are also consistent with a credit in period

13 13 as he computes the standard variable margin as a loss of

14 $245,113 in period 13, versus standard variable margins as gains

15 of $295,017 in period 11, $270,524 in period 12, and $329,506 in

16 period 1 of 2014.  (Ex. 269 at Schedule 11; see also Ex. 51

17 (showing Foster's calculation of the loss of gross profit on the

18 Winco claim).)  The court therefore finds that Diliberto's

19 calculation of the loss of gross profit from Winco's early exit

20 is not reliable and  will award plaintiff the loss of gross

21 profit that Barnes calculated of **$1,107,550** based on Winco's

22 early exit.

23                    8.  Kroger Business

24           Plaintiff also seeks $2,577,625 in loss of gross profit

25 attributable to its loss of sales to the Kroger "banners."  The

26 undisputed evidence at trial was that the Kroger banners of Food

27 4 Less, Foods Co, and Fry's ceased ordering chicken from Foster

28

                              36

after the Public Health Alert and had not resumed orders before the Insured Event. Foster nonetheless contends that, absent the "shutdowns and cockroach infestation," those stores would have resumed doing business again with Foster. The evidence Foster submitted in support of this claim is far too speculative and cannot sustain its burden of proving its loss by a preponderance of the evidence.

In response to the "tremendous" media coverage from the Public Health Alert and the significant impact it had on Foster's business, Mooney met "with every single customer numerous times" in the months following the Public Health Alert trying to regain lost business. (Jan. 13-14, 2016 Tr. at 23:7-9, 25:17.) When the NOS was issued on January 8, Mooney was actually visiting Kroger's headquarters in Cincinnati, Ohio, and gave a "two-hour presentation . . . about the success of [Foster's] brand at Ralphs, the reintroduction at Ralphs and also the progress that [Foster] was making in the plants regarding salmonella." (Id. at 28:19-23.) Mooney was also meeting with Food 4 Less and Foods Co during that time, which were headquartered in Compton, California, and "retain[ed] independent decision-making" from Kroger. (Id. at 21:21-24, 27:25-28:15.)

Mooney testified that before the issuance of the NOS, he had been making "positive inroads" toward regaining Food 4 Less, Foods Co, and Fry's and was "optimistic" they would start purchasing from Foster again. (Id. at 31:22-32:-13.) He thought Foster had been making "good progress at Ralphs" with the limited return of some products in December and that the return to Ralphs

1  "was leading hopefully to other good things."  (Id. at 34:5-7.)

2  All of Mooney's beliefs about the prospect of regaining these

3  Kroger banners was based on what he was "hoping" or "expecting."

4  (See id. at 31:22-25, 32:11-13, 34:5-7, 47:6-19.)

5       The court does not question that Mooney genuinely hoped

6  and even expected Kroger to return.  As a good salesman, he had

7  to hold these beliefs to effectively do his job and convince

8  Kroger that it should return to Foster.  Foster, however, offered

9  no evidence elevating Mooney's beliefs to anything more than mere

10  conjecture.  His optimism about the success of his efforts and

11  the brand he represented cannot carry Foster's burden to prove it

12  was more likely than not that Food 4 Less's, Foods Co's, and

13  Fry's decisions not to return arose solely and directly out of

14  the Insured Event.

15       If Kroger really intended to return to Foster, the

16  court also would have expected Mooney to be discussing pricing

17  and quantities at the January 8 meeting in Cincinnati, not simply

18  making a presentation about all the efforts Foster had undergone

19  to address the salmonella problem.  In light of Mooney's own

20  testimony that a 12-week lead time is usually necessary for

21  "significant new business," it is also reasonable to infer that

22  Kroger would have indicated its intent to return well in advance

23  of even placing its first order.[6]  (See id. at 15:21-16:4.)

24  _____

25  [6]     Mooney testified that he did not take Foods Co and Food
4 Less out of Foster's sales forecasting, thus lead time might
26  not have been necessary for those companies.  He also testified,
however, that he left them in the forecasting because he was
27  "optimistic [Foster was] going to regain that business," not
because either company indicated it was going to start placing
28  orders.  (Id. at 75:7-24.)  At most, Kroger informed him that

Given what was at stake in this case, the court is surprised and frankly unimpressed that Foster did not call a single representative from Kroger to shed light on Kroger's actual intentions.  It is undisputed that Kroger ceased doing business with Foster because of the Public Health Alert and it is just as likely that it had not and would not have regained faith in Foster even in the absence of the Insured Event.  A plaintiff cannot carry its burden to prove "actual and ascertainable" loss by a preponderance of the evidence with speculation and optimism.  Accordingly, because Foster has failed to carry its burden of showing that any loss of gross profit from Fry's, Food 4 Less, and Foods Co arose solely and directly out of the Insured Event, Foster is not entitled to recover any of that loss under the Policy.

Unlike the other Kroger banners, Ralphs had started placing limited orders in December 2013 and January 2014 before the Insured Event.  (See id. at 30:8-9.)  Nonetheless, its orders were not yet regular or predictable and Mooney's optimistic expectations as to what Ralphs would have done in the future are similarly speculative.  Although Mooney testified that Ralphs ceased ordering from Foster immediately after the NOS, (id. at 30:10-16, 30:21-31:3, 34:3-5), he also testified that Kroger pulled Ralphs because Foster could not assure Kroger that it would not short Ralphs, (see id. at 29:17-22 ("And that was one of the biggest issues with Kroger, was by not having Livingston

"the rest of the business was still yet to be determined," (id. at 75:17), and the evidence was that Foods Co and Food 4 Less made their own independent decisions at that time, (id. at 21:21-24, 27:25-28:15).

1   on board, we couldn't promise Kroger that we wouldn't short

2   Ralphs, because we needed to treat all of the customers fairly.

3   And when they heard that, they kind of blew up, and that's why

4   they pulled us again from Ralphs.")).  He further testified that

5   it was difficult for him to differentiate between the loss of

6   sales due to the NOS versus the second shutdown because the

7   customers were "just concerned about the media and the fact that

8   we had to short orders and then redirect orders."  (Id. at 39:22-

9   40:10.)  The court finds it unlikely that Kroger's concerns about

10  Ralphs being shorted would have been as significant if Foster had

11  not imposed the longer voluntary shutdown.  In light of Ralphs'

12  sporadic orders before the Insured Event, Mooney's optimistic but

13  speculative beliefs about future orders, and Kroger's concerns

14  about Ralphs being shorted, the court cannot find that any loss

15  of gross profit from Ralphs arose solely and directly out of the

16  Insured Event.

17              9.    Albertsons Business

18              Foster also seeks a loss of gross profits in the amount

19  of $8,170 based on lost sales to Albertsons.  There was very

20  limited evidence and testimony about Albertsons at trial, but

21  Jonathan Foster testified that Albertsons ceased purchasing

22  organic birds from Foster as a result of the "NOS and Facility

23  shutdown."  (Pl.'s Post-Trial Br. at 21:18-19.)  This testimony

24  is insufficient because it fails to identify any loss arising

25  solely and directly out of the Insured Event, as opposed to the

26  voluntary shutdown.  From his review of the records, Diliberto

27  also explained that Albertsons "ultimately changed its supplier

28

1  of organic fresh chicken later in 2014 after the Livingston

2  shutdowns" and thus was still ordering right after the NOS.  (Ex.

3  268 at 11.)  The court therefore finds that Foster has not

4  carried its burden to show that Albertsons' decision to cease

5  ordering organic chicken from Foster arose solely and directly

6  out of any limited ability Foster had to process organic chicken

7  during the relatively short Insured Event.

8  10.  Incremental Labor Costs

9  Foster next seeks over $3 million for incremental labor

10  costs incurred to process and package as much product as possible

11  at the Cherry and Belgravia facilities during both the Insured

12  Event and the second shutdown.  The court agrees with Foster that

13  incremental labor costs can constitute a loss of gross profit

14  under the Policy because they cause "an actual and ascertainable

15  reduction in the Insured's sales revenue."[7]  (Policy § 4.J.)

16  As a threshold matter, Foster is not entitled to a

17  majority of its claimed incremental labor costs because they were

18  incurred as a result of the second shutdown and did not arise

19  solely and directly out of the Insured Event.  Even after setting

20  _____

21  [7]    The incremental labor costs might logically seem to
come under "Increased Costs of Working," which are the

22  "reasonable and necessary costs, excess of the ordinary cost of
conducting business had the Insured Event not happened . . . ."

23  (Policy § 4.F.)  Among the limitations the Policy places on
"Increased Costs of Working," however, the Policy requires that

24  such labor costs result in "additional expense of subcontracting
the manufacturing of Insured Products to a third party during the

25  restoration of the property."  (Id. § 4.F(iii) (emphasis added).)
Although the testimony at trial revealed that there was not a

26  third party Foster could have used that was within a
geographically feasible range to have mitigated Foster's losses,

27  the court cannot simply ignore this express and unambiguous
limitation in the Policy.

28

41

aside the sum attributable to the second shutdown, the parties
dispute the proper calculation of the incremental labor costs on
numerous grounds.  After considering the testimony at trial and
opinions of both experts on this issue, the court finds that
Diliberto provided the most credible and reliable calculation of
incremental labor costs and will therefore award plaintiff loss
of gross profit attributable to incremental labor costs in the
amount of **$11,457,** which is broken down as $4,638 for incremental
overtime labor by Foster employees at Belgravia and $6,819 for
incremental overtime labor by USDA employees that Foster
compensated at all three facilities.  (See Ex. 267 at  18.)

### c.   Increased Cost of Working

As "Increased Cost of Working," the Policy covers:

> The following reasonable and necessary costs, excess
> of the ordinary costs of conducting business had the
> Insured Event not happened, to restore only the
> Insured's property(ies) where the Insured Event
> happened in order to resume operations and which are
> devoted exclusively to the purpose of reducing Loss:
> (i) cleaning and /or repairing machinery and property;
> . . . .

(Policy § 4.F(iii).)  Although Foster seeks substantial losses
for remediation and clean-up expenses and supplies, Diliberto
testified and explained at trial how most of these costs were
incurred during the second shutdown.  (See Ex. 267 at 18-20; see
also Ex. 71 (detailing remediation services provided after the
Insured Event).)  Of those costs requested, Diliberto opined that
only $19,309 arose solely and directly out of the Insured Event,
and plaintiff did not produce any evidence to dispute this

1  allocation or sufficiently undermine the credibility of

2  Diliberto's reasons for excluding the remainder.

3          In his report, Diliberto excluded all pest control and

4  fumigation costs because he did not have a "clear understanding

5  of them" and correctly opined that most of the costs were

6  incurred during the voluntary shutdown.  The court agrees with

7  this assessment for all of the invoices, except the invoice of

8  $82,060 for Buzz Off Bugs Pest Control ("Buzz Off").  (Ex. 75 at

9  8-9)

10          The testimony at trial was that Buzz Off was providing

11  services in response to the Insured Event and the invoice from

12  that company itemized services by day.  Foster also identified

13  Buzz Off and Orkin as the service team in its Verification Plan.

14  Even if Foster did not voluntarily cease operations and implement

15  remediation efforts greater than what the USDA found sufficient

16  to assure the USDA that the chicken was not adulterated, Foster

17  would have still continued to incur pest control services under

18  the Verification Plan approved in the Abeyance Notice.  The

19  evidence also showed that a separate pest control company was

20  employed to fumigate the facility.  Thus the court finds it more

21  likely than not that the invoice from Buzz Off did not include

22  costs that went above and beyond the Verification Plan.  Foster

23  has thus carried its burden of proving that the remediation costs

24  of $82,060, (Ex. 75 at 8-9), billed by Buzz Off arose solely and

25  directly out of the Insured Event.

26          Foster also seeks $46,744 in increased costs of

27  utilities at Livingston and laboratory fees of $48,884.  Not only

28

43

1   does Diliberto attribute all of these costs to the second

2   shutdown, (see Ex. 267 at 20), the court was not persuaded that

3   any of these costs were in "excess of the ordinary costs of

4   conducting business had the Insured Event not happened," (Policy

5   § 4.F).  With the remaining losses Foster attributes to Increased

6   Cost of Working, such as security costs incurred at Livingston,

7   the court adopts Diliberto's assessments as to why those costs

8   are not recoverable under the Policy.

9        The court will therefore award Foster **$101,369** in

10  "Increased Cost of Working" for supplies and pest control

11  services that arose solely and directly out of the Insured Event.

12  III.  Conclusion

13       For the reasons stated herein, the court hereby finds

14  for Foster on its breach of contract claim and finds that Foster

15  suffered Loss in the amount of $2,706,398.00 covered by the

16  Policy.

17       This matter is set for oral argument on April 4, 2016

18  at 1:30 p.m. for the limited purpose of allowing the parties to

19  address the remaining issues of (1) whether Foster is entitled to

20  prejudgment interest; (2) how the $2 million retention under the

21  Policy should be treated; (3) whether defendant is entitled to

22  any offset from Foster's settlement with Orkin; and, if so, (4)

23  the amount of such offset.

24       IT IS SO ORDERED.

25  Dated:  February 11, 2016

    WILLIAM B. SHUBB
26  UNITED STATES DISTRICT JUDGE

27

28

44